**V I R G I N I A :**

## IN THE CIRCUIT COURT FOR THE COUNTY OF ALBEMARLE

| | |
|---|---|
| **ERRANDS PLUS INC. D/B/A RMA WORLDWIDE CHAUFFEURED TRANSPORTATION,** | ) ) ) ) |
| *Plaintiff,* | ) ) |
| **v.** | ) ) ) |
| **SIGNATURE FLIGHT SUPPORT LLC,** | ) ) ) |
| Serve: Corporation Service Company, R/A 100 Shockoe Slip Fl 2, Richmond, VA 23219 | ) ) ) ) |
| **AND** | ) ) |
| **SIGNATURE AVIATION SERVICES CORPORATION,** | ) ) ) ) |
| Serve: Corporation Service Company, R/A 100 Shockoe Slip Fl 2, Richmond, VA 23219 | ) ) ) ) |
| *Defendants.* | ) ) |

FILED
DATE /2-/7-25 TIME
CIRCUIT COURT CLERKS OFFICE
ALBEMARLE COUNTY
JON R. ZUG, CLERK
DEP. CLERK

CL25-2385-00

### VERIFIED COMPLAINT

Plaintiff Errands Plus Inc. d/b/a RMA Worldwide Chauffeured Transportation ("RMA"), by counsel, brings this Verified Complaint against Defendants Signature Flight Support LLC ("Signature Flight") and Signature Aviation Services Corporation ("Signature Corp.") (collectively, "Signature" or "Defendants"), (collectively, "Defendants"). RMA states as follows:

### INTRODUCTION

1.    Signature—a fixed-base operator ("FBO") that operates solely based on rights granted by various independent airport authorities via lease, including the Charlottesville-

1

Albemarle Airport Authority ("CAAA")—has instituted a ***total ban*** on RMA's presence at or use of Signature's leaseholds at all of Signature's airport leaseholds nationwide. Signature's sole motivation for this arbitrary, capricious, and total ban is to force RMA to take the fall for Signature's negligence, which resulted in substantial damage to a private jet then in the care, custody and control of Signature at the Charlottesville-Albemarle Airport ("CHO") over nine months ago.

2.      Signature's only purported reason for arbitrarily banning RMA from its leaseholds nationwide is a February 28, 2025 incident caused by Signature's negligence at CHO that resulted in damage to a private jet ("February 28 Incident" or the "Incident"). That is a pretextual excuse, and the record proves it. Signature was fully aware of the February 28 Incident the day it occurred, yet allowed RMA to continue to utilize its leaseholds for nearly ***nine months*** after the Incident before instituting its total ban on November 20, 2025. Therefore, neither the Incident itself nor RMA's purported involvement in the Incident triggered the ban.

3.      Instead, Signature's total ban is a blatant and brazen attempt to extract an admission of liability for the February 28 Incident (among other concessions) from RMA. Signature intends to leverage this duress-derived admission of liability in a federal court lawsuit filed by the owner of the private jet damaged as a result of Signature's negligence. *TELUS Communications, Inc. v. Signature Aviation Services Corporation*, No. 1:25-cv-01372 (D. Del. Nov. 11, 2025) (the "*TELUS* Litigation"). Significantly, it was only ***after*** Signature was sued in federal court on November 11, 2025, that Signature abruptly banned RMA from its leaseholds on November 20, 2025.

4.      Rather than allowing the *TELUS* Litigation to proceed in due course, Signature seeks an end-run: Signature, apparently unnerved that TELUS Communications Inc. ("TELUS") chose not to sue RMA in the *TELUS* Litigation, demands not only that RMA agree to informal

2

discovery (including what is, in effect, a deposition), but also demands a non-disclosure agreement, acceptance of liability by RMA, and a bevy of other unusual capitulations in exchange for lifting the arbitrary, manufactured total ban Signature has imposed.

5.      Signature's effort to wield the access granted to it by various airport authorities to gain a tactical advantage in litigation is wrong. It also gives rise to several legal causes of action and warrants immediate injunctive relief.

6.      To be clear, RMA has suffered and will continue to suffer irreparable and largely immeasurable harm. Each day that Signature blocks access to its leaseholds is another day that RMA's reputation in the private air-transport industry sustains damage, and failure to remove the ban will certainly lead to damage beyond repair. That is why RMA is filing an emergency motion for a temporary restraining order contemporaneously with this Complaint.

## PARTIES

7.      RMA is a Maryland corporation with its principal place of business in Rockville, Maryland.

8.      Signature Flight is a Delaware limited liability company with members domiciled in Florida, Delaware, and the United Kingdom. Signature was, and is, a flight support company, duly authorized to transact, and is transacting business in the Commonwealth of Virginia as a flight support company.

9.      Signature Corp. is a flight support company incorporated in the state of Delaware with its principal headquarters located in Orlando, Florida. Signature Corp. is authorized to do business in the Commonwealth of Virginia.

3

## JURISDICTION AND VENUE

10.     This Court has personal jurisdiction over Signature in this matter pursuant to Virginia Code § 8.01-328.1, because, among other things, this action arises from Signature's transaction of substantial, continuous and systematic business in the Commonwealth of Virginia, Signature contracts to supply services and things in the Commonwealth of Virginia, and Signature has caused tortious injury by an act or omission in this Commonwealth.

11.     This Court has subject matter jurisdiction pursuant to Virginia Code § 8.01-620 as circuit courts have jurisdiction to award injunctive relief.

12.     Venue is proper in this Court pursuant to Virginia Code § 8.01-262.

## BACKGROUND

13.     Signature is an FBO that operates a network of private aviation terminals, including a fixed base operation at CHO in Charlottesville, Virginia. Signature operates at more than 200 locations internationally, with over 100 locations in the United States alone.

14.     Among other things, Signature undertakes a duty to escort vehicles attempting to navigate Signature's leaseholds. Specifically, Signature escorts private vehicles, including buses and cars, to chauffeur passengers who are deplaning from private jets. Signature also offers long-term hangar space for corporate aircraft, short-term parking solutions for aircraft in travel, and a variety of other services.

15.     Signature is subject to Federal Aviation Administration ("FAA") standards, rules, obligations, and assurances ("Rules") imposed on Signature directly as well as a result of its status as an FBO with a lease agreement between it and CAAA (among other airport authorities around the country), including those that flow from CAAA's acceptance of Federal Airport Improvement Program ("AIP") funds under 49 U.S.C. § 47107 for use at the CHO.

4

16.    Signature's operations at public airports are authorized only as a result of lease agreements between airport authorities, or other sponsors of airports, and Signature, including the lease agreement between CAAA and Signature. Those lease agreements, on information and belief, subject Signature to comply with all applicable FAA Rules, including FAA Grant Assurances that accompany airports accepting AIP funds, which include mandated economic non-discrimination and uniform application of standards for admission to Signature's leaseholds. 49 U.S.C. § 47107; *see, e.g.*, Airport Sponsor Assurances (2025) 22(a), 22(h), 23, and 36; see also FAA Order 5190.6B (Airport Compliance Manual) (2025) ¶¶ 14.1, 14.2, 14.3 (Restrictions Based on Safety and Efficiency Procedures and Organization) and Advisory Circular 150/5190-8 (Minimum Standards for Commercial Aeronautical Activities) (2025) ¶ 1.2.2(Authority Vested in Airport Sponsors); *see also* **Ex. A**, Lease Agreement between CAAA and Signature ("Lease Agreement") ¶¶ 2.2, 2.16.[1] While Signature has some autonomy to control access as part of its operations, it is not free to do so unreasonably or in a discriminatory fashion. Signature has flouted these rules (and its agreements with various airports) by instituting a targeted, discriminatory ban against RMA without any basis.

17.    Signature often leases substantial space at airports where it operates, and then oversees all ingress, egress, safety, and management in those areas. As relevant here, Signature entered into an agreement to lease 646,602 square feet from CAAA to operate a general FBO. Lease Agreement ¶¶ 1.1, 2.1.

---

[1] The Lease Agreement names Piedmont Hawthorne Aviation, LLC d/b/a Landmark Aviation ("Piedmont Aviation") as the lessee. Piedmont Aviation is now owned by Signature and, therefore, Signature is bound by the Lease Agreement as a successor to the Lease Agreement and has continued to operate under it.

5

18.    RMA operates on Signature's property to service mutual clients. Among other services, RMA provides a private chauffeur service for passengers who are deplaning from private jets. RMA's operations are global in nature, and necessarily depend on the escort services offered by FBOs like Signature, both for purposes of accessing leaseholds and airfields and for purposes of safely navigating those leaseholds and airfields.

19.    Signature agreed, as part of the Lease Agreement, to "use its best efforts to provide . . . [a]ir taxi[s] and charter[s]" in such a manner "that will achieve the *highest* level of customer service and maximize profits." Lease Agreement ¶¶ 2.4(A), 2.8 (emphasis added).

20.    Signature has permitted RMA's vehicles and employees to enter its leaseholds for over 35 years.

21.    RMA, for its part, contracts with thousands of individuals and entities each year to guarantee fast, comfortable, and safe transportation on tarmacs worldwide. RMA's ability to perform under these contracts, and indeed its very business model, depends on the assumption that FBOs—like Signature—will not unduly interfere with RMA's rights of ingress and egress on leaseholds operated by those FBOs so that RMA can service its clients.

22.    RMA has built its brand on convenience, comfort, safety, and timeliness. When RMA's customers arrive on private jets, they know RMA will be waiting for them and that it will offer white-glove service dependent on the customers' needs, which often involves picking them up directly at the base of the ramp or elsewhere on Signature's leasehold, depending on the customer's needs. RMA then whisks its customers away to their next destination, without having to deal with the delays of navigating airports or transferring themselves or their equipment and luggage across multiple vehicles.

6

**Long After the February 28 Incident, Signature Contractually Guarantees RMA Access to Leaseholds Nationwide, Including Signature's CHO Leasehold**

23.    Up until October 2, 2025, Signature permitted RMA to access its leaseholds throughout the United States with no requirements that RMA even execute a release—and prior to the February 28 Incident, RMA had accessed Signature leaseholds thousands of times. Then, on October 2, 2025, Signature suddenly requested that RMA sign a release before it would allow it to access its leasehold at CHO, and RMA did so. In that document, a Third Party Vendor Release (the "Release Agreement"), Signature guaranteed RMA the right to access its CHO leasehold. **Ex. B**, Release Agreement ¶ 2.

24.    In the Release Agreement, Signature agreed that RMA "*shall enter* Signature's Premises" to "perform[] Service at the request of Signature or its *customer, Permittee, tenant, Aircraft owner, pilot or other designated representative*." *Id.* (emphases added).

25.    RMA's customers are necessarily Signature's customers, meaning RMA was entitled to enter Signature's leasehold at CHO "at the request" of RMA's customers. *Id.*

26.    At no point in time prior to execution of the Release Agreement (or in the month thereafter) did Signature indicate that RMA was unwelcome or otherwise barred from entering any of Signature's leaseholds throughout the country, and as such RMA continued to service its customers' needs at Signature leaseholds throughout the United States, both before and after execution of the Release Agreement.

27.    Pursuant to the terms of the Release Agreement, Signature guaranteed RMA the right to continue to enter Signature's leasehold at CHO in exchange for RMA indemnifying Signature per the terms of the Release Agreement. Until on or about November 20, 2025, RMA continued to operate its business as it had for approximately 35 years at Signature leaseholds.

7

28.    Signature never asked RMA to sign any similar release agreements in return for access at other Signature leaseholds, and RMA never refused or indicated any intention to refuse had such a request been made.

### Signature Abruptly Bans RMA From All of Its Terminals Worldwide

29.    In a sudden departure from 35 years of practice, on November 20, 2025, Signature abruptly informed RMA that RMA, its employees, its vehicles, its agents, and its subcontractors were banned from entering "any Signature Aviation leasehold nationwide." **Ex. C**, Signature's November 20, 2025 Letter at 1. Thus, since November 20, 2025, RMA has been banned from "seek[ing] entry to any Signature property or driv[ing] on any signature ramp." *Id.*

30.    Signature's total ban came on the heels of a lawsuit filed against Signature in the United States District Court for the District of Delaware on November 11, 2025. *See TELUS Litigation.* In that lawsuit, the owner of a private jet, TELUS, sued Signature for damage sustained by the private jet while it was parked at the Signature leasehold at CHO and in the care, custody, and control of Signature on February 28, 2025. **Ex. D**, Complaint, Dkt. 1, *TELUS Communications, Inc. v. Signature Aviation Services Corporation*, No. 1:25-cv-01372 (D. Del. Nov. 11, 2025) ("*TELUS* Complaint"). TELUS alleges that Signature's gross negligence caused the damage to its jet. *Id.* at ¶¶ 31-35.

31.    Oddly, although RMA is not a named party in the *TELUS* Litigation, Signature accompanied its total ban with a demand that RMA indemnify Signature for any loss claimed in the *TELUS* Litigation. **Ex C**, Signature's November 20, 2025 Letter at 1.

### Signature's Pretextual Excuse for the Total Ban

32.    Signature has not offered a direct reason for instituting the total ban of RMA.

33.    Signature appears to tether its total ban of RMA to the February 28 Incident.

8

34.    The February 28 Incident occurred *265 days* before Signature instituted the total ban.

35.    Signature was on notice of the February 28 Incident the day it occurred.

36.    To be clear, liability for the February 28 Incident will be determined in the *TELUS* Litigation. This lawsuit is not about the February 28 Incident. Because, however, Signature evidently relies on that Incident as an excuse for its total ban, the facts of the Incident are detailed below.

37.    The February 28 Incident resulted from Signature's negligence. *E.g.*, **Ex. D**, *TELUS* Complaint.

38.    On February 28, 2025, Signature's client, TELUS, parked a Gulfstream G550 (the "TELUS Gulfstream") at a private terminal operated by Signature at the CHO.

39.    The TELUS Gulfstream was taxied and parked at a private terminal under Signature's direction.

40.    At all relevant times, the TELUS Gulfstream was under Signature's care, custody and control.

41.    At approximately 2:00 a.m., RMA's charter bus chauffeur relied upon Signature's escort for access to the ramp and for direction receiving arriving passengers from another jet—an Embraer 190, which Signature had caused to be parked close to the TELUS Gulfstream.

42.    Signature directed RMA to travel between the two aircraft, which were parked 105 feet from wingtip to wingtip.

43.    Signature failed to provide any warning about the unlit TELUS Gulfstream.

44.    Signature failed to provide adequate lighting around the TELUS Gulfstream.

9

45.     Signature failed to provide flares or lights on the ground that would show where the TELUS Gulfstream's wingtip ended.

46.     Signature failed to inform RMA that the TELUS Gulfstream was on the tarmac.

47.     Signature failed to enlist a "wing walker" to walk to the end of the TELUS Gulfstream's wingtip and only provided one for the corresponding Embraer 190 wingtip.

48.     Signature's escort driver led RMA's charter bus chauffeur driver directly into the TELUS Gulfstream's wing.

49.     Signature failed to safely escort RMA's charter bus chauffeur driver.

50.     As a result of Signature's negligence, RMA's charter bus chauffeur driver collided with the right wing of the TELUS Gulfstream.

51.     RMA's charter bus and the TELUS Gulfstream sustained damage.

52.     After the collision, RMA's charter bus chauffeur driver was informed by Signature employees that Signature was short staffed and had recently brought on new, inexperienced employees.

53.     Immediately after the February 28 Incident, at least two of Signature's employees provided written statements and a police report was filed.

54.     Signature was on notice of the February 28 Incident the moment it occurred.

55.     Signature continued to allow RMA to utilize Signature's leaseholds at CHO and nationwide at all times until on or about November 20, 2025.

56.     Neither before nor after the February 28 Incident has an RMA employee been involved in a collision with an aircraft on a Signature-operated ramp or area.

10

**Signature Attempts to Force RMA to Accept All Responsibility and Liability for the
February 28 Incident Under Duress**

57.     Until November 20, 2025, Signature never claimed or asserted that RMA was responsible for or liable for the February 28 Incident.

58.     Between February 28, 2025, and November 20, 2025, Signature continued to allow RMA access to its leaseholds consistent with its prior practice.

59.     On November 11, 2025, TELUS sued Signature in federal court, alleging millions of dollars in damages resulting from Signature's negligence. *See* **Ex. D**, *TELUS* Complaint.

60.     RMA is not a party to the *TELUS* Litigation.

61.     After the *TELUS* Litigation was filed, Signature set its sights on RMA.

62.     Signature began by instituting the total ban on or about November 20, 2025.

63.     The total ban is not limited to CHO. The total ban applies to all Signature leaseholds nationwide, constituting approximately over 100 airports.

64.     Signature knew that the total ban would result in long-term damage to RMA's brand, customer relationships, and income stream. Signature had to know, because it knew that some of the customers who used its facilities were transported to and from those facilities by RMA.

65.     With the total ban in place, Signature began to demand numerous concessions from RMA.

66.     On November 20, 2025, Signature demanded that RMA provide a "full defense and indemnification" for the February 28 Incident. **Ex. C**, Signature's November 20, 2025 Letter.

67.     On November 20, 2025, Signature also demanded that RMA provide a "complete copy of every [insurance] policy that may afford coverage for the" February 28 Incident. *Id.* at 1.

11

## RMA Attempts to Reason with Signature

68.     RMA, surprised by Signature's unexpected total ban, responded on November 22, 2025, wherein RMA explicitly informed Signature that Signature's total ban was "intentionally interfering with [RMA's] contracts and business, and also unlawfully restraining" RMA's trade. **Ex. E**, RMA's November 22, 2025 Letter at 1. RMA requested that Signature lift the total ban immediately. *Id.*

69.     RMA also offered to execute a Third-Party Vendor Release for any Signature-operated facilities. *Id.* RMA further offered to provide applicable insurance policies for the February 28 Incident, and to provide a Certificate of Insurance for future events (items that Signature had never before requested). *Id.*

### Signature Refuses to Lift the Ban and Attempts to Take Advantage of the Manufactured Duress It Imposed on RMA

70.     On November 26, 2025, Signature responded to RMA's offers with more demands. **Ex. F**, Signature's November 26, 2025 Letter.

71.     Signature refused to lift the total ban, in contravention of the FAA uniformity and economic non-discrimination rules described above.

72.     Signature offered to lift the ban for just *six days* on a "temporary" basis, but only if RMA capitulated to extraordinary demands including that RMA:

   a.   Execute a prospective release and indemnity agreement;

   b.   Obtain insurance coverage of at least $5 million for incidents arising on Signature's properties;

   c.   Arrange for a call between counsel for TELUS to ask TELUS why TELUS did not sue RMA in the *TELUS* Litigation;

12

    d.  Arrange for an interview of RMA's driver who was involved in the February 28 Incident;

    e.  Waive all jurisdictional objections and accept third-party practice in the United States District Court for the District of Delaware in the *TELUS* Litigation;

    f.  Agree to $10,000 in liquidated damages for violating any of these requirements;

    g.  Provide written witness statements of RMA employees present during the February 28 Incident; and

    h.  Execute a non-disclosure agreement.

*Id.*

    73.  Signature's November 20 and November 26 demands represent a naked attempt to (a) leverage its leasehold grants to obtain an admission of liability from RMA where it has no such liability; (b) retaliate against RMA for refusing to capitulate to Signature's baseless demands; and (c) take advantage of the duress Signature manufactured in order to harm RMA's business.[2] *See id.*

---

[2] On December 5, 2025, Signature's counsel reiterated its position that Signature is "within its rights to impose and maintain its ban of RMA from its FBOs." **Ex. G**, Signature's December 5, 2025 Letter. In that letter, Signature maintained that the total ban would remain in place absent RMA's compliance with certain conditions and that, even if RMA complied with those conditions, Signature would *still* maintain total discretion to bar RMA from accessing its ramps and relegate RMA (and its customers) to curbside pickup. *Id.* That is obviously not what RMA's customers pay for. RMA's customers pay for convenience and accessibility, which includes seamless delivery to and from private aircraft parked on the airside (secured) side of Signature leaseholds at CHO and other airports. For example, a significant portion of RMA's services involve transporting band members and their *large, heavy* equipment to and from Signature's leasehold, making airside access, and property access generally, to pickup and drop-off customers imperative. More importantly, on information and belief, Signature has not made other chauffeur services' access to its ramps conditional on Signature's approval, again contravening the FAA Rules' uniformity requirements. Thus, RMA's counsel responded that Signature's "conditional offer" was "not consistent with [its] obligation to provide uniform access to companies like RMA that play a critical role in supporting aeronautical activity at [CAAA] and airports across the country,"

### Signature's Unlawful, Arbitrary Exclusion of RMA Threatens Irreparable Harm to RMA's Reputation, Goodwill, and Business Relationships

74.     RMA's customers depend on RMA to chauffeur them to their aircraft and pick them up when they deplane.

75.     Signature's total ban of RMA makes it near impossible for RMA to provide the services it has contractually agreed to provide to its customers when they land or depart from a Signature leasehold.

76.     Monetarily, the harm caused by Signature's misconduct is substantial. In the first eleven months of 2025, RMA's contractual revenue at Signature leaseholds alone exceeded $1,000,000. So long as the total ban is in place, that revenue cannot be generated.

77.     Much of the revenue and associated customers described above are part of larger mutual client relationships with RMA. For those broader, mutual client relationships, RMA's revenue exceeds $20,000,000 annually. All of those mutual client relationships are threatened by Signature's total ban.

78.     RMA's customers are paying for convenience. Part of that convenience is knowing that RMA can supply services to customers *anywhere*. Because Signature's total ban makes doing so impossible, it threatens RMA's contractual relationships not only with customers who have flown into or out of a Signature leasehold in the last year, but *any* RMA customer who needs assurance that RMA can chauffeur them no matter where they may land.

79.     RMA's reputation has also been damaged by Signature's total ban. Customers have been forced to arrange for alternative transportation upon arrival at Signature leaseholds. Customers have been told that RMA cannot chauffeur them on Signature leaseholds. Signature's

and reiterated that RMA intends to immediately file a complaint and emergency motion for temporary injunction if the ban is not removed. **Ex. H**, RMA's December 5, 2025 Response.

conduct has brought irreparable damage to RMA's brand and reputation, which is built on a guarantee that RMA will timely and without fail pick up its customers upon deplaning and deliver them for departure.

80.    Meanwhile, RMA's competitors have taken advantage of Signature's total ban by contacting RMA's customers to offer and arrange for alternative transportation.

81.    Just a few examples of these impacts are listed below:

    a.  At a Signature leasehold in Roanoke, Virginia in mid-November 2025, Signature informed American Airlines that RMA buses were barred from picking up the passengers. Indeed, Signature went so far as to claim that RMA was embargoed from all Signature locations. Signature's unilateral notice of a total ban on RMA's access to its leaseholds has raised concerns from American Airlines and other third parties regarding customer and operational impacts, inevitably pushing charter companies toward competitors. Worse, because air charter companies often select a chauffeur upon arrival, Signature's decision to inform air charter companies of its total ban of RMA means quantifying RMA's ongoing losses as a result of pushing air charters away from using RMA is extremely challenging.

    b.  In mid-November 2025, RMA had contracted with the University of Miami football team to provide transportation to and from the Signature leasehold at the Roanoke airport located in Roanoke, Virginia. Signature prohibited RMA's buses from entering the ramp upon arrival and departure of the aircraft transporting the University of Miami football team. RMA could not provide its standard level of services because it was barred from entering the ramp. Signature's ban resulted in considerable inconvenience and disruption for RMA's customers, who considered

15

canceling their return transportation. The University of Miami football team—and other teams impacted by Signature's total ban—are likely to pursue other, more convenient, chauffeur options for their future needs.

c.  RMA's competitors, seizing on knowledge that RMA is barred from all Signature locations, have begun targeting RMA's customers. For example, the General Manager of one of RMA's major competitors has begun soliciting RMA's *largest customer*, with revenues to RMA surpassing $6,000,000 a year. RMA's competitors use the fact that RMA is barred from Signature's leaseholds as a hook for their solicitation.

d.  Signature is *actively (and prospectively) informing* RMA's customers that RMA is barred from picking them up at Signature leaseholds. For example, on December 2, 2025, RMA was scheduled to pick up passengers at Washington-Dulles International Airport. In the course of communicating with those customers, RMA learned that the customers were explicitly informed by Signature that RMA was prohibited from picking them up. As a result, the customers were forced to call Ubers for their means of transit.

82.  To be clear, the harm to RMA resulting from these incidents is not isolated. When RMA agrees to transport one passenger, the impacts of its failure to do so extend beyond that individual. Many of the individuals RMA transports are but one member of a much larger entity, such as a university or corporation, that has contracted with RMA to timely transports their agents and employees. Failure to do so on even one occasion jeopardizes RMA's *entire business relationship* with those broader entities.

83.      The harm to RMA is not limited to customers who fly into or out of Signature leaseholds during pendency of the ban. The ban also means that RMA will lose future customers, the loss of which is necessarily difficult to quantify. That is because RMA's customers are considering a variety of chauffeur options. As nationwide and often global travelers, RMA's customers are looking for the chauffeur service that can provide them with the *most nationwide and global accessibility*. During pendency of the ban, RMA cannot meaningfully compete, because it is banned from over 100 leaseholds around the United States. This places RMA at a distinct competitive disadvantage, foisted on it by Signature.

84.      RMA's customers are paying for white-glove service at airports around the country (and around the world, for that matter). Signature's retaliatory conduct makes delivering that service near-impossible at Signature leaseholds, and has reverberating, exponential effects across RMA's entire business.

## COUNT I
## TORTIOUS INTERFERENCE WITH CONTRACT

85.      RMA repeats and incorporates by reference the allegations in preceding paragraphs above as if fully set forth herein.

86.      RMA has valid contractual relationships with its customers, including customers who have arrived at or departed from Signature leaseholds for which RMA provides chauffeur services.

87.      Signature has knowledge of RMA's contractual relationships with its customers, including because Signature is aware that RMA contracts with Signature's customers to chauffeur them to, from, and within Signature leaseholds.

17

88.    Signature has intentionally interfered with RMA's contractual relationships with its customers, including by instituting a total ban on RMA's ability to chauffeur RMA's customer to, from, and within Signature leaseholds nationwide.

89.    Signature's interference has induced or caused termination of RMA's contractual relationships with its customers, including because the total ban encourages and induces RMA's customers to terminate their contractual relationships with RMA, given that RMA cannot provide its offered services—chauffeuring its customer to, from, and within Signature leaseholds nationwide.

90.    Signature's total ban was imposed by improper means and for an improper purpose, including because it was imposed in contravention of the FAA's uniformity and non-discrimination rules, and because it was imposed in a bare effort to extract indemnification for the February 28 Incident.

91.    Signature acted with malice toward RMA's business in that its wrongful actions in this matter were committed without just cause or excuse, warranting punitive damages.

92.    As a result of Signature's willful and malicious conduct, RMA has suffered and will continue to suffer irreparable harm and substantial damages, including the loss of customers, loss of customer relationships, lost profits, loss of goodwill, and damage to RMA's brand and reputation.

93.    RMA is entitled to compensatory and punitive damages.

94.    RMA is entitled to injunctive relief.

95.    RMA is entitled to attorneys' fees and costs.

18

## COUNT II
### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

96.    RMA repeats and incorporates by reference the allegations in preceding paragraphs above as if fully set forth herein.

97.    RMA expects additional contracts with new and existing customers who wish to engage RMA for its services, including future business relationships that would result in economic advantage for RMA.

98.    Signature has knowledge of RMA's expected contractual relationships with new and existing RMA customers, including knowledge of future business relationships that—if interfered with—would result in the loss of an economic advantage for RMA. Indeed, RMA has explicitly informed Signature that it has existing and future business relationships that have been and are being damaged by Signature's total ban.

99.    Absent Signature's intentional total ban on RMA's presence at Signature leaseholds, RMA would have continued existing relationships with its customers and would have realized expected future relationships, because RMA would have been able to continue servicing its existing customer base, growing its existing customer base, and obtaining additional customers.

100.    Signature used improper means or methods to intentionally interfere with RMA's contract expectancy, prospective business relationships and economic advantage, including by instituting a total ban on RMA's ability to service its customers at Signature leaseholds nationwide, which contravened standard industry practice and FAA Rules, thus violating Signature's agreements with various airport authorities.

101.    Signature acted with malice towards RMA's business in that its wrongful actions in this matter were committed without just cause or excuse.

19

102.    As a result of Signature's willful and malicious conduct, RMA has suffered and will continue to suffer irreparable harm and substantial damages, including the loss of customers, loss of customer relationships, loss of expected future customers, loss of expected future business relationships, lost profits, loss of goodwill, and damage to RMA's brand and reputation. RMA is entitled to compensatory and punitive damages.

103.    RMA is entitled to injunctive relief.

104.    RMA is entitled to attorneys' fees and costs.

### COUNT III
### BUSINESS CONSPIRACY
**(Statutory Business Conspiracy Under Virginia Code §§18.2-499, 48.2-500)**

105.    RMA repeats and incorporates by reference the allegations in preceding paragraphs above as if fully set forth herein.

106.    Signature concertedly conspired to interfere with RMA's access to all Signature fixed base operations, and concertedly conspired to interfere with RMA's contractual and business relationships.

107.    Signature's interference was willful, reckless, and malicious, which endangered RMA's business operations.

108.    Signature acted with legal malice toward RMA's business in that their wrongful actions in this matter were committed without just cause or excuse.

109.    As a result of Signature's willful and malicious conduct, RMA has suffered and will continue to suffer irreparable harm and substantial damages. RMA is entitled to compensatory and punitive damages.

110.    RMA is entitled to injunctive relief.

111.    RMA is entitled to treble damages pursuant to Va. Code § 18.2-500.

20

112.    RMA is entitled to attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Errands Plus Inc. d/b/a RMA Worldwide Chauffeured

Transportation prays for the following:

A. Judgment in RMA's favor as to each claim pled herein;

B. Judgment for RMA for damages caused by Defendants, including an award of compensatory, punitive, and treble damages;

C. An emergency temporary restraining order requiring Signature to retract its ban of RMA from Signature's leaseholds and to permit RMA access to Signature leaseholds consistent with the access it enjoyed prior to November 20, 2025;

D. An emergency preliminary injunction preliminarily requiring Signature to retract its ban of RMA from Signature's leaseholds and to permit RMA access to Signature leaseholds consistent with the access it enjoyed prior to November 20, 2025;

E. A permanent injunction permanently requiring Signature to retract its ban of RMA from Signature's leaseholds and to permit RMA access to Signature leaseholds consistent with the access it enjoyed prior to November 20, 2025;

F. Pre-judgment and post-judgment interest as allowed by law;

G. Judgment for RMA for attorneys' fees and costs; and

H. Judgment for RMA for such further relief as this Court may deem just and equitable.

Date: December 12, 2025

**ERRANDS PLUS, INC. D/B/A RMA
WORLDWIDE CHAUFFEURED
TRANSPORTATION**

/s/

Jason E. Manning (VSB No. 74306)
David M. Asbury (VSB No. 88977)
TROUTMAN PEPPER LOCKE LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Telephone: 757.687.7564
Facsimile: 757.687.1524

21

*Counsel for Plaintiff*

## **UNSWORN DECLARATION UNDER PENALTY OF PERJURY**

I, Jason E. Manning, declare under penalty of perjury that I am the attorney for Errands

Plus, Inc. d/b/a RMA Worldwide Chauffeured Transportation, and that I have read the allegations

set forth in the foregoing Verified Complaint and know its contents. The contents of the Verified

Complaint and the exhibits attached hereto are true and accurate to the best of my knowledge,

information, and belief.

Executed on December 12, 2025, in Virginia Beach, Virginia.

Jason E. Manning, Esq.

# Exhibit A

**LEASE AGREEMENT**

**BETWEEN**

**CHARLOTTESVILLE-ALBEMARLE AIRPORT AUTHORITY**

**AND**

**PIEDMONT HAWTHORNE AVIATION, LLC, D/B/A
LANDMARK AVIATION**

JLS with JW 121410 #2

1

TABLE OF CONTENTS

PAGE NUMBERS

**ARTICLE 1 - LEASED PREMISES**                                      4

**ARTICLE 2 - USE OF PREMISES**                                      5

**ARTICLE 3 - TERM**                                                 8

**ARTICLE 4 - RENTAL AND FEES**                                      9

**ARTICLE 5 - OBLIGATIONS AND DUTIES OF LESSEE**                    12

**ARTICLE 6 - SECURE AREAS (AOA)**                                  15

**ARTICLE 7 - COSTS AND UTILITIES**                                 17

**ARTICLE 8 - MAINTENANCE**                                         18

**ARTICLE 9 - IMPROVEMENTS**                                        19

**ARTICLE 10 - DAMAGE OR DESTRUCTION OF PREMISES**                  23

**ARTICLE 11 - INDEMNIFICATION AND INSURANCE**                      24

**ARTICLE 12 - ENVIRONMENTAL COMPLIANCE**                           27

**ARTICLE 13 - SIGNS**                                              28

**ARTICLE 14 - TAXES AND LICENSE FEES**                             28

**ARTICLE 15 - RESERVATION OF RIGHTS**                              29

**ARTICLE 16 - ASSIGNMENT, SUBLETTING &**
      **APPROVAL OF OWNERSHIP**                                     30

**ARTICLE 17 - TERMINATION BY LESSEE**                              30

**ARTICLE 18 - TERMINATION BY COMMISSION**                          31

**ARTICLE 19 - INDEPENDENT CONTRACTOR**                             33

**ARTICLE 20 - SERVICES BY AIRCRAFT OWNER**                         33

**ARTICLE 21 - GOVERNMENTAL AGREEMENTS**                            33

2

**ARTICLE 22 - ASSURANCES REQUIRED BY STATE &**
**FEDERAL GOVERNMENTS**                                      34

**ARTICLE 23 - NOTICES**                                    35

**ARTICLE 24 - MISCELLANEOUS PROVISIONS**                   36

**ARTICLE 25 - NONEXCLUSIVE RIGHT**                         36

**ARTICLE 26 - FORMER LEASES TERMINATED**                   37

**LEASE AGREEMENT**
**BETWEEN**
**CHARLOTTESVILLE-ALBEMARLE AIRPORT AUTHORITY**

**AND**
**PIEDMONT HAWTHORNE AVIATION, LLC,**
**D/B/A LANDMARK AVIATION**

THIS LEASE AGREEMENT ("Lease" or "Agreement"), made and effective as of April 1, 2015, is by and between the Charlottesville-Albemarle Airport Authority, a political subdivision of the Commonwealth of Virginia ("Authority"), and Piedmont Hawthorne Aviation, LLC, d/b/a Landmark Aviation (hereinafter referred to as "Lessee" or "Landmark"), a limited liability company organized and existing under the laws of the state of Delaware. Authority and Lessee may sometimes be referred to collectively as "Parties".

**WITNESSETH THAT:**

WHEREAS, the Authority and Piedmont Aviation Services, Inc. have previously entered into an Airport Use Agreement dated July 1, 1997, as amended, modified, assigned, extended, or superseded

WHEREAS, Piedmont Aviation Services, Inc. was merged into Lessee in 2004;

WHEREAS, the Authority owns and operates the Charlottesville-Albemarle Airport ("the Airport"), located in Albemarle County, Virginia, and deems it advantageous to the Authority and its operation of the Airport that the Lessee should be granted certain privileges, rights, use, interests, and responsibilities, as hereafter set forth; and

WHEREAS, the Parties desire to establish herein new terms and conditions for this new Lease and to cancel and terminate in its entirety the Airport Use Agreement dated July 1, 1997, upon the effective date of this Lease.

NOW, THEREFORE, Authority and Lessee, for and in consideration of the premises and mutual covenants contained in this Agreement, do hereby covenant and agree as follows:

**ARTICLE 1 - LEASED PREMISES**

1.1    Leased Premises.  Authority hereby leases to Lessee, and Lessee hereby accepts from the Authority as tenant, approximately 646,602 square feet of space as identified in Schedule A ("the Leased Premises"), including exact square footage measurements as may be prepared by Authority and incorporated into this Lease Agreement as a final version of Schedule A.

1.2    Condition of Leased Premises.  Lessee acknowledges that it has previously occupied

and/or inspected the Leased Premises and shall accept all of the Leased Premises at the commencement of the Lease Term in their present as-is condition.

1.3    Premises subject to easements. The grant of the Leased Premises is subject to any and all existing and future easements and permits, recorded and unrecorded, for public or private roads, highways and taxiways, public utilities, sewer mains and lines, and pipelines. The Authority reserves to itself and others the right of ingress to, from, and over such easements on the Premises for the use, repair, maintenance and preservation of such roads, highways, taxiways, utilities, and sewer lines; provided, however, that the Authority shall not unreasonably interfere with Lessee's use of the Premises in exercising such right.

## ARTICLE 2 - USE OF PREMISES

2.1    Use of Premises. The Leased Premises shall be used to operate a general fixed-base operation ("FBO") and business and to provide such related services as are required or permitted by this Agreement and for no other purpose. All uses of the Leased Premises of Lessee shall comply with the Airport's Minimum Standards for FBOs, and Lessee shall at all times observe all rules and regulations promulgated by the Authority, which in the Authority's judgment are necessary for the general well-being, safety, security, care, and cleanliness of the Leased Premises and the Airport.

2.2    Services Subject to Applicable Requirements. In conducting any FBO or related services on or from the Leased Premises, Lessee shall at all times comply with all applicable Federal Aviation Administration ("FAA") and Authority operational, space, minimum aircraft, and other standards and requirements, including, without limitation, the Authority's Minimum Standards for FBOs as they now exist or are modified hereafter.

2.3    Required General Aviation Services. Lessee shall be required to provide all of the following general aviation services:

A.    Parking, tie-down, and outside storage for itinerant general aviation aircraft, which are aircraft not based at the Airport;

B.    Provision and sale of avgas, jet fuel, and other aviation petroleum products available 24 hours per day, seven days per week;

C.    FBO Terminal operations and services staffed and available 24 hours per day, seven days per week;

D.    Limited engine and accessory maintenance and repair of general aviation aircraft;

E.    Into-plane air carrier fueling services and related ground services;

5

    F.    Aircraft storage within aircraft hangars and related office rentals.

2.4   Permitted General Aviation Services. Lessee shall not be required, but shall use its best efforts to provide, one or more of the following general aviation services:

    A.    Air taxi and charter;

    B.    Sports Charter Ground Handling;

    C.    Aircraft Charter; and

    D.    Aircraft Maintenance.

2.5   Permitted Services Upon Certain Conditions. Lessee shall be permitted, but not required, to provide one or more of the following services if Lessee has been contracted to do so by an aviation user or tenant of the Charlottesville-Albemarle Airport which is authorized by the Authority to contract for such services, and either Lessee has adequate space within its Leased Premises to provide such services or space for the provision of such services has been made available at the applicable fee by Authority or its tenant airline:

    A.    fueling of ground support equipment;

    B.    Above- and/or below-wing ground handling and fueling of scheduled passenger carriers;

    C.    Ground handling, fueling, and cargo handling of scheduled cargo carriers;

    D.    Above- and/or below-wing ground handling, luggage handling, cargo handling and fueling of charter aircraft, so long as Lessee pays or ensures that the charter operator pays all required Authority rentals and fees;

    E.    On-call maintenance and repair for scheduled air carriers' passenger aircraft.

2.6   Approval of Additional Uses Required. No use of the Leased Premises, other than those uses itemized in Sections 2.3, 2.4, and 2.5, above, is authorized unless Lessee has obtained the express written permission of the Authority in advance of commencing such other use. The Leased Premises may not be used or developed by Lessee in a manner contrary to the Airport's Airport Layout Plan ("ALP").

2.7   Prohibited Services and Activities. Lessee shall not engage in any of the following services or activities which are strictly prohibited:

    A.    Banner towing;

B.   Skydiving;

C.   Aerial spraying; or

D.   Aerial photography.

2.8   Conduct of Services.   Lessee shall provide all such services in a manner that will achieve the highest level of customer service and maximize profits, and shall use its best efforts to maintain, develop, and increase the business conducted by it at the Airport.

2.9   Grades and Utilities: Lessee shall make no changes in the land grade or level of the Leased Premises, or to utility lines, which will affect the Leased Premises or any abutting or other airport property without the written consent of the Authority's Executive Director or his designee. No utility company may enter the Leased Premises or any adjoining area at Lessee's request to run any utility line or service unless it has the specific approval of the Authority as evidenced by a properly executed and recorded utility easement.

2.10  Animals: With the exception of seeing-eye dogs, animals are not permitted in or on the hangars, landing areas, ramp areas, aircraft parking and storage areas and gasoline storage areas of the Airport except for shipment by air, or while leashed or otherwise confined en route to an aircraft.

2.11  Explosives: Lessee expressly covenants and agrees that there shall be no blasting or use or storage of explosives of any type by it at any time on the Leased Premises or on Airport property.

2.12  Housing: Lessee shall not permit any person to use a hangar or other building as a permanent or temporary residence or housing.

2.13  Electronic and Radio Interference: Lessee and its subtenants shall not emit electrical, electronic, or radio emissions which will interfere, obstruct, or adversely affect the operation of air navigation aids or airport radio communications.

2.14  Use of Common Facilities: Authority grants Lessee and its subtenants the right in common with others to use the public portions of the Airport, subject to all applicable regulations and policies as they now exist or hereafter may be amended.

2.15  Ingress and Egress. Subject to applicable badging and escort requirements and unanticipated interruption or mechanical breakdown of Authority security programs or equipment, Lessee shall have reasonable rights of ingress and egress from its Leased Premises over Airport roadways, including common use roadways.  Such rights of ingress or egress shall apply to the Lessee's employees, guests, patrons, invitees, subtenants, suppliers and other authorized individuals.  The rights of ingress and egress

likewise apply to the transport of equipment, material, machinery and other property. In the event that such ingress and egress adversely affects Airport operations in the opinion of the Authority, the Authority shall have the right to establish reasonable hours for such ingress and egress.

2.16    Non-Discrimination. Lessee shall furnish its services to the public at the Airport on a fair, equal, and not unjustly discriminatory basis to all users thereof, and shall charge fair, reasonable, and not unjustly discriminatory prices for such services. Lessee may make reasonable, non-discriminatory discounts, rebates, or other, similar types of price reductions to volume customers without breaching its obligations under this paragraph.

2.17    Sublets. Lessee may sublet suitable portions of the Leased Premises to individual aircraft owners or entities for storage of aircraft, provided Lessee has met the hangar keeper's liability insurance requirements contained herein; the sublessee does not provide any FBO services or conduct any other business from or at the Leased Premises except incidental to its aircraft operations; and there is a written agreement between Lessee and sublessee containing certain minimum requirements. The written sublease shall obligate sublessees to comply with the Lessee's obligations (but shall not entitle them to Lessee's rights of operation) under this Agreement, and its form and content shall be subject to the approval of the Authority, which approval shall not be unreasonably withheld. Lessee shall make changes to the form and/or content of any such agreement as reasonably requested by the Authority.

## ARTICLE 3 - TERM

3.1    Term. The term of this Lease shall be for a period of twenty-five (25) years commencing at April 1, 2015 and expiring at March, 2040 ("Term") unless earlier terminated or cancelled, in whole or part, pursuant to the provisions of this Lease. Lessee represents that, to the best of its knowledge and belief at the date of commencement of this Lease, said Term is reasonably necessary to amortize its investment in the required improvements (see Section 9, below) and to provide a reasonable return for its development thereof. Provided Lessee is not in default under this Agreement at the time of exercise and further provided that Lessee has spent at least $500,000 in facility improvements over and above its required improvements described in Section 9 prior to March 31, 2039, Lessee shall have two options to extend the Term for five years each. Six months prior to the expiration of the lease (by October 1, 2039), tenant must, in writing, request their desire to execute the options. Exercise of the extension options is subject to approval by the Authority which is subject to the Authority's reasonable business discretion.

3.2    Surrender of Premises. At the end of the Term Lessee covenants and agrees to yield and deliver peaceably to the Authority possession of the Leased Premises and the facilities

8

attached thereto, on the date of cessation of this Lease, whether such cessation be by termination, expiration, or otherwise, promptly and in good condition, reasonable wear and tear excepted.

3.3 Holding Over. In the event Lessee shall hold over and remain in possession of the Premises after the expiration of the Term, without any written renewal thereof and without written notice from the Authority to vacate, such holding over shall not be deemed to operate as a renewal or extension of this Lease, but shall create a tenancy from month to month, which may be terminated by either party at any time upon sixty (60) days' written notice. All provisions of this Lease, except those pertaining to the term, shall apply during the month-to-month tenancy, provided that upon sixty (60) days' written notice the Authority may increase the rent to be paid by Lessee.

3.4 Removal of Lessee's Property. Upon Lessee's written request and the express written consent of the Authority's Executive Director or his designee, or upon the Authority's express written demand, for a period of up to sixty (60) days after expiration or any earlier termination of this Agreement, and for which period Lessee shall pay rent, Lessee shall forthwith, and at its own expense, remove all its personal property, equipment, devices, and appurtenances thereto and any other portions of the facility or its structural components which are readily removable without damaging the Leased Premises; provided, however, that no hangars, buildings, installed or extended utility lines or facilities, or any other structure or appurtenances permanently affixed or not removable without damaging the Leased Premises shall be removed therefrom unless Lessee is directed to do so by the Authority (in which case such removal shall be at Authority's expense). Any damage to the Leased Premises on account of removal by Lessee of any item or portion of the facility or appurtenances thereto shall be promptly repaired by Lessee at its own expense during said period of up to sixty (60) days, and the Leased Premises shall be restored to the condition in which they were received by Lessee at the commencement of this Agreement, or as they were improved thereafter. If another fixed-base operator requires the use of part or all of the Leased Premises during such period after the termination or expiration of Lessee's Term, then the Authority may refuse or modify Lessee's request to remove, or demand expedited removal of, the above-referenced items, and Lessee must vacate and repair the premises within the time then specified by the Authority.

## ARTICLE 4 · RENTAL AND FEES

4.1 A.    Annual Rental. During the Term, for the privilege of leasing the Leased Premises, under the terms and conditions herein set forth, Lessee shall pay an annual rental ("Rent") of:

| | |
|---|---|
| Effective March 1, 2015 | $ 169,722.54 |
| Effective September 1, 2015 | $ 174,582.54 |

9

As of April 1 of each year starting April 1, 2016 and through April 1, 2023, the Rent shall be increased by 1.5% annually. On April 1, 2024, the parties agree that title to the improvements on the Premises shall revert to the Authority whereupon Rent shall increase to $355,264.01 annually. On April 1, 2025 and through April 1, 2028 the Rent shall be increased by 1.5% annually. On April 1, 2028, the parties agree that title to the building identified as Hangar #3 shall revert to the Authority whereupon Rent shall increase to $427,742.23 annually. On April 1, 2029 and each April 1 for the balance of the Term, including all extensions, the Rent shall increase by 1.5% annually. A comprehensive schedule of Rent can be found on Schedule B of this agreement.

B.      Payment. Annual rental payments shall be paid monthly, in twelve equal monthly installments, by check made payable to the Charlottesville-Albemarle Airport Authority and received no later than the 10th day of the month for which payment is being made. All such checks shall be delivered to the Authority's Office of the Director of Finance and Administration.

4.2     Fuel Flowage Fees. Lessee shall pay the following additional fees to the Authority on a monthly basis:

A.      For general aviation fuels (but not fuel delivered to an airline) sold at the Leased Premises in any given year of the Term Lessee shall pay a flowage fee of $0.08 per gallon.

B.      Lessee shall pay a percentage fee of 5% of gross receipts (but not to include any applicable taxes or airport imposed fees) for all other business activities at the Airport excluding revenues for general aviation fuel sales, aircraft deicing sales and services, aircraft sales, landing fee retention and aircraft maintenance services.

4.3     Landing Fees. Lessee shall collect and pay to Authority seventy-five percent (75%) of the landing fee assessed by the Authority pursuant to its schedule of rates and charges for general aviation aircraft using the Leased Premises. Lessee shall be allowed to retain the remaining 25% of such landing fees.

4.4     Other Fees. Lessee shall also be responsible for payment of all other current or future Authority fees, charges, and assessments which are applicable to Lessee's operations at the Airport or Lessee's use of space/facilities outside its Leased Premises. Such fees may include airport use fees, passenger facility charges, seat fees, per-use fees, ramp fees, gate fees or other such fees, and charges or assessments currently imposed or which may apply in the future to Lessee in common with other FBOs.

4.5     Monthly Statements. On or before the 15th day of each calendar month, Lessee shall provide the Authority with a statement detailing the source and amount of Lessee's

gross receipts from its operations, including the total dollar amount of all landing fees collected by Lessee on behalf of Authority during the preceding calendar month.

4.6     Invoices. Each month the Authority will send an invoice to Lessee detailing the fuel flowage, landing fee, and other charges due and owing to the Authority. Lessee shall submit payment to Authority within fifteen (15) days of the date of each invoice.

4.7     Late Fee. Lessor shall be entitled to assess a late payment charge of one and one-half percent (1.5%) per month or portion thereof on any rental amounts, additional amounts, or rental fees that are not paid when due.

4.8     Performance Guarantee.

   A.     Required. Lessee shall provide and maintain a lease performance guarantee for all its obligations hereunder in a form satisfactory to the Authority in its reasonable discretion. The performance guarantee shall be in an amount equal to forty-two percent (42%) of the annual rental rate. This performance guarantee shall guarantee the full and faithful performance by Lessee of all of Lessee's obligations, requirements, terms, and conditions under this Agreement and shall be subject to claim in full or in part by the Authority in the event of any failure to perform or default by Lessee. The Lessee shall ensure that the performance guarantee is maintained at all times in the proper amount throughout the period required by Authority.

   B.     Form of Guarantee. The performance guarantee, at the option of the Lessee, may be an irrevocable letter of credit or a surety bond issued by a surety company reasonably acceptable to the Authority on a form in the substance of Schedule C.

   C.     Certificate of Renewal. At least forty-five (45) days prior to the expiration date of any such guarantee, Lessee shall file with the Authority a renewal or replacement guarantee. If a bond is used, it shall be submitted in the form as hereto attached.

   D.     Maintenance of Guarantee. If the Lessee fails to provide or maintain the performance guarantee in effect at any time required by Authority, the Lessee shall be in default, and this Agreement may be terminated by Authority.

   E.     Audits. At its option, the Authority may conduct one or more special audits during the Term of Lessee's books and accounts of Lessee's activities at the Airport. If conducted, such audits shall be performed by an Independent Certified Public Accountant selected by the Authority. The cost of such audits shall be paid by the Authority. There shall be no more than one (1) such audit during any year of the Term.

11

**ARTICLE 5 - OBLIGATIONS AND DUTIES OF LESSEE**

5.1     Compliance with Laws, Rules and Regulations.

A.     State, Federal, Local, and Authority Rules and Regulations:  In Lessee's exercise of the privileges granted herein, Lessee, its officers, agents, employees, guests, invitees, contractors, sublessees, and any other persons whose presence on Airport property was required or permitted by Lessee shall observe, obey and comply fully at Lessee's own expense with all present and future laws of the city, county, federal, state and other local governmental bodies having jurisdiction over the Airport, the Authority, the Leased Premises, or operations at the Airport; all rules, regulations, and orders promulgated thereunder; and all rules, regulations, resolutions, and directives of the Authority applicable to or affecting, directly or indirectly, Lessee or its operations and activities on or in connection with the Leased Premises. In particular, but without limiting the foregoing, Lessee shall at all times comply with all applicable FAA, Transportation Security Administration ("TSA"), and Environmental Protection Agency ("EPA") regulations, orders, and directives, and Lessee shall obtain all necessary FAA, TSA, and EPA approvals whenever necessary to their activities and operations on the Leased Premises. This Lease is expressly made subject to all such present and future laws, ordinances, rules, and regulations.

B.     Safety Regulations:  Lessee, its officers, agents, employees, guests, invitees, contractors, sublessees, and any other persons whose presence on Airport property was required or permitted by Lessee shall comply with all applicable fire and Occupational Safety and Health Administration rules, regulations, and resolutions, and with rules, regulations, and directives of the Authority or the Executive Director currently in effect or as may be issued from time to time in the interests of protecting health, safety, sanitation, and good order on or about the Leased Premises or elsewhere at the Airport, including but not limited to the Authority's Minimum Standards for FBOs. Unless specifically changed by the Authority or applicable law, such safety regulations shall include, but not be limited to, the following:

i.)     Fueling – Fueling shall occur at least thirty feet from any hangar or other building. Refueling units, when not in use, shall be stored or parked in the fuel truck parking areas.

ii.)    Fires – Lessee shall not permit fires or open flames, nor any smoking or carrying of lighted cigars, cigarettes, pipes, matches, etc., in any of Lessee's fuel storage areas, hangars, or aircraft parking areas.

iii.) <u>Painting of Aircraft</u> - Lessee shall not paint or permit others to paint aircraft inside Lessee's hangars.

iv.) <u>Flammables</u> - Lessee shall not store or permit others to store any flammable liquids, gasses, or other similar materials in Lessee's hangars except in rooms or areas specifically approved by Authority.

C. <u>Licenses and Other Authorizations</u>: Lessee shall procure from all government authorities having jurisdiction over the operations of Lessee at the Airport or elsewhere, and maintain in effect at all times during the term of this Lease, all licenses, certificates, permits, or other authorizations which may be necessary to conduct its operations or any activity authorized by the terms hereof. Lessee shall provide proof of the existence of such authorization(s) to the Authority's Executive Director or his designee upon request.

D. <u>Security Requirements</u>: Lessee and its agents, employees, subtenants, and contractors shall comply with applicable portions of federal security regulations and the Authority's Airport Security Program.

E. <u>Fines and Penalties</u>: Lessee shall pay all costs, expenses, claims, fines, penalties, and damages that may, in any manner, arise out of or be imposed by any governmental authority because of Lessee's failure to comply with Paragraphs A, B, C, or D, above, and in any event agrees to defend, indemnify, and hold the Authority harmless against all claims, actions, damages, costs, penalties, fines, connected with or arising out of the same. The Authority and Lessee each agree to attempt to promptly give notice to the other of any notice of violation, warning, summons, or legal process received by either Party relating to any such law, ordinance, rule, regulation, or orders.

G. <u>Subordination of Lease</u>. This Lease is subordinate to the provisions of any existing or future agreements between the Authority and the United States government, the Commonwealth of Virginia, or any agencies of either relative to the operation, funding, or maintenance of the Airport.

H. <u>Compliance with Agreement</u>. Lessee covenants and agrees to compel its officers, agents, employees, guests, invitees, contractors, sublessees and any other persons over whom Lessee has control to observe and obey all terms and provisions of this Agreement, as well as all applicable rules and regulations of the Authority or its Executive Director, now in effect or hereinafter promulgated, governing the conduct and operation of the Airport.

5.2 <u>Cost of Operation of Business</u>. Lessee shall bear, at its own expense, all costs of

operating the Leased Premises and Lessee's business thereon, and shall pay, in addition to rent, all taxes and other costs connected with the use and operation of the Leased Premises and facilities, unless specifically provided otherwise herein.

5.3    Vehicles. Neither Lessee nor its officers, agents, employees, sublessees, or contractors shall bring into or operate any vehicle or motorized equipment within the fenced-in portions of the Air Operations Areas (AOAs) unless they have complied with the Authority's current and future regulations concerning vehicle identification, safety requirements, driver training, insurance, and related matters.

5.4    Fair Price and Service. Lessee shall charge fair, reasonable, and not unjustly discriminatory prices for services it provides to the public, and it shall furnish its services on a fair, equal, and non-discriminatory basis to all users.

5.5    Employees. Lessee shall be responsible for the conduct, demeanor and appearance of its employees and agents, if any. Upon receipt of any complaint or objection to the conduct, demeanor, or appearance of any agent or employee, Lessee shall immediately take all reasonable steps necessary to remove the cause of the complaint or objection. Lessee shall require all of its employees to wear identification badges acceptable to the Authority and to comply with all security regulations and programs.

5.6    Damage to Airport Property. Lessee shall be responsible for paying the full cost for repair of any damage done to Airport property by Lessee, its officers, agents, employees, guests, invitees, sublessees, contractors and other persons whose presence on Airport property was required or permitted by Lessee, normal wear and tear excepted.

5.7    Required Records. Lessee shall maintain (or cause its subtenant(s) to maintain), at all times, accurate records of all persons/owners/tenants housed at the Leased Premises, including the name, address, and telephone number of all aircraft owners and aircraft type, description, tail number, and any other pertinent information. Authority shall have the right to inspect such records upon reasonable request.

5.8    Tank Farm. Lessee shall maintain all tanks in accordance with the Virginia Department of Environmental Quality and the Federal Environmental Protection Agency at no cost to the Lessor. Lessee shall maintain trained staff in receiving and dispensing functions of the fuel facility and all general maintenance, upkeep, repair and servicing of fuel facility systems. Lessee shall maintain fuel facility quality systems and compliances in accordance with the Air Transport Association 103 and be inspected by qualified third party inspectors a minimum of twice annually. Signatory Airlines, Federal Aviation Administration and Department of Defense fuel inspectors qualify as such third party approved inspectors. Lessee shall be responsible for the compliance of all fuel quality control, safety and record keeping in association with requirements under the Federal

14

Aviation Regulations Part 139 at no cost to the Lessor. Lessee shall maintain and provide services pursuant to the current Department of Defense fueling contract at the Airport while approved as a supplier. All Signatory Airlines servicing the Airport shall be permitted to store aircraft fuel at the fuel facility for the purpose of aircraft refueling, Lessee has the right to charge reasonable rates for such storage services. Upon request of the Signatory Airline the Lessee and Authority will use their best effort to provide storage capacity to meet the Airlines needs.

5.9 Obligations Not Limited. The obligations of Lessee listed in this Article 5 are provided for convenience of reference and do not in any way exclude, limit, or diminish responsibilities cited elsewhere in this Agreement.

## ARTICLE 6 - SECURE AREAS

6.1 Airport Security

A. Secured Area and Badges. Lessee acknowledges that the Leased Premises are within the fenceline of the Airport and part of its AOA or Security Identification Display Area ("SIDA"), to which access is restricted. Lessee further acknowledges that certain of its operations will occur in the Airport's Secured Area, including but not limited to the airline terminal and cargo areas, to which access is more limited than to the AOA or SIDA. Lessee agrees to be responsible for, and to insure that, none of its employees, agents, subcontractors, subtenants, or representatives gains access to, enters, or moves about the Secured Area, the SIDA, or the AOA without prior approval of the Authority's Executive Director, as evidenced by an appropriate Authority-issued identification badge, or constant escort by a duly authorized and badged employee of the Authority or Lessee; and that the Lessee, its employees, agents, subcontractors, subtenants, and representatives shall comply with the requirements of the Authority's federally-mandated security program. Only persons delivering materials or performing job functions of short duration will be permitted inside the Secured Area under escort by a badged representative of Lessee; all other persons involved with and performing services for and on behalf of Lessee must be approved, trained, and badged.

Prior to the Authority's issuance of an appropriate identification badge, an authorized representative of Lessee shall initiate requests for unescorted access to the Secured Area or the SIDA and AOA (collectively, "the Airport Security Restricted Areas"), as the case may be, for its employees and the employees of its subcontractors, in accordance with the Authority's Airport Security Program ("ASP"). Each employee for whom access is requested may be required to submit to a fingerprint-based background check and a TSA-required Security Threat Assessment (STA), and to attend a security training class taught by Authority

personnel. The Authority reserves the right to deny unescorted access to the Airport Security Restricted Areas to some or all of Lessee's employees and subcontractors. All costs associated with the procurement of access privileges shall be at Lessee's expense, including payment to the Authority of a reasonable security deposit. In the event that a badge is lost or otherwise unaccounted for, the security deposit shall be forfeited, and a new deposit and fee shall be charged for the replacement badge in accordance with the schedule of fees established by the Authority.

Upon voluntary or involuntary termination of employment of its employees, Lessee shall notify Airport security personnel within 8 hours and surrender the identification badge(s) within 24 hours, provided that the badge is reasonably accessible.

Lessee must keep employment records for each badged employee for at least 180 days after termination of his or her access privileges and return of the badge(s).

B.   Vehicles. Lessee agrees that any vehicles that may be permitted inside the fence shall be operated by trained employees with Authority-issued badges or under escort by an appropriate Lessee employee.

All unescorted, privileged-access vehicle operators shall be trained in accordance with Airport policy regarding driving inside the security fence in an area near where aircraft are operating. Such training and/or authority shall be indicated on their identification badges.

In addition, when they are within the Airport Security Restricted Areas, Lessee and its employees shall keep all vehicles and any bins, tool boxes, etc. in a locked condition whenever they are not actively engaged in the process of removing/replacing tools and materials into or out of the vehicle.

C.   Access Points. Lessee shall use only authorized access points and routes into and within the Airport Security Restricted Areas. Lessee is responsible for ensuring that all of its employees use only the authorized access points and approved routes to access aircraft or provide services, and that they verify that the access points are secure immediately after use. Gates that fail to secure must be immediately reported to on-duty Airport security personnel. The persons and vehicles entering the Airport Security Restricted Areas shall proceed immediately to and from the work sites and the entrance gate, and shall not unnecessarily drive or walk onto or across any aircraft parking and taxiing area.

The airport is subject to TSA security requirements and rigid adherence is mandatory. Any fines resulting from unauthorized Lessee's personnel entering the

16

Airport Security Restricted Areas, or other security violations by Lessee, its employees, and subcontractors, will paid by Lessee, and access to the Airport Security Restricted Areas may be denied to the offending person or persons.

6.2     Future Requirements. Authority and Lessee understand and agree that the rules and regulations concerning airport/airline security are subject to frequent and substantial changes, and that Lessee shall comply with applicable provisions of such rules and regulations (including but not limited to the Authority's federally-mandated security plan) as they now exist or may hereafter be modified.

### ARTICLE 7 – COSTS AND UTILITIES

7.1     Lessee's Responsibilities.  Lessee shall be solely responsible for all costs of the facilities and their upgrade, maintenance, and repair; its operations; taxes; the cost of all utilities, including heat, cooling, electricity, water, sewer, cable, internet, and telephone services used at the Leased Premises; and any other costs and expenses arising from Lessee's operations or the use of the Leased Premises or the Airport. Lessee shall bear the cost of installing, extending, and expanding any and all utilities to and within the Leased Premises, the cost of connection or installation of utility services and meters, and the cost of modifying such services to address the specific requirements of Lessee. All meters for utility services shall be located outside the AOA, and no utility company may install a line or service across Authority-owned land without a valid utility easement from the Authority.

Lessee shall repair and maintain and keep in safe condition, or cause to be repaired, maintained, or kept safe, the heating, cooling, plumbing, and electrical systems on the Leased Premises, and all utility lines installed by or on behalf of Lessee running to or within the Leased Premises.

### ARTICLE 8 - MAINTENANCE

8.1.     General. Lessee agrees and covenants that it shall faithfully and fully maintain the Leased Premises and all improvements and facilities thereon in good and first-class condition and repair, at its sole cost and expense, during the entire Term of this Lease and any further extension thereof. Lessee agrees, except as otherwise provided herein, that it shall, during the Term or any extension of this Lease, maintain and keep the Leased Premises in a safe, workable, clean, and sanitary condition, in good repair and free from obstructions, and shall be responsible for trash collection and removal, and the removal of snow or ice from all of the facilities and grounds within the Leased Premises. Should the Lessee request that the Authority remove snow and ice from the FBO's leased premises, the Authority will invoice the Lessee for labor and materials used for removal at agreed upon rates.  Lessee shall provide at its own expense all special lighting, utilities, and other equipment, services, and decorations that may be required by it at the Leased Premises.  In addition, Lessee shall, at its own expense, install all

equipment, furnishings, and appliances necessary to operate the facility in strict accordance with all current and future Airport safety and/or security requirements and FAA requirements.

8.2    Land. Lessee agrees to maintain and keep the unimproved and paved areas of the Leased Premises free and clear of all foreign objects and debris; to maintain a safe area for persons and vehicles and a sightly appearance; and to minimize the presence of hazards that could cause damage to aircraft engines.

Authority shall maintain and repair all paved taxiways, taxi lanes, airplane parking areas, and common roadways outside the Leased Premises provided they have not been damaged by the intentional or negligent acts of Lessee, its officers, employees, agents, subtenants, contractors, guests, invitees, or other persons whose presence on Airport property was required or permitted by Lessee.

8.3    Buildings. Lessee agrees at its cost to maintain and make repairs necessary for safe conduct of its operations and to maintain in good repair the Leased Premises and the facilities thereon , including all buildings constructed on the Leased Premises, the fixtures and equipment therein and appurtenances thereto, and including without limitation the roof, windows, hangar and other doors and entrances, signs, floors, pads, interior walls and ceilings, the surfaces of interior columns, partitions, gates, any intercom system, security system, communications lines, lighting, heating, ventilating, plumbing, air conditioning, and other utility systems within the Leased Premises. Lessee agrees to keep and maintain in good and safe condition all utilities and related systems and equipment within the Leased Premises, including, but not limited to, lighting fixtures and bulbs, receptacles, electrical wiring and equipment, and heating and cooling systems and fixtures located at or in its Leased Premises.  Lessee's duty to repair and maintain shall include all repairs whether internal or external, structural or non-structural, ordinary or extraordinary.

8.4    Prior Approval. Prior to making any major repairs other than to its own equipment or fixtures, Lessee shall obtain the approval of the Authority's Executive Director, which approval shall not be unreasonably withheld. All work performed by the Lessee or its contractor must be inspected and approved by the Executive Director or his designee and, if necessary, by the local building inspector.

All repairs done by the Lessee or on its behalf shall be of first class quality in both materials and workmanship.  All repairs shall be made in conformity with the laws, rules and regulations prescribed from time to time by Federal, State, or local authorities having jurisdiction over the work at the Leased Premises.

8.5    Failure to Maintain.  If it is determined by the Authority's Executive Director that the

18

required maintenance is not being satisfactorily performed, the Executive Director may notify Lessee in writing of its obligation to correct the noted deficiencies. If such corrective maintenance is not substantially accomplished to the satisfaction of the Executive Director within fifteen (15) days after receipt of such written notice, or such longer period of time as may reasonably be required to accomplish such corrective maintenance provided Lessee acts with due diligence, the Authority shall have the right, without further notice, to perform or cause performance of such maintenance as may be necessary, and Lessee shall promptly pay the Authority for the cost thereof, plus fifteen percent (15%) for administrative overhead as additional rent.

8.6    Restoration upon Termination. Upon expiration or termination of this Agreement for any reason, Lessee shall deliver the Leased Premises and all fixed improvements installed with Authority's approval to Authority in the same condition as when constructed, reasonable and ordinary wear and tear excepted.

## ARTICLE 9 - IMPROVEMENTS

9.1    Improvement Defined. "Improvements" shall mean all buildings, structures, and facilities, including paving, fencing, signs, tanks, and landscaping, constructed, installed, or placed on, under, or above the Leased Premises by Lessee, and the rehabilitation of the same.

9.2    Required Improvements. On or before July 31, 2016, Lessee commits to spend a minimum of $2,300,000, including professional fees, on Improvements to the Premises to consist at least of the design and build of an 18,000 square foot industry standard general aircraft storage hangar with ceiling heights acceptable for the storage of aircraft comparable to a Gulfstream V ("Project").

In the event that Lessee is unable, following its diligent and best efforts, to obtain any governmental approval necessary to allow the construction or installation of the Project or if construction is hindered by adverse weather conditions, then the deadline to complete the Project shall be extended to a time which is reasonable to allow Lessee to obtain the required permits or for a time reasonably allowable based upon the adverse weather conditions, to be agreed between Lessee and the Authority within reasonable discretion of each.

9.3    Approval of Discretionary Improvements Required. Lessee shall provide Authority with advance written notice of any intended improvements and shall not construct or install any improvements (or commence construction or installation) without Authority's approval, which shall not be unreasonably withheld. Authority shall not be required to approve any improvements which, in its opinion, would result in a facility or use contrary to the provisions of this Lease, the ALP, or any federal, state, or local law, regulation, or other legal requirement.

19

If it has endorsed an improvement, Authority will promptly sign applications made by Lessee for site plan approvals, grading permits, building permits, use permits, or other documents as may be necessary to obtain a required governmental approval.

9.4     Conduct of Required and Discretionary Improvements.

A.     Workmanlike manner. All improvements shall be completed by the Lessee in a good and workmanlike manner, and in compliance with all applicable laws, ordinances, regulations, and other legal requirements.

B.     Services of architects and engineers. Lessee shall be required to employ an engineering and/or architectural firm to design, prepare, and seal plans for required and discretionary improvements. Such engineer/architect shall also be required to confirm that the completed improvements/construction are in accordance with the approved plans.

C.     Submission of plans for approval. Prior to their submission to any other governmental agency or authority, Lessee shall submit preliminary and final plans, sections, working drawings, specifications, elevations, and other materials to Authority for review and approval. Authority's approval shall not be unreasonably withheld and the Authority's delay shall extend the deadline for completion of the Project. Lessee shall have no right to commence construction until it has received the written approval of the Authority.

D.     Permits. At its sole expense, Lessee shall procure all governmental permits and approvals required for or in connection with the construction or installation of the Projects or any other pre-approved improvements, and no work shall begin until Lessee has presented to the Executive Director a copy of any required building permit.

E.     Compliance. Lessee and its contractor shall at all times comply with all applicable FAA, TSA, and EPA regulations, orders, and directives.

F.     Materials storage. During the construction or other process of installing any improvements, Lessee shall store all apparatus, materials, supplies, machinery, and equipment associated therewith in an orderly fashion on the Leased Premises, so as not to unduly interfere with the progress of its own work or the work or operations of Authority or any other Airport tenants or users. Lessee shall place on the Leased Premises only such loads, materials, or debris as may be consistent with the progress and safety or current work activity on the Leased Premises.

G.     Delivery of "as built" drawings. Promptly upon completion of any improvements, Lessee shall deliver to the Authority one set of "as-built" drawings thereof.

9.5    Ownership. During the term of this Lease, title to all buildings and facilities constructed on the Leased Premises by Lessee shall remain in Lessee. Upon expiration or other termination of the Lease term, ownership of all buildings, improvements, facilities, additions, and newly constructed facilities installed or erected upon the Leased Premises shall vest in Authority.

9.6    Contractor Access to Airport Security Restricted Areas and Compliance with Authority Rules. Lessee agrees to be responsible for, and to ensure that, the employees, agents, and representatives of each of its contractors complies with the requirements of Section 6.1, above, and all rules and regulations promulgated by the Authority, including but not limited to the Airport's Minimum Standards for FBOs.

9.7    Pre-construction Meeting: Within 60 days of the start of any work on any improvement, representatives of Lessee, the Authority, and the relevant contractor shall meet to discuss the requirements of this section, as well as to discuss the contractor's written phasing and safety schedule for the project. Lessee shall be responsible for scheduling such meeting.

9.8    Additional Insurance Requirements.

    A.    Prior to the Executive Director granting Lessee authority to proceed with any improvement, Lessee shall provide the Authority's Executive Director suitable evidence that its contractor(s) has the following insurance coverage:

        i.)    Liability Coverage. Commercial general liability insurance, on a per-occurrence basis, that includes contractual liability and products and completed operations insurance, and automobile liability, naming contractor as insured and its employees, subcontractors, Lessee, and the Authority, and its officials, officers, agents, and employees, as additional insureds, providing coverage against any and all claims and demands made by any person or persons for injuries or death or property damage incurred in connection with or arising out of the work performed on the improvement and including contractual liability coverage for the terms and conditions of this Agreement, which policies shall provide limits of not less than $1,000,000.00. In the event that the contractor will bring a vehicle into the AOA, the limits of such insurance shall be $5,000,000.

        ii.)    Worker's Compensation. Statutory Worker's Compensation and Employer's Liability Insurance for all employees engaged in the work. Such coverage shall be maintained during the term of the Contract. In case any such work is subcontracted, the contractor shall require the subcontractor to provide such insurance for all of its employees engaged in the work.

        iii.)    Builder's Risk. Builder's risk or course of construction coverage appropriate for the improvements being constructed.

    B.    Documentation Required. The policy or policies required shall contain the following special provision: "The Company agrees that, thirty (30) days prior to cancellation or reduction of the insurance afforded by this policy, with respect to the contract involved, written notice will be sent by certified mail to the Charlottesville-Albemarle Airport Authority's Executive Director."

    C.    Bonds. Lessee shall be responsible for proper completion and payment to all persons for any and all work or improvements on the Leased Premises. Lessee shall require its contractor to provide construction performance completion and labor and material payment guarantees with Lessee and Authority listed as dual obligees in a sum equal to the full cost of the construction.

9.9    Protection of Utility Lines and Equipment. All work undertaken pursuant to this Agreement shall be subject to the condition that Lessee make, at its expense, suitable arrangements as approved by the Authority's Executive Director for relocation of any affected governmental or other utility lines, cables, or other equipment. Further, Lessee shall not pave roads, parking ramps, or tie-downs over said utility lines, cables, or equipment without the prior written approval of the Authority's Executive Director and any affected third party.

9.10    Lessee's Cost for Construction. As soon as practicable following completion of an improvement, but in no event longer than 90 days, Lessee shall submit to the Authority an itemized statement, certified by an officer of Lessee, showing the actual cost of the improvements as constructed, including fees paid to independent architects and engineers, and produce copies of all invoices and other records in connection therewith. Said itemized statement shall constitute prima facie proof of expenditure by the Lessee of the costs shown therein.

9.11    No Encumbrances. In addition to any other indemnification agreements contained in this Lease, Lessee shall indemnify and hold the Lessor harmless from and against all liens, charges, and encumbrances that Lessee creates, or allows to be created, upon the Leased Premises. Notwithstanding the foregoing, Lessee may enter into agreements with a financial institution granting such financial institution a lien or security interest in the required improvements, and in the Lease, provided that: (1) such lien or security interest shall not continue beyond the Term of this Lease; and (2) Lessee advises all prospective lienors, in writing, of the Authority's lack of obligation to the lienor and Lessee's indemnification obligation hereunder. Otherwise, Lessee shall have no authority, express or implied, to create any lien, charge, or encumbrance upon the Leased Premises, whether by reason of or in connection with any improvements or

22

otherwise.

9.12    Amortization and Lack of Authorization.    In the event the Term is shorter than the period required to fully amortize any capital improvements which have been approved and authorized by the Authority (applying U.S. generally accepted accounting principles), and Lessee does not continue operations beyond the Term, any successor to Lessee or the Authority shall be required to pay Lessee unamortized capital costs. If Lessee elects to proceed with any capital improvements not approved by the Authority, then Lessee will do so at its own risk and the unamortized capital cost of those improvements will not be subject to this Section 9.12.

## ARTICLE 10 - DAMAGE OR DESTRUCTION OF PREMISES

10.1    Buildings or Structures Built by Lessee.    If any building or structure on the Leased Premises is partially damaged by fire, the elements, or other casualties, but is capable of being repaired in forty-five days, as determined by the Authority's Executive Director, such building or structure shall be repaired with due diligence by Lessee at its own cost and expense to the character, quality, and condition comparable to which the building existed at the commencement of the lease term. In such case, Lessee shall be entitled to receive and apply the proceeds of any insurance covering the loss, and any excess of proceeds shall belong to Lessee.

If any such building or structure is completely destroyed or is so damaged that adequate repairs cannot be made within forty-five (45) days, as determined by the Authority's Executive Director, Lessee may, at its discretion: (1) cancel the lease, with the Authority receiving a percentage of the insurance proceeds equal to the number of full years which have expired during the Term of this Agreement divided by twenty-five (25), and Lessee receiving the balance thereof; or (2) reconstruct the building or structure, with due diligence and at its own cost and expense, in which case it shall be entitled to receive and apply the full proceeds of any insurance covering the loss.

10.2    Limits of Lessee's Obligation.    It is understood that in the application of the foregoing Section 10.1, the Lessee's obligations shall be limited to repair or reconstruction of the building or structure on the Leased Premises to the same extent and of equal quality existing at the commencement of the Term. Redecoration and replacement of finishes, fixtures, furniture, equipment, and supplies shall be equivalent in quality to that originally installed, subject to the Authority's approval.

## ARTICLE 11 - INDEMNIFICATION AND INSURANCE

11.1    Indemnification - Mutual Hold Harmless.    Each Party to this Agreement shall defend, indemnify, and hold harmless the other and its officials, officers, agents, and employees

23

against any and all claims, demands, debts, liabilities, penalties, fines, and causes of action, including, without limitation, all expenses and reasonable attorneys' fees incurred in connection therewith, whether in law or in equity, by reason of death, injury or damage to any person or persons, or loss or damage or destruction of property or loss of use thereof, arising out of or in any way connected with its respective use of the Leased Premises or operations at the Airport. The Parties' indemnification obligation shall specifically include, without limitation, any and all costs related to claims, fines, penalties, and costs associated with bringing the Leased Premises into compliance with the Americans with Disabilities Act; fines and penalties related to violations of federal regulations, especially those related to security and airport certification; fines and penalties related to building code violations; and costs and claims related to violations of the Authority's rules, regulations, and security programs. Each Party shall provide to the other prompt and reasonable written notice of any such claim or action known to it and each shall have the right to investigate, compromise, and defend the same to the extent of its own interest. This obligation to indemnify shall survive any expiration and/or termination of this Agreement.

11.2    Limitation on Authority's Liability. In no event shall the Authority be liable in any manner to Lessee or any other party as the result of the acts or omissions of Lessee, its agents, employees, contractors, or any other tenant of the Authority.

11.3    General Requirements. The following general requirements apply to all insurance policies mandated by this Agreement.

    A.    Insurance Required Prior to Execution. Authority shall not execute this Agreement until all insurance requirements contained in this Agreement have been complied with as outlined below, and until certificates of insurance evidencing Lessee's coverage have been filed with the Executive Director. On reasonable request, Authority may review Lessee's policies.

    B    Quality of Insurance Company. Any and all companies providing insurance required by this Agreement must meet minimum financial security requirements as follows: (1) Best's Rating not less than B+ and (2) current Best's Financial Category not less than Class VII. These requirements conform to the ratings published by A. M. Best & Co. in the current Best's Key Rating Guide--Property-Casualty. The ratings for each company must be indicated on documentation supplied by Lessee to Authority.

    C.    Insurance to be Maintained during Term. Any and all insurance required by this Agreement shall be maintained during the entire term of this Agreement, including any extensions thereto. The Authority shall have the right, from time to time, to inquire into the adequacy of the insurance requirements set forth in this Agreement and to require such adjustments as reasonably appear necessary.

D.  Notice of Cancellation. The Authority shall, without exception, be given not less than thirty (30) days' notice prior to cancellation for other than non-payment of premium or for material change of any insurance required by this Agreement. Non-payment of premium or material change shall require ten (10) days' notice of cancellation.

E.  Authority and Others as Additional Insureds. The Authority and its officers, officials, agents, and employees, shall be covered as additional insureds under any and all insurance required by this Agreement, except for Worker's Compensation and Employer's Liability, and such insurance shall be primary with respect to the additional insureds.

F.  Authority of Insurance Agent. Each and every agent acting as an authorized representative of a company providing the coverage required by this Agreement shall warrant that the insurer has specifically authorized the agent to bind coverage as required. In addition, each and every agent shall warrant that the agent is licensed to do business in the Commonwealth of Virginia.

11.4  Comprehensive Aviation General Liability Insurance. Lessee shall procure and maintain comprehensive aviation general liability insurance, on a per-occurrence basis, in an amount not less than fifty million dollars ($50,000,000.00). Coverage must include broad form contractual liability covering Lessee's indemnity obligations hereunder, aviation premises liability, hangar keeper's liability, cargo and baggage liability, and coverage for property damage, personal injury, and products/completed operations hazards.

11.5  Automobile Liability Insurance. Lessee shall procure and maintain automobile liability insurance with not less than an aggregate of five million dollars ($5,000,000.00) on a per-occurrence basis, on each licensed motor vehicle owned by Lessee or used in its business operations at the Airport. Lessee may satisfy this requirement by obtaining one million dollars of automobile liability insurance coverage ($1,000,000.00) with the excess four million dollars ($4,000,000.00) pursuant to a general commercial liability or umbrella policy specifically applicable to motor vehicle liability. The coverage required by this paragraph shall extend to owned, hired, leased, and non-owned vehicles. Coverage for non-owned motor vehicles must be specifically indicated as an endorsement on either the Lessee's personal automobile policy or the aviation liability coverage required by this Agreement.

11.6  Fire and Casualty Insurance. Lessee shall maintain standard fire and extended casualty coverage, as well as boiler and other vessel insurance, on the General Aviation Terminal Building, all hangars, and any other building structures. Such insurance will be in the

25

amount of the full replacement value of the structures and shall include the Authority as a co-insured as its interests may appear. Lessee shall maintain appropriate fire and casualty insurance to cover its own finishes, furnishings, personal property, trade fixtures, equipment, and stock in trade, and acknowledges that Authority will not carry such insurance. Lessee may meet the requirement of this paragraph by providing special form all risk coverage inclusive of all required coverages.

11.7  Worker's Compensation and Employer's Liability Insurance. Lessee shall procure and maintain Worker's Compensation and Employer's Liability Insurance in the amounts required by the Commonwealth of Virginia.

11.8  Pollution Liability Insurance. Lessee shall procure and maintain Pollution Liability Insurance in at least the following amounts:

| | |
|---|---|
| Per environmental incident: | $ 1,000,000.00 |
| Per annual aggregate: | $ 2,000,000.00 |
| Limits of defense per environmental incident: | $ 1,000,000.00 |

11.9  Replacement Coverage. If at any time the coverage, carrier, limits, or minimum amounts on any policy, or the type of insurance required herein, shall become unsatisfactory to the Authority, the Lessee shall forthwith provide a new policy meeting the requirements of the Executive Director.

11.10  Not a Limit on Liability. Lessee covenants and agrees that the insurance coverages required by this Agreement shall in no way be considered or used in any manner as a limit or cap of any kind on any liability or obligation that Lessee may otherwise have, including, without limitation, liability under the indemnification provisions contained in this Agreement.

11.11  Waiver of Subrogation. If and to the extent the Authority is not an additional insured on an applicable policy, no party shall have any right or claim against the Authority for any property damage, personal injury, or damages of any kind (whether caused by negligence or the condition of the Leased Premises or any part thereof) by way of subrogation or assignment, Lessee hereby waiving and relinquishing any such right. Lessee shall ask its insurance carrier(s) to waive its right of subrogation and provide to Authority the insurer's written verification that it has done so.

11.12  No Third-Party Beneficiaries. It is specifically agreed between the parties hereto that it is not intended by any of the provisions nor any part of this Agreement: (i) to create in or on behalf of any other third party, person, organization, or member of the public rights as a third-party beneficiary; or (ii) to authorize anyone not a party to this Agreement to maintain a suit for personal injuries or property damage pursuant to the terms of this Agreement.

26

## ARTICLE 12 - ENVIRONMENTAL COMPLIANCE

12.1.  Refuse and Hazardous Materials, Substances or Wastes.

A.  Compliance with Environmental Laws. While on Airport property, Lessee shall comply with all federal, state, and local laws, rules, regulations, and ordinances controlling air, water, noise, solid waste, and other pollution and relating to the use, storage, transport, release, or disposal of hazardous materials, substances, and waste.

B.  Waste Removal. Lessee shall be responsible, at its sole cost, for the prompt and proper collection and disposal of all of its waste, refuse, and garbage, including all heavy and bulk items, such as concrete, asphalt chunks, rocks, engine blocks, scrap lumber, 55-gallon drums, and all normal, toxic, or hazardous debris or wastes, and all petroleum product wastes, such as "waste oil." Lessee shall collect waste oil in such containers and on such platform or with such dike as the Authority shall approve; provided, however, that in no event shall Lessee be permitted to collect waste oil in barrels located on unprotected earth or paved areas.

C.  Hazardous Wastes and Materials. Lessee shall not store, dispose of, or release any hazardous or toxic wastes or materials of any kind on Airport premises, nor shall Lessee place such wastes in any waste containers that may be provided and emptied by the Authority. The proper removal and disposal of such hazardous or toxic wastes and materials in accordance with all environmental laws will be Lessee's sole responsibility, at its sole cost. Lessee shall provide documentation confirming proper removal and disposal of such hazardous wastes materials and waste oil to the Authority upon request, and shall be subject to unannounced inspections of its facilities by Authority for the purpose of determining Lessee's compliance with such laws.

12.2  Storm Water Pollution Prevention Plan. Lessee agrees to comply with, and require its sublessees and contractors to comply with, the Authority's Storm Water Pollution Prevention Plan, as amended from time to time, and all applicable requirements of the Authority's Virginia Department of Emergency Services or national permit, whichever is applicable. Lessee shall participate in compliance audits, surveys, and information sessions conducted by the Authority, and shall require that it and its employees comply with best management practices identified by it or contained in the Authority's Storm Water Pollution Prevention Plan.

12.3  Report Release of Hazardous Materials. Lessee shall immediately furnish to the

27

Authority written notice of any and all releases of hazardous or other wastes or substances whenever such releases also are required to be reported to any federal, state, or local authority and shall pay for all clean up and removal costs. Such written notice shall identify the substance released, the amount released, and the measures undertaken to clean up and remove the released material and any contaminated soil or water, and shall further certify that no contamination remains. Lessee shall also provide the Authority with copies of any and all reports resulting from tests on Airport property or made to any governmental agency which relate to Airport property.

12.4   Plans and Permits. Upon request, Lessee shall provide the Authority with a copy of any written plan, program, or permit required by any state, local or federal environmental rules and regulations and required of Lessee as a result of its operations on and at the Airport.

### ARTICLE 13 - SIGNS

13.1.  Prior to the erection, construction, or placing of any external identifying signs on the Leased Premises, Lessee shall submit to the Authority, for approval in writing, such drawings, sketches, design dimensions and type, number and character of the sign(s), and proposed means of attachment as is necessary to obtain such approval.

### ARTICLE 14 - TAXES AND LICENSE FEES

14.1   License, Fees, Taxes, and Assessments. In addition to rent, Lessee shall pay all leasehold and other taxes, assessments, stormwater utility fees, license fees, and charges of a like nature, if any, which at any time during the Term hereof may be levied, assessed, charged, or imposed or which may become a lien by virtue of levy, assessment, or charge by the federal government, Commonwealth of Virginia, any municipal or county government, any successor in authority to the foregoing, or any other tax- or assessment- levying bodies upon or with respect to the Leased Premises or the aircraft located thereon, or which are attributable to or arise out of, either directly or indirectly, the letting, use, development, or occupancy of the Leased Premises and facilities or which arise out of, directly or indirectly, Lessee's activities or business conducted on the Leased Premises.

Should Lessee desire to contest the amount or validity of any tax or assessment payable by it hereunder, it may do so, at its expense, after providing such security as the Authority deems adequate to cover any delinquency, penalty, or interest charges that may arise from such contest. Lessee shall indemnify the Authority from all taxes, penalties, costs, expenses, and attorneys' fees incurred by the Authority resulting directly or indirectly from any and all such contests.

### ARTICLE 15 - RESERVATION OF RIGHTS

28

15.1    Right to Develop Landing Area. Authority reserves the right to further develop or improve the landing area of the Airport as it sees fit, regardless of the desires or view of the Lessee, and without interference or hindrance.

15.2    Right to Repair Landing Area. Authority reserves the right, but shall not be obligated, to maintain and keep in repair the landing area of the Airport and all publicly owned facilities of the Airport.

15.3    Right to Lease Landing Area. During the time of war or national emergency, Authority shall have the right to lease the landing area or any part thereof to the United States government for military or naval use, and, if such lease is executed, the provisions of this instrument, insofar as they are inconsistent with the provisions of the lease to the government, shall be suspended.

15.4    Right to Protect Approaches. Authority reserves the right to take any action it considers necessary to protect the aerial approaches of the airport against obstructions, together with the right to prevent Lessee from erecting, or permitting to be erected, any building or other structure on or adjacent to the Airport which, in the opinion of the Authority, would limit the usefulness of the Airport or constitute a hazard to aircraft.

15.5    Right to Control All Airport Operations. Authority reserves the right to control all Airport operations. This right shall include, without necessarily being limited to, the following: the right to close any airport facilities, without any liability to Lessee for the consequences thereof, when it deems such closing to be reasonably necessary for the maintenance, repair, or development of any Airport property or facility or for the safety of the general public. This right shall also include the right to reserve adequate apron area for the landing, unloading, and parking of aircraft at the Airport. Authority reserves the right to make all Airport facilities developed with federal aid, and all Airport facilities usable for the landing and taking-off of aircraft, available to the United States at all times, without charge, for use by military aircraft.

15.6    Right to Inspect Premises. Authority, through its employees, agents, representatives, and contractors, shall have the right to enter the Leased Premises at reasonable times to inspect them and Lessee's operations to determine whether Lessee has complied with and is complying with the terms and conditions of this Agreement. Nothing herein, however, shall be deemed to place any responsibility or liability upon Authority for the safety or condition of the Leased Premises, which are solely the obligation of Lessee.

15.7    Right to Maintain Systems. Without limiting the generality of the foregoing, the Authority, through its employees, agents, representatives, contractors, and furnishers of utilities and other services, shall have the right, but not the duty, for the benefit of other tenants at the Airport, to maintain existing and future common utility, mechanical,

electrical, and other systems, and to enter upon the Leased Premises at all reasonable times to make such repairs, replacements, and/or alterations as the Authority may deem necessary or advisable and, from time to time, to construct or install over, in, or under the Leased Premises new systems or parts thereof, and to use the Premises for access to other parts of the Airport otherwise not conveniently accessible; provided, however, that the exercise of such rights shall not unreasonably interfere with the use and occupancy of the Leased Premises by the Lessee, and that every reasonable effort shall be made to restore the Leased Premises to the condition existing prior to the exercise of such rights. The exercise of any or all such rights by the Authority, or others acting on behalf of the Authority, shall not be construed to be an eviction of the Lessee, nor shall it be made the grounds for any abatement of rent, fees, or charges of any type, nor for any claim or demand for damages, consequential or otherwise.

15.8     Use of Adjacent Land and Facilities. Authority reserves the right to use and to permit others to use all roadways, taxiways, ramps and access ways, gates, parking areas, and other public use areas adjacent to the Leased Premises.

15.9     Right to Rearrange Airport; Master Plan Update. Authority reserves the right to rearrange or expand any Airport facility and to rearrange and reallocate, at Authority's expense, the space of Lessee incident to such expansion. Authority covenants that it will not interrupt the business of Lessee except to the extent reasonably necessary for such expansion.

## ARTICLE 16 - ASSIGNMENT AND SUBLETTING

16.1     Prohibition of Transfer. Subject to Section 2.17, above, Lessee covenants and agrees that it will not sublet, license, assign, or transfer, by operation of law or otherwise, this Lease, the Leased Premises, or any services Lessee is authorized to provide hereunder, without the express written consent of the Authority, which consent will not be unreasonably withheld.   Neither a sale in the stock or membership interests of Lessee's ultimate parent company nor a public offering involving Lessee shall in any manner be construed as an assignment or transfer subject to this provision.

## ARTICLE 17 - TERMINATION BY LESSEE

17.1     Termination for Cause. Lessee may cancel this Agreement and terminate its obligations hereunder subsequent to the occurrence of any of the following events, upon written notice to the Authority of such cancellation and the specific reason therefor:

     A.     The substantial restriction of, or interference with, Lessee's use of the Leased Premises for a period in excess of ninety (90) days; provided that such restriction or interference is not due to any fault of Lessee;

30

B.     The default by the Authority in the performance of any material term or material terms of this Agreement and the failure of the Authority to remedy such default within a period of thirty (30) days after receipt from Lessee of written notice to remedy the same;

C.     The abandonment of the Airport as an airport or airfield;

D.     The assumption by the United States government, or any authorized agency thereof, of the operation, control, or use of the Airport, or any substantial part or parts thereof, in such manner as to substantially restrict Lessee from operating thereon for a period of at least ninety (90) days; or

E.     The issuance by any court of competent jurisdiction of any injunction, not caused by the act or omission of the Lessee, preventing or restraining the use of the Airport in such a manner as to substantially restrict the Lessee from operating at the Leased Premises, and the remaining in force of such injunction for at least ninety (90) days.

In the event Lessee refrains from canceling this Agreement despite the existence of one or more of the reasons listed in A., C., D., or E. above, all rent, fees, and commissions for the period that the Leased Premises are unusable by Lessee will be abated, provided Lessee first notifies the Authority that it intends to take advantage of this provision and the Authority agrees that one or more of the above conditions exist.

### ARTICLE 18 - TERMINATION BY AUTHORITY

18.1    Default. The happening of any one or more of the following listed events shall constitute an event of default and a breach of this Agreement on the part of Lessee:

A.     The failure of Lessee to pay any rent or any other amount due and payable under this Agreement within a period of thirty (30) days after receipt from the Authority of written notice to pay same;

B.     The failure by Lessee to perform any of its obligations under this Agreement and the failure of Lessee to remedy, or undertake to remedy, to the Authority's satisfaction, such failure within a period of thirty (30) days after the receipt of written notice from the Authority, or such longer period of time as shall be reasonable;

C.     The filing of a voluntary petition in bankruptcy, including a reorganization plan; making a general or other assignment for the benefit of creditors; the adjudication of Lessee as bankrupt; or the appointment of a receiver for the property or affairs of Lessee which is not vacated within thirty (30) days;

31

D.   The abandonment, desertion, vacation, or discontinuance by Lessee of its operation of the business herein authorized for a period in excess of thirty (30) days; or

E.   Material violation of any federal, state, or local law or ordinance, rule, regulation, or order applicable to Lessee or its operations at the Airport.

18.2   Effect of Default. Upon the happening of any event of default as defined in paragraph 18.1, above, or at any time thereafter during the continuance thereof, the Authority may, at its option, exercise concurrently or successively any one or more of the following rights and remedies:

A.   Without waiving any default, pay any sum required to be paid by Lessee to others than the Authority and which Lessee has failed to pay, and perform any obligation required to be performed by Lessee hereunder. Any amounts so paid or expended by the Authority in fulfilling the obligations of Lessee hereunder shall be repaid by Lessee to the Authority on demand, with interest thereon at the prime rate as set forth in the Wall Street Journal on the date of such payment or expenditure;

B.   To sue for the collection of rents, fees, or other amounts for which Lessee may be in arrears or for the performance of any other covenant, promise, or agreement devolving upon Lessee, all without terminating this Agreement or re-entering and gaining possession of the Leased Premises;

C.   Upon 10 days' written notice, terminate this Agreement and the rights of Lessee hereunder; and/or

D.   Exercise any and all additional rights and remedies which the Authority may have at law or in equity.

18.3   Remedies not exclusive. All rights and remedies provided in this Lease shall be deemed cumulative and additional and not in lieu of or exclusive of each other or of any other remedy available to the Authority at law or in equity.

18.4   Waiver. No waiver by the Authority of any event of default by Lessee in the performance of this Agreement shall be construed to be a waiver of any subsequent event of default. The acceptance of rent or other payments or the performance of all or any part of this Lease Agreement by the Authority during any period after a default by Lessee shall not be deemed a waiver of any right on the part of the Authority to terminate this Lease Agreement for the current breach or a subsequent breach thereof.

18.5   Acts of God. Neither the Authority nor Lessee shall be liable for any delay or failure of

32

performance due solely to strikes, fires, acts of God or the public enemy, acts of the government, floods, epidemics, typhoons, quarantines, freight embargoes, or similar causes beyond their control, provided that the party to this Lease seeking the benefits of this Section shall have given notice in writing to the other party of such cause for failure or delay or anticipated delay within twenty (20) days of the date that the party seeking the benefit of this Section became aware, or reasonably should have become aware, of the act or conditions which is the cause for failure or anticipated delay and shall have used its best efforts to fulfill its duties under this Lease as expeditiously as possible, taking such cause for delay or failure into account.

## ARTICLE 19 - INDEPENDENT CONTRACTOR

19.1  In the use of the Leased Premises and the conduct of its business hereunder, Lessee acts as and is an independent contractor and not an agent of the Authority; therefore, nothing contained herein shall be deemed or construed by the parties hereto, or by any third party, as creating the relationship of principal and agent, partners, joint venturers, or any other such relationship between the parties hereto. Lessee shall in no manner act or hold itself out to be an agent of the Authority.

## ARTICLE 20 - SERVICES BY AIRCRAFT OWNER

20.1  It is clearly understood by Lessee that no right or privilege has been granted or denied herein which would operate to prevent any person, firm, or corporation operating aircraft at the Airport from performing any services that it may choose to perform on its own aircraft with its own regular full-time employees (including, but not limited to, maintenance and repair), subject to such rules and regulations as may be prescribed by the FAA or the Authority, and such additional safety rules and regulations as may be prescribed by Lessee for its own tenants within the leased premises.

## ARTICLE 21 - GOVERNMENTAL AGREEMENTS

21.1  Governmental Agency Agreements. Authority hereby advises the Lessee that it has entered into various agreements with the United States government and the Commonwealth of Virginia with respect to the Airport. Authority further represents that it intends from time to time hereafter to enter into additional agreements with governmental agencies with respect to applications for funds for improvements to be made at the Airport, in accordance with pertinent statutes, rules, and regulations of governmental authorities having jurisdiction thereof. This Lease is expressly made subject to all such agreements now existing or hereafter made.

21.2  Right to Amend. In the event that the FAA or its successor requires modifications or changes in this Agreement as a condition precedent to the granting of funds for the

33

improvement of the Airport, or otherwise, the Lessee agrees to consent to such amendments, modifications, revisions, supplements, or deletions of any of the terms, conditions, or requirements of this Agreement as may be reasonably required; provided, however, if such modifications or changes substantially change or substantially adversely affect the financial condition of Lessee hereunder, the Lessee shall have the option, upon thirty (30) days' written notice to Commission, to terminate this Agreement.

21.3    Cooperation. Lessee shall do nothing which may cause Authority not to comply with the grant assurances which have been provided to the Authority by the Virginia Department of Aviation with respect to the use and disposition of the Airport's satellite weather system.

### ARTICLE 22 - ASSURANCES REQUIRED BY STATE AND FEDERAL GOVERNMENTS

22.1    Nondiscrimination. Notwithstanding any other or inconsistent provision of this Agreement, during the performance of this Agreement, Lessee, for itself, its members, employees, successors in interest, assigns, contractors, and sublessees, as part of the consideration for this Agreement, does hereby covenant and agree, as a covenant running with the land, that:

A.      No person on the grounds of race, color, religion, sex, or national origin shall be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination in, the use of the Leased Premises;

B.      In the construction of any improvements on, over, or under the Premises, and the furnishing of services therein or thereon, no person on the grounds of race, color, religion, sex, or national origin shall be excluded from participation in, denied the benefits of, or otherwise be subject to discrimination;

C.      Lessee shall use the Leased Premises in compliance with all other requirements imposed by or pursuant to Title 49, Code of Federal Regulations, Department of Transportation, Subtitle A, Office of the Secretary, Part 21, Nondiscrimination in Federally Assisted Programs of the Department of Transportation - Effectuation of Title VI of the Civil Rights Act of 1964, and as said regulations may be amended.

D.      In the event of breach of any of the above nondiscrimination covenants, Authority shall have the right to terminate this Agreement and to reenter and repossess the Premises and hold the same as if said Agreement had never been made or issued.

34

22.2    <u>Affirmative Action</u>. The Lessee assures that it will undertake an affirmative action program, as required by 14 CFR Part 152, Subpart E, as amended, to ensure that no person shall, on the grounds of race, creed, color, national origin, or sex, be excluded from participating in or receiving the services or benefits of any program or activity covered by this subpart. The Lessee assures that it will require that its covered organizations provide assurance to the Lessee that they similarly will undertake affirmative action programs and that they will require assurances from their sub-organizations, as required by 14 CFR Part 152, Subpart E, as amended, to the same effect.

The Lessee agrees to comply with any affirmative action plan or steps for equal employment opportunity required by 14 CFR Part 152, Subpart E, as amended, as part of the affirmative action program or by any federal, state, or local agency or court, including those resulting from a conciliation agreement, a consent decree, court order, or similar mechanism. The Lessee agrees that a state or local affirmative action plan will be used in lieu of any affirmative action plan or steps required by 14 CFR Part 152, Subpart E, as amended, only when they fully meet the standards set forth in 14 CFR 152.409, as amended. The Lessee agrees to obtain a similar assurance from its covered organizations, and to cause them to require a similar assurance of their covered sub-organizations, as required by 14 CFR Part 152, Subpart E, as amended.

The Lessee agrees that it will not discriminate against any persons or class of persons by reason of race, color, creed, sex, or national origin in its employment practices or in providing any services, or in the use of any of its facilities provided for the public, in any manner prohibited by Title 49 CFR, Department of Transportation Regulations, or in any manner prohibited by Title VI of the Civil Rights Act of 1964.

22.3    <u>Indemnity</u>. Lessee shall defend, indemnify and hold harmless the Authority from any claims and demands of third persons, including the United States of America, resulting from Lessee's noncompliance with any of the provisions of this Article, and Lessee shall reimburse the Authority for any loss or expense incurred by reason of such noncompliance.

## ARTICLE 23 - NOTICES

23.1    <u>Forms of Notice</u>. Unless otherwise specified, all notices, consents, and approvals required or authorized by this Agreement to be given by or on behalf of either Party to the other shall be in writing and signed by a duly designated representative of the Party by or on whose behalf they are given, and shall be deemed given five days after the time a certified letter, properly addressed and postage prepaid, is deposited in any United States Post Office, or upon delivery by hand, or upon delivery by an overnight express carrier.

23.2 Notice to Authority. Notice to the Authority shall be addressed to it and delivered at the office of the <u>Executive Director, 100 Bowen Loop Road, Charlottesville, Virginia 22911,</u> either by certified letter, by hand, or by overnight express carrier, or at such other office as it may hereafter designate by notice to Lessee in writing.

23.3 Notice to Lessee. Notice to Lessee shall be addressed and delivered to <u>the General Manager, 100 Aviation Drive, Suite 100, Charlottesville, Virginia 22911,</u> either by certified letter, by hand, or by overnight express carrier, or at such other office as it may hereafter designate by notice to Authority in writing.

### ARTICLE 24 - MISCELLANEOUS PROVISIONS

24.1 Entire Agreement. This Agreement constitutes the entire understanding between the Parties related to the Leased Premises. Any change or modification of this Agreement must be in writing signed by both parties.

24.2 Severability. In the event any provisions hereof shall be finally declared void or illegal by any court or administrative agency having jurisdiction, the remaining provisions shall continue in full force and effect as nearly as possible, in accordance with the original intent of the parties.

24.3 Headings. The headings used in this Agreement are intended for convenience of reference only and do not define, expand, or limit the scope or meaning of any provision of this Agreement.

24.4 Governing law. This Agreement is to be construed in accordance with the laws of the Commonwealth of Virginia. The parties agree that, to the extent permitted by law, any action arising from this Agreement shall be brought in the Circuit Court for the County of Albemarle or in the U.S. District Court for the Western District of Virginia.

24.5 Remedies not exclusive. All rights and remedies provided in this Agreement shall be deemed cumulative and additional to, and not in lieu of or exclusive of, each other or of any other rights or remedies available to the parties by virtue of this Agreement, or by virtue of any administrative or legal proceeding, whether legal or equitable in nature.

24.6 Successors and Assigns Bound. This Lease shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto, where permitted by this Agreement.

### ARTICLE 25 - NONEXCLUSIVE RIGHT

25.1 It is understood and agreed that nothing herein contained shall be construed to grant or authorize the granting of an Airport-wide exclusive right to Lessee to provide the services listed herein.

## ARTICLE 26 - FORMER LEASES TERMINATED

26.1    Former Lease Terminated. Authority and Lessee agree that upon the effective date of this Lease, after proper execution of this Lease by both parties, the lease dated July 1, 1997, as amended, modified, assigned, or extended, is hereby cancelled and terminated; of no further force or effect; and replaced and superseded in its entirety by this Agreement.

[Signature page follows]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written:

**Charlottesville-Albemarle Airport Authority**

APPROVED AS TO FORM

By: *Melinda Crawford*

Deputy City Atty.
City of Charlottesville

Melinda Crawford
Executive Director

Attest: *Penny Shifflett*

Date: 3-26-2015

Cathy Pendleton
Secretary

Penny Shifflett
Director of Finance

**PIEDMONT HAWTHORNE AVIATION, LLC d/b/a LANDMARK AVIATION**

By: _____
Title: _____
Date: 5/16/2015

Attest: _____
              Secretary

SCHEDULE A

**LEASED PREMISES**

# Schedule "A" – Leased Premises



# Schedule "A" Support – Leased Premises



**Schedule B**

**Annual Rent Schedule**

# Schedule B

## Annual rent schedule

### Lease years 1 - 35

| $ per sq ft | Sq footage: | | Total annual rent | |
|---|---|---|---|---|
| $ 0.27 | 628,602 | $ | 169,722.54 | Rent to begin when lease is executed |
| $ 0.27 | 646,602 | $ | 174,582.54 | Rent to begin 6 months after executed includes 18,000 sq ft on which Hangar 4 will be constructed |

See "Escalation of Rent" tab/spreadsheet for calculation of annual increase

| | Dates of annual rent increases | New Annual Rent | | | | Annual Rent |
|---|---|---|---|---|---|---|
| Year 1 | 3/1/2016 | $ 177,201.28 | | | | |
| Year 2 | 3/1/2017 | $ 179,859.30 | | | | |
| Year 3 | 3/1/2018 | $ 182,557.19 | | | | |
| Year 4 | 3/1/2019 | $ 185,295.54 | | | | |
| Year 5 | 3/1/2020 | $ 188,074.98 | | | | |
| Year 6 | 3/1/2021 | $ 190,896.10 | | | | |
| Year 7 | 3/1/2022 | $ 193,759.54 | | | | |
| Year 8 | 3/1/2023 | $ 196,665.94 | | | | |
| Year 9 | 3/1/2024 | $ 199,615.93 | | | | |
| Pro-Rate | 3/1/24 - 6/30/24 | $ 16,634.66 " /month | | | | |
| Pro-Rate | 7/1/2024 | $ 355,264.01 | If Option #1 is executed | | | |
| Pro-Rate | 7/1/24 - 2/28/25 | $ 29,605.33 " /month | Year 26 | 3/1/2041 | $ | 519,087.62 |
| Year 10 | 3/1/2025 | $ 360,592.97 | Year 27 | 3/1/2042 | $ | 526,873.94 |
| Year 11 | 3/1/2026 | $ 366,001.86 | Year 28 | 3/1/2043 | $ | 534,777.05 |
| Year 12 | 3/1/2027 | $ 371,491.89 | Year 29 | 3/1/2044 | $ | 542,798.70 |
| Year 13 | 3/1/2028 | $ 377,064.27 | Year 30 | 3/1/2045 | $ | 550,940.68 |
| Pro-Rate | 3/1/28 - 6/30/28 | $ 31,422.02 " /month | | | | |
| Pro-Rate | 7/1/2028 | $ 427,742.23 | If Option #2 is executed | | | |
| Pro-Rate | 7/1/28 - 2/28/29 | $ 35,645.19 " /month | Year 31 | 3/1/2046 | $ | 559,204.79 |
| Year 14 | 3/1/2029 | $ 434,158.36 | Year 32 | 3/1/2047 | $ | 567,592.86 |
| Year 15 | 3/1/2030 | $ 440,670.73 | Year 33 | 3/1/2048 | $ | 576,106.76 |
| Year 16 | 3/1/2031 | $ 447,280.80 | Year 34 | 3/1/2049 | $ | 584,748.36 |
| Year 17 | 3/1/2032 | $ 453,990.01 | Year 35 | 3/1/2050 | $ | 593,519.58 |
| Year 18 | 3/1/2033 | $ 460,799.86 | | | | |
| Year 19 | 3/1/2034 | $ 467,711.86 | | | | |
| Year 20 | 3/1/2035 | $ 474,727.53 | | | | |
| Year 21 | 3/1/2036 | $ 481,848.45 | | | | |
| Year 22 | 3/1/2036 | $ 489,076.17 | | | | |
| Year 23 | 3/1/2038 | $ 496,412.32 | | | | |
| Year 24 | 3/1/2039 | $ 503,858.50 | | | | |
| Year 25 | 3/1/2040 | $ 511,416.38 | | | | |

# Appraised FMV of Landmark Aviation Lease Area (Buildings and Land)

## Support for Schedule B Annual Rent Schedule

In 2013, the Authority began discussions with Landmark Aviation to 1) expand the lease area to accommodate the construction of new 18,000 sq ft hangar (Hangar #4), 2) to combine the land lease for Hangar #4 with their two existing agreements (original agreement dated 1999 w/expiration date of 4/20/28 and Hangar #3 lease dated 2003 w/expiration date of 7/16/28) into one new agreement, 3) extend the expiration date of the new agreement to 25 years with two five year mutually agreed upon options.

On 11/19/13 AWG completed a rent study of the building and land within the Landmark Aviation lease area and the following is a breakdown of the established FMV Landmark has agreed to a 1.5% annual escalation for the term of the lease (to include all extension options)

| Breakdown of Hangars area | Total Sq ft | $ per sq ft * | Rates at date of execution of issue 3/1/15 (sq. Ft. x $.27) does not include Hangar #4 space | Rate begin escalation to 7/1/24 + equal 2024 thereup | Rate to begin 'in 2024 when Hangar #3 goes to FMV + escalation | The difference between the 2024 rate and the actual FMV rate of Hangar #3 ($8,000 sf *12.59-.27) |
|---|---|---|---|---|---|---|
| Hangar #3 (exact foot print of building) | 18,000 | 2.59 | $ 4,860.00 | | $ 46,620.00 | 41,760.00 |
| Landsurrounding Hangar #3 (land only) | 5,000 | 0.34 | $ 1,350.00 | $ 1,700.00 | $ 1,700.00 | |
| South Tie Downs | 8,079 | 0.42 | $ 2,181.33 | $ 3,393.18 | $ 3,393.18 | |
| Ramp Area | 479,809 | 0.30 | $ 129,546.43 | $ 143,842.70 | $ 143,842.70 | |
| Wash Rack | 4,200 | 0.34 | $ 1,134.00 | $ 1,428.00 | $ 3,428.00 | |
| Proposed Hangar #4 | 18,000 | 0.34 | | $ 6,120.00 | $ 6,120.00 | |
| Maintenance Hangar | | 0.34 | - | | | |
| Pegasus Office | 900 | 12.3 | - | $ 11,070.00 | $ 11,070.00 | |
| Pegasus Hangar | 5670 | 2.14 | - | $ 12,133.80 | $ 12,133.80 | |
| Landmark Hangar | 5906 | 2.25 | - | $ 13,288.50 | $ 13,288.50 | |
| Landmark Office | 288 | 5.43 | - | $ 1,566.72 | $ 1,566.72 | |
| Total Maintenance Hangar | 12,764 | | $ 3,446.28 | | | |
| Hangar #1 | | | | | | |
| Hangar #1 | 11220 | 2.48 | | $ 27,825.60 | $ 27,825.60 | |
| F&O Terminal | 5090 | 2.48 | | $ 12,623.20 | $ 12,623.20 | |
| F&O Offices | 6418 | 2.48 | | $ 15,916.64 | $ 15,916.64 | |
| Total Hangar #1 | 22,728 | | $ 6,136.36 | | | |
| Hangar #2 | | | | | | |
| Hangar #2 | 11220 | 2.59 | | $ 29,059.80 | $ 29,059.80 | |
| CFC Offices | 1008 | 2.59 | | $ 2,610.72 | $ 2,610.72 | |
| Total Hangar #2 | 12,228 | | $ 3,301.56 | | | |
| Auto Parking | 7,100 | 0.37 | $ 1,917.00 | $ 2,627.00 | $ 2,627.00 | |
| Fuel Farm | 11,844 | 0.34 | $ 3,197.88 | $ 4,026.96 | $ 4,026.96 | |
| Roadway 32> 15% | 27,200 | 0.34 | $ 7,344.00 | $ 9,248.00 | $ 9,248.00 | |
| Auto Parking | 16,650 | 0.37 | $ 4,495.50 | $ 6,160.50 | $ 6,160.50 | |
| Auto Parking | 3,000 | 0.37 | $ 810.00 | $ 1,130.00 | $ 1,110.00 | |
| Total lease area square foot | 646,602 | | $ 169,722.54 | $ 310,711.32 | 152,671.32 | |

Less sq footage for Hangar #4 during first 6 months   18,000

Total lease area sq ft for first 6 months   628,602

Landmark Aviation 2015 Agreement
Escalation of Rents
Support for Schedule B Annual Rent Schedule

Annual Increase to occur on
anniversary date of execution:        1.50%
Actual Date of Execution:              (Anticipated date 3/1/15)                                          Col F + Column G

| | | Rent during the first 8 months of the new agreement | Rent to begin the 7th month of new agreement to allow for lease area of Hangar #4 | 11/19/2011 Appraised FMV of buildings and land + escalation to begin 7/1/2024 | The difference between the 2024 rate and the actual FMV rate of Hangar #3 (18,000 sf *(2.59-.27) | 11/19/2015 Appraised FMV of Hangar #3 + escalation to begin 7/17/2028 |
|---|---|---|---|---|---|---|
| | | $.27 x 628,602 sf | $.27 x (628,602 + 18,000 sf) | $ 350,371.42 escalated from 2014 - 2024 | $ 41,760.00 escalated from 2014 - 2028 | 352,271.42 escalated from 2014 - 2028 |
| | 2015 Rents | $169,722.54 | $ 174,562.54 | | | |
| | + annual increase | | $ 3,618.34 | | | |
| Year 1 | 2016 Adjusted Rents | | $ 177,201.18 | | | |
| | + annual increase | | $ 2,658.02 | | | |
| Year 2 | 2017 Adjusted Rents | | $ 179,859.30 | | | |
| | + annual increase | | $ 2,697.89 | | | |
| Year 3 | 2018 Adjusted Rents | | $ 182,557.19 | | | |
| | + annual increase | | $ 2,738.36 | | | |
| Year 4 | 2019 Adjusted Rents | | $ 185,295.54 | | | |
| | + annual increase | | $ 2,779.43 | | | |
| Year 5 | 2020 Adjusted Rents | | $ 188,074.98 | | | |
| | + annual increase | | $ 2,821.12 | | | |
| Year 6 | 2021 Adjusted Rents | | $ 190,896.10 | | | |
| | + annual increase | | $ 2,863.44 | | | |
| Year 7 | 2022 Adjusted Rents | | $ 193,759.54 | | | |
| | + annual increase | | $ 2,906.39 | | | |
| Year 8 | 2023 Adjusted Rents | | $ 196,665.92 | | | |
| | + annual increase | | $ 2,948.99 | | | |
| Year 9 | 2024 Adjusted Rents | | $ 199,615.91 | $ 355,264.01 | | |
| Pro Rate I + annual increase | | | | $ 1,328.96 | | |
| Year 10 | 2025 Adjusted Rents | | | $ 360,592.97 | | |
| | + annual increase | | | $ 5,408.89 | | |
| Year 11 | 2026 Adjusted Rents | | | $ 366,001.86 | | |
| | + annual increase | | | $ 5,490.03 | | |
| Year 12 | 2027 Adjusted Rents | | | $ 371,491.86 | | |
| | + annual increase | | | $ 5,572.38 | | |
| Year 13 | 2028 Adjusted Rents | | | $ 377,064.27 | $ 50,677.99 | $ 427,742.23 |
| Pro Rate I + annual increase | | | | | | $ 6,416.13 |
| Year 14 | 2029 Adjusted Rents | | | | | $ 434,158.36 |
| | + annual increase | | | | | $ 6,512.38 |
| Year 15 | 2030 Adjusted Rents | | | | | $ 440,670.73 |
| | + annual increase | | | | | $ 6,610.06 |
| Year 16 | 2031 Adjusted Rents | | | | | $ 447,280.80 |
| | + annual increase | | | | | $ 6,709.21 |
| Year 17 | 2032 Adjusted Rents | | | | | $ 453,990.01 |
| | + annual increase | | | | | $ 6,809.85 |
| Year 18 | 2033 Adjusted Rents | | | | | $ 460,799.86 |
| | + annual increase | | | | | $ 6,912.00 |
| Year 19 | 2034 Adjusted Rents | | | | | $ 467,711.86 |
| | + annual increase | | | | | $ 7,015.68 |
| Year 20 | 2035 Adjusted Rents | | | | | $ 474,727.53 |
| | + annual increase | | | | | $ 7,120.91 |
| Year 21 | 2036 Adjusted Rents | | | | | $ 481,848.45 |
| | + annual increase | | | | | $ 7,227.73 |
| Year 22 | 2037 Adjusted Rents | | | | | $ 489,076.17 |
| | + annual increase | | | | | $ 7,336.14 |
| Year 23 | 2038 Adjusted Rents | | | | | $ 496,412.32 |
| | + annual increase | | | | | $ 7,446.18 |
| Year 24 | 2039 Adjusted Rents | | | | | $ 503,858.50 |
| | + annual increase | | | | | $ 7,557.88 |
| Year 25 | 2040 Adjusted Rents | | | | | $ 511,416.38 |
| If Option #1 is executed | | | | | | |
| | + annual increase | | | | | $ 7,671.25 |
| Year 26 | 2041 Adjusted Rents | | | | | $ 519,087.62 |
| | + annual increase | | | | | $ 7,786.31 |
| Year 27 | 2042 Adjusted Rents | | | | | $ 526,873.94 |
| | + annual increase | | | | | $ 7,903.11 |
| Year 28 | 2043 Adjusted Rents | | | | | $ 534,777.05 |
| | + annual increase | | | | | $ 8,021.66 |
| Year 29 | 2044 Adjusted Rents | | | | | $ 542,798.70 |
| | + annual increase | | | | | $ 8,141.98 |
| Year 30 | 2045 Adjusted Rents | | | | | $ 550,940.68 |
| If Option #2 is executed | | | | | | |
| | + annual increase | | | | | $ 8,264.11 |
| Year 31 | 2046 Adjusted Rents | | | | | $ 559,204.79 |
| | + annual increase | | | | | $ 8,388.07 |
| Year 32 | 2047 Adjusted Rents | | | | | $ 567,592.86 |
| | + annual increase | | | | | $ 8,513.89 |
| Year 33 | 2048 Adjusted Rents | | | | | $ 576,106.76 |
| | + annual increase | | | | | $ 8,641.60 |
| Year 34 | 2049 Adjusted Rents | | | | | $ 584,748.36 |
| | + annual increase | | | | | $ 8,771.23 |
| Year 35 | 2050 Adjusted Rents | | | | | $ 593,519.58 |

Page 1 of 1

### SCHEDULE C

### PERFORMANCE BOND

KNOW ALL MEN BY THESE PRESENTS:

Piedmont Hawthorne Aviation, LLC, d/b/a Landmark Aviation 1500 CityWest Blvd., Ste. 600,

Houston TX 77042

(Insert full name or legal title and address of Principal)

(hereinafter referred to as "Principal"), and

Atlantic Specialty Insurance Company, 601 Carlson Parkway, Suite 600, Minnetonka, MN 55305

(Insert full name or legal title and address of Surety)

a corporation duly organized under the laws of the state of _____NY_____ and legally authorized to do business in the Commonwealth of Virginia (hereinafter referred to as "Surety"), are held and firmly bound unto the CHARLOTTESVILLE-ALBEMARLE AIRPORT AUTHORITY ("the Authority"), 100 Bowen Loop Road, Charlottesville, VA 22911 (hereinafter referred to as " Authority "), as Obligee in the amount equal to Seventy Five Thousand and 00/100 ($75,000) dollars for the payment whereof Principal and Surety bind themselves, their successors, and their assigns, jointly and severally, firmly by these presents.

WHEREAS, Principal has entered into a certain Lease Agreement with the Authority dated 4/1/2015, for approximately 11 acres of space, including the facilities located thereon ("Agreement"), wherein Principal has agreed to operate a business and to perform and abide by certain terms, conditions, and obligations, a copy of said Agreement being attached hereto and expressly incorporated by reference herein.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that if the Principal or its successors and assigns, shall promptly and faithfully perform the Agreement, in strict conformity with each and every term, condition, obligation, and requirement thereof, then this obligation shall be null and void; otherwise, it shall remain in full force and effect, as stated herein.

a. The Principal shall well and truly perform, and carry out and abide by all the terms, conditions, and provisions of said Agreement, and complete the work and all obligations therein specified in accordance with the terms thereof; and in the event the Principal fails to perform the Agreement as aforesaid, it shall be the duty of the Surety herein to make payment to the Authority in accordance with the terms of the Agreement; and the Surety herein shall and does hereby agree to defend, indemnify, and hold harmless the Authority for, from, and against any and all liability, loss, cost, damage, or expense, including reasonable attorney's fees or other professional services, which the Authority may incur or

41

which may occur or be imposed upon it by reason of any negligence, default, breach or misconduct on the part of Principal, its agents, servants, subcontractors, or employees in, about, or on account of performance of said Agreement and shall repay to and reimburse to the Authority, promptly upon demand, all sums of money, including attorney's and other professional fees, reasonably paid out or expended by the Authority on account of the failure or refusal of said Principal to carry out, do, perform, or comply with any of the terms and provisions of said Agreement within the time and in the manner therein provided.

b.  Any alteration, modification, omission, or addition which may be made in or to the terms of the Agreement, including, without limitation, the amount to be paid under it, or the giving by the Authority of any extension of time for the performance of the Agreement or any other forbearance of any nature whatsoever on the part of either the Authority or the Principal to the other, shall not in any way affect or release the Principal and the Surety, or either of them, their successors, or their assigns with regard to their obligations and liability hereunder, and notice of such alteration, extension, or forbearance is hereby expressly waived by Surety.

c.  This bond shall continue in full force and effect and shall not be canceled or expire until all of Principal's obligations under the Agreement have been satisfactorily completed, including, without limitation, all maintenance, guarantee, and indemnification obligations. In any event, this bond shall not be deemed canceled or to have expired unless and until Authority receives from Surety written notice evidencing compliance with the requirements of this bond at least 30 calendar days prior to such cancellation or expiration.

d.  IT IS NOT INTENDED BY ANY OF THE PROVISIONS OF ANY PART OF THIS BOND TO CONFER A BENEFIT UPON ANY PERSON OR ENTITY NOT A PARTY TO IT, OTHER THAN THE AUTHORITY OR ITS SUCCESSORS OR ASSIGNS, OR TO AUTHORIZE ANY PERSON OR ENTITY NOT A PARTY TO THIS BOND, OTHER THAN THE AUTHORITY OR ITS SUCCESSORS OR ASSIGNS, TO MAINTAIN A SUIT PURSUANT TO ITS TERMS OR PROVISIONS.

e.  Any suit or action hereunder shall be brought in a Virginia court of competent jurisdiction located in and serving the County of Albemarle, or in the United States District Court for the Western District of Virginia, Charlottesville Division, and not elsewhere.

f.  The provisions of this bond shall be governed by and are intended to be consistent with the laws of the Commonwealth of Virginia. In the event of any conflict, discrepancy, or omission as between this bond and applicable provisions of the laws of the Commonwealth of Virginia, the laws of the Commonwealth of Virginia shall be determinative and controlling.

SIGNED and SEALED this 13th day of May, 2015, in the presence of:

Principal

42

WITNESS:                                        By:(Seal)

                                                (Type Name and Title)

                                                Surety

WITNESS:                                        By:(Seal)
                                                Attorney-In-Fact

(SURETY: Attach Power of Attorney)              (Type Name and Title)

43

## PROPOSED TERMS
### FOR AMENDED LEASE BETWEEN CHO AND LANDMARK AVIATION

1. **Term:**
   25 years (plus two 5 year options which must be mutually agreed upon by Landmark and the Authority)

2. **Total square footage of leased premises:**
   a. Current (March 2014):        Written in lease as approx 11 acres and Hangar #3 lease
                                    area of 23,000 sq. ft.
   b. New consolidated lease:      646,602 sq feet

3. **Consideration Offered to Authority:**

| | Current | Proposed |
|---|---|---|
| **Annual Rent** | $160,000 Yrs 15-19<br>$175,000 Yrs 20-27 | New Rate - **$0.27 x 628,602 sq ft = $169,722.41***<br>*Effective 6 months from execution of agreement<br>Rent for new lease area for 18,000 sq ft Hangar #4 will<br>begin the earlier of September 1, 2015 or at date of<br>Beneficial Occupancy.<br>**Each Subsequent Year         1.5% Annual<br>Increase**<br>**True Up in 2024** (end of orig. lease) **$355,264.01***<br>**True Up in 2028** (add in Hangar #3) **$427,742.23***<br>*Reflects 1.5% annual increase on 2014 Rental Calculations<br>each year on effective date. See Schedule B Rent Schedule. |
| **Fuel Flowage** | $0.05 per gal.< 650,000 gals<br>$0.06 per gal. > 650,000 gals | $0.08 per gal |
| **Gross Receipts** | 3% gross revenues<br>(excluding fuel sales and<br>aircraft sales) | 5% "gross" receipts<br>"gross receipts" does not include taxes or Airport fees<br>collected by Landmark for Authority; and does not include<br>general Aviation fuel sales; aircraft deicing sales and<br>services; aircraft sales; aircraft maintenance services |
| **Performance Guarantee** | $13,000 | 42% Annual Rental<br>$65,000 Yrs 1-5<br>$71,400 Yrs 6-11<br>$77,700 Yrs 12-17, etc. |
| **Improvements to Airport Premises** | | **Phase A:**<br>Minimum $2,300,000 capital improvements to<br>Leased Premises, including;<br>Design and build an 18,000 square foot industry standard<br>general storage hangar with ceiling heights acceptable<br>for the storage of aircraft comparable to Gulfstream V.<br>*(Completion no later than 1 year after the complete<br>execution of the new lease.)*<br><br>**Phase B:**<br>Maximum $380,000 matching fund for Virginia<br>state grant for transition ramp construction<br>If CHO is able to secure funding, Landmark Aviation will<br>provide the 20% match to demolish 20 T-hangars<br>adjacent to the main FBO building and renovate the ramp<br>space within that area to provide additional static ramp<br>space. *(Completion no later than 1 year after CHO<br>secures funding.)* |

Jim Hoffman  Date: 2/17/15                    Michele Crawford
                                              2/13/15                    1 | Page

**PROPOSED TERMS**
**FOR AMENDED LEASE BETWEEN CHO AND LANDMARK AVIATION**

4.  **Additional Services:**
    a.  Collection of Landing Fees (Fee arrangement: 25% to Landmark, 75% to Authority)

5.  **Conditions:**
    a.  In order for Landmark to exercise its extension options, Landmark must have spent an additional $500,000 in facility upgrades prior to 2039. This may include the $380,000 matching funds referred to under Phase B, above.

    b.  Where the agreed to lease term is shorter than the period required to fully amortize any capital improvements which have been approved and authorized by the Authority, lease provisions will be made for any successor or the CHO Airport to "buy-out" the Landmark's unamortized capital costs. If Landmark elects to proceed with any capital improvements not approved by the Authority, then they will do so at their own risk and the unamortized capital cost of those improvements will not be eligible for "buy-out" by the Authority or any successor.

*Melds Crawford 2/13/15*

# Exhibit B

## Third Party Vendor Release ("Release")

SIGNATURE FLIGHT SUPPORT LLC, a Delaware limited liability company, ("Signature"), which maintains a Fixed Base Operation ("FBO") at __Charlottesville-Albemarle__ Airport, __Charlottesville__, __Virginia__ ("Airport"), by its execution hereof, hereby authorizes the following person or entity, ("Vendor"), to enter the FBO premises on a temporary basis, consistent with the terms and conditions hereinafter stated.

1.    **Vendor.** The name, address, and telephone number of the Vendor are as follows:

Name: RMA WORLDWIDE          Address: __12270 WILKENS AVENE - Rockville MD 20852__
Telephone: __301-231-6555__          Email: __act.miesemer@rmalimo.com__

Service provided ("Service"): _____

2.    **Services To Be Performed.** Vendor shall enter Signature's Premises for the sole purpose of performing Service at the request of Signature or its customer, Permittee, tenant, Aircraft owner, pilot or other designated representative. Vendor shall be authorized only to perform the Service noted above and only in the area(s) designated for such Service by local Signature management. Vendor expressly agrees that at no time shall its activities infringe upon Signature's or its customers' ability to operate aircraft or use Signature's leasehold, including, but not limited to, ingress and egress from the FBO, offices, shops, ramps or parking lots.

3.    **Compliance With Laws.** Vendor represents that it shall adhere to the prevailing and applicable rules of the Airport, Federal Aviation Administration ("FAA"), and the Transportation Security Administration ("TSA").

4.    **Indemnification.** Vendor agrees to indemnify, defend and hold harmless Signature and the Airport, their respective officers, directors, agents and employees and Signature's parent, subsidiary, related and affiliated companies from and against any and all liabilities, damages, injuries, losses, claims, fines, penalties or judgments, of any kind whatsoever (including those arising from third parties), including all costs, attorneys' fees, and expenses incidental thereto, which may be suffered by, or charged to, Signature by reason of any loss of or damage to any property or injury to or death of any person arising out of or by reason of any breach, violation or non-performance by Vendor or its agents, servants, consultants, contractors, subcontractors, licensees or employees of any covenant or condition of this Release or by any act or failure to act or negligence of such persons.

5.    a. **Insurance.** Before commencing Services, Vendor shall evidence the following types and amounts of insurance:
    i.    **Liability - Airport Premises**
      (1) Commercial general    Combined single limit $5,000,000 per occurrence, products and completed operations
      (2) Motor vehicle    Combined single limit $5,000,000 per occurrence
        (a) This coverage is conditionally waived if Vendor does not have a motor vehicle that is both (1) registered in its name and (2) driven on Signature's ramp. If Vendor subsequently registers a vehicle in its name and drives on the ramp, the waiver shall be automatically revoked and Vendor shall obtain the requisite coverage.

      (3) Environmental / pollution    Combined Single Limit $5,000,000 per occurrence.

    ii.    **Worker's Compensation & Employer's Liability**
      (1) Worker's compensation    Statutory
      (2) Employer's liability    $500,000 each occurrence for bodily injury by accident
          $500,000 each occurrence for bodily injury by disease
          $500,000 aggregate policy limit

    b.    **Special Provisions For Certificates of Insurance**: All such required liability insurance, except (1) motor vehicle, (2) worker's compensation, and (3) employer's liability shall name (exactly as set forth in quotations) "Signature, its parent, subsidiary, related, and affiliated companies and the Authority" as additional insureds. If the required liability polices do not contain a standard separation of insured provision, they shall be endorsed to provide cross liability coverage. All required insurance policies, except (1) motor vehicle, (2) worker's compensation, and (3) employer's liability shall contain a waiver of subrogation in favor of "Signature, its parent, subsidiary, related, and affiliated companies and the Authority". All required insurance policies shall be evidenced by certificates of insurance that provide at least thirty (30) days advance written notice of any cancellation or changes adverse to the interests of Signature Flight Support LLC, or its subsidiaries. Minimum insurance amounts stated shall not be lowered without express written consent of Signature Flight Support LLC. Higher insurance limits may be required by the Airport; in which case, the Airport's limits shall supersede the limits stated above. VENDOR ACKNOWLEDGES THAT ITS POTENTIAL LIABILITY IS NOT LIMITED TO THE AMOUNT OF ANY LIABILITY INSURANCE COVERAGE OR TO INSURANCE POLICY LIMITS REQUIRED IN THIS RELEASE.

| Signature Flight Support LLC | Vendor: |
|---|---|
| By: _____ | By: _____ |
| Title: _____ | Title: __Executive Vice Pres__ |
| Date: _____ | Date: __10/ /25__ |

Third Party Vendor Release
01-14-2020

= 1 =

# Exhibit C



harman claytor corrigan wellman
THE CIVIL LITIGATION FIRM

JON A. NICHOLS
804.762.8039
DIRECT FAX | 804.212.0875
jnichols@hccw.com
Respond to: Richmond

**_VIA EMAIL AND U.S. MAIL_**

November 20, 2025

Cameron Beck
McCandlish Holton
1111 East Main Street, Suite 2100
Richmond, VA 23219

      Re:   **Telus Communications v. Signature Aviation Services Corporation**
            USDC Delaware : 25-CV-1372-UNA
            Date of Loss:  February 28, 2025

Dear Cam:

      Thank you for your time yesterday. As discussed, my firm represents Signature Flight Support LLC dba Signature Aviation ("Signature") in connection with the property damage claim asserted by Telus Communications ("Telus"). Telus alleges in a lawsuit against "Signature Aviation Services Corporation," a misnamed entity, that its aircraft was damaged when it was struck by a bus driven by Harold Wilbur Benjamin while he was driving for Errands Plus/RMA Worldwide Chauffeured Transportation at the Charlottesville–Albemarle Airport on February 28, 2025.

      As we addressed, Telus has filed suit against Signature in the United States District Court for the District of Delaware. A copy of the suit is attached. By this letter, Signature hereby makes a formal demand for a full defense and indemnification for the February 28, 2025 loss under any and all policies of insurance issued to your client that may apply. This correspondence also serves as Signature's formal request for a complete copy of every policy that may afford coverage for the subject incident.

      Additionally, **effective immediately, your client, including its vehicles, employees, agents, and subcontractors, is prohibited from entering any Signature Aviation leasehold nationwide. Your client is expressly instructed not to seek entry to any Signature property or drive on any Signature ramp.**

**RICHMOND**
POST OFFICE BOX 70280 | RICHMOND, VA 23255
4951 LAKE BROOK DR. | SUITE 100 | GLEN ALLEN, VA 23060

**DC METRO**
1900 DUKE ST. | SUITE 210 | ALEXANDRIA, VA 22314
**ROANOKE**
27 CHURCH AVE. SW | ROANOKE, VA 24011

PHONE 804.747.5200 | FAX 804.747.6085 | WEB HCCW.COM
member of the harmonie group

# Exhibit D

Case 1:25-cv-01372    Document 1-2    Filed 11/11/25    Page 1 of 1 PageID #: 11

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| TELUS COMMUNICATIONS, INC. | SIGNATURE AVIATION SERVICES CORPORATION |

| **(b)** County of Residence of First Listed Plaintiff _____ | County of Residence of First Listed Defendant _____ |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* <br> NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF <br> THE TRACT OF LAND INVOLVED. |

| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* <br> Joseph S. Naylor (3886DE) SWARTZ CAMPBELL LLC <br> 300 Delaware Avenue, Suite 1410 Wilmington, DE 19801 <br> 302-656-5935 Telephone | Attorneys *(If Known)* |
|---|---|

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government <br> Plaintiff | ☐ 3 Federal Question <br> *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government <br> Defendant | ☒ 4 Diversity <br> *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place <br> of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place <br> of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a <br> Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment <br> & Enforcement of Judgment <br> ☐ 151 Medicare Act <br> ☐ 152 Recovery of Defaulted <br> Student Loans <br> (Excludes Veterans) <br> ☐ 153 Recovery of Overpayment <br> of Veteran's Benefits <br> ☐ 160 Stockholders' Suits <br> ☐ 190 Other Contract <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | **PERSONAL INJURY** <br> ☐ 310 Airplane <br> ☐ 315 Airplane Product <br> Liability <br> ☐ 320 Assault, Libel & <br> Slander <br> ☐ 330 Federal Employers' <br> Liability <br> ☐ 340 Marine <br> ☐ 345 Marine Product <br> Liability <br> ☐ 350 Motor Vehicle <br> ☐ 355 Motor Vehicle <br> Product Liability <br> ☐ 360 Other Personal <br> Injury <br> ☐ 362 Personal Injury - <br> Medical Malpractice | **PERSONAL INJURY** <br> ☐ 365 Personal Injury - <br> Product Liability <br> ☐ 367 Health Care/ <br> Pharmaceutical <br> Personal Injury <br> Product Liability <br> ☐ 368 Asbestos Personal <br> Injury Product <br> Liability <br> **PERSONAL PROPERTY** <br> ☐ 370 Other Fraud <br> ☒ 371 Truth in Lending <br> ☒ 380 Other Personal <br> Property Damage <br> ☐ 385 Property Damage <br> Product Liability | ☐ 625 Drug Related Seizure <br> of Property 21 USC 881 <br> ☐ 690 Other <br><br><br><br><br> **LABOR** <br> ☐ 710 Fair Labor Standards <br> Act <br> ☐ 720 Labor/Management <br> Relations <br> ☐ 740 Railway Labor Act <br> ☐ 751 Family and Medical <br> Leave Act | ☐ 422 Appeal 28 USC 158 <br> ☐ 423 Withdrawal <br> 28 USC 157 <br><br> **PROPERTY RIGHTS** <br> ☐ 820 Copyrights <br> ☐ 830 Patent <br> ☐ 835 Patent - Abbreviated <br> New Drug Application <br> ☐ 840 Trademark <br> **SOCIAL SECURITY** <br> ☐ 861 HIA (1395ff) <br> ☐ 862 Black Lung (923) <br> ☐ 863 DIWC/DIWW (405(g)) <br> ☐ 864 SSID Title XVI <br> ☐ 865 RSI (405(g)) | ☐ 375 False Claims Act <br> ☐ 376 Qui Tam (31 USC <br> 3729(a)) <br> ☐ 400 State Reapportionment <br> ☐ 410 Antitrust <br> ☐ 430 Banks and Banking <br> ☐ 450 Commerce <br> ☐ 460 Deportation <br> ☐ 470 Racketeer Influenced and <br> Corrupt Organizations <br> ☐ 480 Consumer Credit <br> ☐ 485 Telephone Consumer <br> Protection Act <br> ☐ 490 Cable/Sat TV <br> ☐ 850 Securities/Commodities/ <br> Exchange <br> ☐ 890 Other Statutory Actions <br> ☐ 891 Agricultural Acts |
| **REAL PROPERTY** <br> ☐ 210 Land Condemnation <br> ☐ 220 Foreclosure <br> ☐ 230 Rent Lease & Ejectment <br> ☐ 240 Torts to Land <br> ☐ 245 Tort Product Liability <br> ☐ 290 All Other Real Property | **CIVIL RIGHTS** <br> ☐ 440 Other Civil Rights <br> ☐ 441 Voting <br> ☐ 442 Employment <br> ☐ 443 Housing/ <br> Accommodations <br> ☐ 445 Amer. w/Disabilities - <br> Employment <br> ☐ 446 Amer. w/Disabilities - <br> Other <br> ☐ 448 Education | **PRISONER PETITIONS** <br> **Habeas Corpus:** <br> ☐ 463 Alien Detainee <br> ☐ 510 Motions to Vacate <br> Sentence <br> ☐ 530 General <br> ☐ 535 Death Penalty <br> **Other:** <br> ☐ 540 Mandamus & Other <br> ☐ 550 Civil Rights <br> ☐ 555 Prison Condition <br> ☐ 560 Civil Detainee - <br> Conditions of <br> Confinement | ☐ 790 Other Labor Litigation <br> ☐ 791 Employee Retirement <br> Income Security Act <br><br><br> **IMMIGRATION** <br> ☐ 462 Naturalization Application <br> ☐ 465 Other Immigration <br> Actions | **FEDERAL TAX SUITS** <br> ☐ 870 Taxes (U.S. Plaintiff <br> or Defendant) <br> ☐ 871 IRS—Third Party <br> 26 USC 7609 | ☐ 893 Environmental Matters <br> ☐ 895 Freedom of Information <br> Act <br> ☐ 896 Arbitration <br> ☐ 899 Administrative Procedure <br> Act/Review or Appeal of <br> Agency Decision <br> ☐ 950 Constitutionality of <br> State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original <br> Proceeding | ☐ 2 Removed from <br> State Court | ☐ 3 Remanded from <br> Appellate Court | ☐ 4 Reinstated or <br> Reopened | ☐ 5 Transferred from <br> Another District <br> *(specify)* | ☐ 6 Multidistrict <br> Litigation - <br> Transfer |  ☐ 8 Multidistrict <br> Litigation - <br> Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(a)

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION <br> UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____     DOCKET NUMBER _____

| DATE <br> 11/11/2025 | SIGNATURE OF ATTORNEY OF RECORD <br> /s/ Joseph S. Naylor |
|---|---|

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TELUS COMMUNICATIONS, INC., | |
| *Plaintiff,* | Case No. |
| v. | **COMPLAINT** |
| SIGNATURE AVIATION SERVICES CORPORATION, | **DEMAND FOR JURY TRIAL** |
| *Defendant.* | |

Plaintiff TELUS Communications, Inc. ("TELUS"), by its undersigned counsel, files its Complaint against Defendant Signature Aviation Services Corporation ("Signature Aviation") and hereby alleges as follows, based both upon its personal knowledge and, with respect to the actions of others, upon information and belief after a reasonable inquiry:

### NATURE OF THE ACTION

1.    TELUS' aircraft sat stationary on a tarmac operated by Signature Aviation at Charlottesville–Albemarle Airport when it was hit by a charter bus escorted by Signature Aviation. The charter bus caused substantial damage to the aircraft, as shown in the photograph attached hereto as Exhibit A. As a result, TELUS incurred substantial direct and consequential uninsured losses, including but not limited to, loss of use, permanent diminution in value, and uninsured repair costs. Because the aircraft was stationary, avoiding it required only minimal care. Signature Aviation failed even that basic standard. TELUS seeks actual and punitive damages.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff TELUS Communications Inc. is a Canadian corporation organized under the laws of British Columbia with its principal place of business in Vancouver, Canada.

3.      Defendant Signature Aviation Services Corporation is a Delaware corporation with its principal place of business in Orlando, Florida. It may be served with process through its registered agent, Corporation Service Company, at 251 Little Falls Drive, Wilmington, Delaware 19808.

4.      Non-Party Errands Plus Inc. d/b/a RMA Worldwide Chauffeured Transportation ("RMA") is a Maryland corporation with its principal place of business in Rockville, Maryland. Its registered agent is Simon M. Nadler, who may be found at 12270 Wilkins Avenue, Rockville, Maryland 28052.

5.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a), because this is an action between a citizen of a foreign state and a citizen of Delaware, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.      This Court has general personal jurisdiction over Signature because Signature is a Delaware corporation.

7.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Signature resides in this judicial district.

## FACTUAL BACKGROUND

8.      The damaged aircraft was a 2014 Gulfstream G550 corporate jet bearing tail number C-FTEL (the "Aircraft"), which was owned, operated, and exclusively used by TELUS.

9.      Signature Aviation is a fixed-based operator that operates a network of private aviation terminals, with more than 200 locations internationally. Signature Aviation provides long-

2

term hangar space for corporate aircraft and offers short-term parking solutions for aircraft in travel.

10.     At the time of the accident, TELUS maintained the Aircraft at Signature Aviation's private terminal at Vancouver International Airport and had parked the Aircraft at the Signature Aviation terminal at Charlottesville–Albemarle Airport.

**A. The Aircraft was severely damaged while in Signature Aviation's custody.**

11.     On February 27, 2025, TELUS executives and employees traveled from Boston Logan International Airport to Charlottesville–Albemarle Airport. The Aircraft landed in Charlottesville at approximately 3:08 p.m. local time.

12.     Upon landing, the Aircraft taxied to Signature Aviation's private terminal and was ushered by Signature Aviation employees to a parking space on a tarmac operated by Signature Aviation. TELUS parked the Aircraft exactly where it was directed to by Signature Aviation employees.

13.     Once parked, Signature Aviation employees placed wheel chocks on all landing gear to prevent the Aircraft from moving. TELUS' executives and employees disembarked from the Aircraft and departed the airport, leaving the Aircraft in Signature Aviation's exclusive custody and control. The Aircraft remained in place.

14.     An Embraer 190 aircraft (the "Embraer") subsequently landed at Charlottesville–Albemarle Airport and taxied to Signature Aviation's private terminal. The Embraer was ushered by Signature Aviation employees and, at Signature Aviation's direction, parked at a location only 105 feet from the Aircraft.

15.     The passengers of the Embraer arranged transportation from the airport by a charter bus operated by RMA. RMA dispatched its employee, 76-year-old Harold Benjamin, to pick up

3

and transport the Embraer passengers. Mr. Benjamin had arrived at the airport before the Embraer, and he was sleeping in the bus at or near the Signature Aviation terminal when the Embraer arrived.

16.    Upon arrival of the Embraer, a Signature Aviation employee, Chris Bolden, woke Mr. Benjamin and escorted the bus to the Embraer. Another Signature Aviation employee, Duane Herndon, directed Mr. Benjamin to follow Mr. Bolden's escort vehicle to the Embraer. Mr. Benjamin followed Mr. Bolden.

17.    Under Signature Aviation's direction and escort, Mr. Benjamin then drove the bus directly into the wing of the Aircraft, causing significant damage to the Aircraft. *See* Ex. A. Either Mr. Bolden led Mr. Benjamin into the wing of the Aircraft or Mr. Benjamin deviated from Mr. Bolden's indicated path and Messrs. Bolden and Herndon failed to stop him, causing the collision.

18.    In either event, the collision should have never happened.

19.    Both Signature Aviation and RMA failed to maintain proper procedures or adequately train their employees to operate in a safe manner and to safely navigate around a parked aircraft.

20.    No TELUS employees were present when the accident occurred.

21.    Although the RMA bus was equipped with a two-way camera, it was allegedly not operational when the accident occurred.

22.    Although the Signature Aviation tarmac was equipped with surveillance cameras, many were allegedly not operational when the accident occurred; those that were operational were allegedly too far from the Aircraft to obtain clear footage.

**B. The Aircraft required significant repair, causing substantial injury to TELUS.**

23.    The accident caused significant damage to the Aircraft. The bus damaged and removed an entire portion of the aircraft's wing, and the abrupt impact caused the Aircraft to jump

4

its wheel chocks, damaging the Aircraft's landing gear. Even repaired, the extensive damage caused a diminution in the Aircraft's value to TELUS and in the market.

24.     The Aircraft was taken out of service for months while it underwent extensive repairs, causing additional harm to TELUS. TELUS paid an insurance deductible toward the repair costs, incurred substantial uninsured costs, and expects to suffer additional uninsured costs, including but not limited to increased insurance expenses, resulting from the accident.

25.     Despite the Aircraft being out of service, TELUS continued to incur costs associated with maintaining the Aircraft, including but not limited to fees to maintain hangar space in Signature Aviation's private terminal and compensation, benefits, and other costs to train and maintain personnel who are directly and exclusively employed by TELUS.

26.     TELUS was also forced to arrange alternate flight transportation to conduct business travel while simultaneously paying to maintain the unusable aircraft, causing considerable harm in the form of extra expense.

27.     Commercial alternatives cannot replicate what the Aircraft provided to TELUS' business, resulting in lost business opportunity and profit.

28.     The Aircraft was repaired in June 2025, but TELUS has been unable to use the Aircraft as it did prior to the accident.

29.     All conditions precedent to bringing this action have been satisfied.

**CLAIMS FOR RELIEF**

**GROSS NEGLIGENCE**

30.     TELUS incorporates by reference paragraphs 1-28 of the Complaint as if the same were set forth in full herein.

5

31.    Signature Aviation owed TELUS a duty of care in operating its private terminal and providing parking for the Aircraft.

32.    Signature Aviation breached its duty of care, including by, *inter alia*:

   a.    accepting custody and control of the Aircraft and then failing to protect it from foreseeable harm;

   b.    the manner in which it directed the Aircraft and Embraer to park;

   c.    the manner in which it allowed, oversaw, and directed RMA to operate in the terminal;

   d.    directing a bus driver who had been sound asleep moments before to operate a ground vehicle in the terminal;

   e.    leading the RMA bus into the Aircraft's wing or failing to prevent the collision; and

   f.    failing to maintain proper procedures or properly train its employees to operate the terminal in a safe manner.

33.    Signature Aviation's actions were grossly negligent and constitute an extreme departure from the standard of care. It knew or should have known that such actions would result in injury.

34.    As a proximate result of Signature Aviation's actions, the Airplane was severely damaged and required extensive repairs.

35.    TELUS suffered damages as a result and is entitled to recover.

## NEGLIGENCE

36.    TELUS incorporates by reference paragraphs 1-28 of the Complaint as if the same were set forth in full herein.

6

37.    At minimum, even if not grossly negligent, Signature Aviation's actions breached

its duty of care with respect to TELUS and proximately caused substantial injury to TELUS.

38.    TELUS suffered damages as a result and is entitled to recover.

### PUNITIVE DAMAGES

39.    TELUS incorporates by reference paragraphs 1-28 of the Complaint as if the same

were set forth in full herein.

40.    Signature Aviation operated its private terminal recklessly and with a wanton or

willful disregard for the safety of the Aircraft and the rights of TELUS.

41.    As a result, the Airplane was severely damaged and required extensive repairs.

42.    TELUS is entitled to recover punitive damages as a result.

### CONCLUSION AND PRAYER

WHEREFORE, TELUS respectfully requests the Court enter judgment in favor of TELUS,

awarding TELUS appropriate damages, including compensatory and punitive damages, attorneys'

fees, and such other and further relief as the Court may deem just and proper.

7

Dated: November 11, 2025

Respectfully Submitted,

SWARTZ CAMPBELL LLC

*/s/ Joseph S. Naylor*
Joseph S. Naylor (DE Bar No. 3886)
300 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 656-3935
jnaylor@swartzcampbell.com

Of counsel:

ALLEN OVERY SHEARMAN
STERLING US LLP

Daniel H.R. Laguardia
(*pro hac vice application forthcoming*)
140 New Montgomery Street, 10th Floor
San Francisco, CA 94105
Telephone: (415) 616-1199
Daniel.Laguardia@aoshearman.com

Emily Westridge Black
(*pro hac vice application forthcoming*)
300 West 6th Street
Austin, Texas 78701
Telephone: (512) 647-1909
Emily.WestridgeBlack@aoshearman.com

*Attorneys for Plaintiff TELUS
Communications, Inc.*

8

# Exhibit A





# Exhibit E

D. Cameron Beck, Jr., Esquire
Direct Dial: 804.344.6322
Facsimile: 804.775.3800
E-Mail:    cbeck@lawmh.com



November 22, 2025

**By Email**
Jon A. Nichols
Harman Claytor Corrigan & Wellman
PO Box 70280
Glen Allen, VA 23060

  Re: **Banning of Errands Plus from Signature Aviation Leaseholds and Property**

Dear Jon:

  I am responding to your letter of November 20, 2025 and following up on our telephone call this afternoon. Signature Aviation's ("Signature") barring Errands Plus vehicle and employees from any leaseholds has and will cause significant damages to Errands Plus.

  At Signature's request, Errands Plus executed a Third Party Vendor Release for the Charlottesville Airport on October 2, 2025. Errands Plus is willing to sign the same Release for any other Signature facilities. Signature had never requested such a release or indemnity prior to the February 28, 2025 incident. I also expect Errands Plus can provide a Certificate of Insurance for future events. Errands Plus is willing to provide a copy of its applicable insurance policies for the February 28, 2025 incident provided the premiums are redacted.

  In terms of Signature's request for defense and indemnity, National Interstate Insurance Company retains the authority to decide whether defense and indemnity will be offered pursuant to the applicable policy. Errands Plus does not have such authority.

  Errands Plus requests that Signature immediately withdraw its ban as to any of Errands Plus' vehicles, employees, agents, and subcontractors on Signature's leaseholds and property. Signature is intentionally interfering with Errands Plus's contracts and business, and also unlawfully restraining the trade of Errands Plus. If Signature refuses to withdraw the ban, Errands Plus will take all available legal measures to obtain damages against Signature for its unreasonable and unlawful prohibition.

Please provide this letter to your client immediately and of Errands Plus' intent to seek damages if the matter is not resolved without delay. I look forward to hearing from you.

Sincerely,

/s/ Cameron Beck

D. Cameron Beck, Jr.

DCBjr/

cc:    Robert Alexander, CEO of RMA Worldwide

# Exhibit F



harman claytor corrigan wellman
THE CIVIL LITIGATION FIRM

JON A. NICHOLS
804.762.8039
DIRECT FAX  |  804.212.0875
jnichols@hccw.com
Respond to: Richmond

**VIA EMAIL ONLY**

November 26, 2025

Cameron Beck
McCandlish Holton
1111 East Main Street, Suite 2100
Richmond, VA 23219

> Re:  **Telus Communications v. Signature Aviation Services Corporation**
> USDC Delaware : 25-CV-1372-UNA
> Date of Loss: February 28, 2025

Dear Cam:

Thank you for arranging the video call earlier today with your client, Errands Plus/RMA ("RMA"), its President, Robert Alexander, and its insurance broker, Ben Cook. We understand that Mr. Alexander has asked Signature Flight Support LLC d/b/a Signature Aviation ("Signature") to consider lifting the ban imposed on RMA on November 20, 2025. Following internal discussions, Signature is willing to extend a temporary accommodation to RMA, strictly conditioned upon full and timely satisfaction of the requirements set forth below.

### Accommodation

Subject to the conditions that follow, RMA—including its vehicles, employees, agents, and subcontractors—will be permitted to enter Signature Aviation leaseholds nationwide. This accommodation will become effective upon Signature's receipt and confirmation of substantial compliance with all required conditions, and will remain in effect only until **Monday, December 1, 2025, at 9:00 a.m.** At that time, the existing entry ban will automatically and immediately resume without further notice to RMA, and will remain in effect unless and until Signature determines otherwise.

**RICHMOND**
POST OFFICE BOX 70280  |  RICHMOND, VA 23255
4951 LAKE BROOK DR.  |  SUITE 100  |  GLEN ALLEN, VA 23060

**DC METRO**
1900 DUKE ST.  |  SUITE 210  |  ALEXANDRIA, VA 22314
**ROANOKE**
27 CHURCH AVE. SW  |  ROANOKE, VA 24011

PHONE 804.747.5200  |  FAX 804.747.6085  |  WEB HCCW.COM
member of the harmonie group

November 26, 2025

## **Required Conditions**

### **Execution of Release / Indemnity Agreement**

RMA must execute and return the attached release/waiver/hold harmless agreement, confirming that it will defend, indemnify, and hold harmless Signature from all claims arising out of RMA's presence on any Signature property between now and December 1, 2025 at 9:00 a.m. Immediate return of this executed document is required.

### **Insurance Requirements**

RMA must add Signature Flight Support LLC d/b/a Signature Aviation as an additional insured on its applicable insurance policies. RMA must also provide written confirmation that it maintains coverage of at least **$5 million** for any incident arising from the operation of its vehicles around aircraft or elsewhere on Signature's premises, and that such coverage is primary in all respects. Certificates of insurance and written confirmation must accompany the executed agreement.

### **Call With Telus Counsel**

You will arrange a telephone conference with counsel for Telus (Emily Westridge Black and Daniel LaGuardia) for the purpose of determining why Telus elected not to assert claims against RMA arising from the February 28, 2025 incident. You will use best efforts to obtain a direct and substantive response to this question. The call must be scheduled to occur on or before **December 5, 2025**, subject to reasonable flexibility regarding Telus counsel's availability.

### **Video Interview of Driver Harold Wilbur Benjamin**

You will arrange a video call between you, me and your driver, Harold Wilbur Benjamin, during which I will question him regarding his qualifications and all events related to the incident, including his driver training, schedule on the date in question, sleep and medication history, recollection of the incident, and subsequent actions and investigation. A specific date for this interview must be provided within the month of December. The interview will continue for a reasonable duration at my discretion.

### **Jurisdictional Consent**

If Signature is unsuccessful in securing transfer of the pending Telus litigation from the U.S. District Court for the District of Delaware, RMA agrees to waive all jurisdictional objections and to accept third-party practice in that court.

November 26, 2025

**Liquidated Damages for Non-Compliance**

To ensure strict adherence to these conditions, some of which come due after the permissible period, any failure by RMA to comply with any of the above requirements shall result in liquidated damages in the amount of **$10,000.00** and shall constitute an independent basis for a breach-of-contract action by Signature, in which RMA waives all defenses.

\*        \*        \*        \*        \*

As discussed, and to facilitate continued progress toward resolution—and ideally, toward RMA's acceptance of full responsibility—Signature will provide written statements of its employees who were present on the night of the incident. These statements will be provided in a format of Signature's choosing, but **only** after the video interview with Mr. Benjamin has occurred. The statements shall not be disclosed to any third party, shall not be admissible at trial, and shall not be used to examine or cross-examine any witness at deposition or trial in any matter relating to the February 28, 2025 incident. Your client must execute a reasonable non-disclosure agreement (NDA) to safeguard these materials. We will work cooperatively with you in good faith to finalize the NDA terms.

This accommodation is a good-faith effort to assist your client in its current predicament. It is extended **without prejudice** to any rights, defenses, or claims of Signature, and RMA and its insurer agree that neither this letter nor the accommodation it describes may be referenced, offered, or relied upon in any litigation.

Please convey this proposal to your client immediately. If acceptable, have RMA sign this letter, gather and transmit all required documents (including those previously provided, which should be resubmitted together in a consolidated package), and return them to me so that the temporary lifting of the ban may take effect. I look forward to your prompt response.

With best regards, I am

Sincerely yours,

Jon A. Nichols

JAN/eet

Enclosures: Indemnity Agreement

cc:     Signature Aviation

November 26, 2025

SEEN AND AGREED:

_____

ROBERT ALEXANDER, PRESIDENT
ERRANDS PLUS, INC./RMA

# Exhibit G



harman claytor corrigan wellman
THE CIVIL LITIGATION FIRM

**FOR SETTLEMENT PURPOSES ONLY**
*(pursuant to FRCP Rule 408 and
any state-based equivalent)*

JON A. NICHOLS
804.762.8039
DIRECT FAX | 804.212.0875
jnichols@hccw.com
Respond to: Richmond

**VIA EMAIL ONLY** (jason.manning@troutman.com)

December 5, 2025

Jason E. Manning, Esq.
troutman pepper locke
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462

> Re: **Telus Communications v. Signature Aviation Services Corporation**
> USDC Delaware : 25-CV-1372-UNA
> Date of Loss: February 28, 2025

Dear Jason:

Thank you for arranging the video call earlier today with me and with Patrick Byrnes. I reviewed the citations you provided and consulted with an aviation regulatory professional with respect to aeronautical vs. non-aeronautical activities at Signature's FBO, the involvement of the FAA, and minimum standards. Following those discussions, I am confident that Signature is within its rights to impose and maintain its ban of RMA from its FBOs.

That ban, however, does not allow either party to resolve the more important issue of responsibility for the damage to the Telus aircraft on February 28, 2025. This remains Signature's primary concern. As such, Signature proposes the following resolution to this dispute, strictly conditioned upon full and timely satisfaction of the requirements set forth below.

First, RMA—including its vehicles, employees, agents, and subcontractors—**will be permitted to enter Signature Aviation leaseholds nationwide to pick up passengers/clients**. RMA will be permitted to access parking lots, waiting areas, pickup roundabouts in front of Signature's facilities, provided it does not obstruct customer or employee traffic or access. RMA, however, will not be permitted inside of the secured gate/ramp unless expressly authorized, in writing, by the general manager of the facility, on a case-by-case basis as conditions necessitate, at Signature's sole discretion.

**RICHMOND**
POST OFFICE BOX 70280 | RICHMOND, VA 23255
4951 LAKE BROOK DR. | SUITE 100 | GLEN ALLEN, VA 23060

**DC METRO**
1900 DUKE ST. | SUITE 210 | ALEXANDRIA, VA 22314
**ROANOKE**
27 CHURCH AVE, SW | ROANOKE, VA 24011

PHONE 804.747.5200 | FAX 804.747.6085 | WEB HCCW.COM
member of the harmonie group

December 5, 2025

Second, RMA must maintain a minimum of $5,000,000.00 in liability insurance coverage, and agrees to add Signature Flight Support LLC d/b/a Signature Aviation as an additional insured on its applicable insurance policies. The policy procured by RMA will provide first/primary coverage for any loss as a result of RMA's presence on the property. Proof of this insurance is required. It shall also provide a signed copy of the previously provided hold-harmless agreement. I do not believe you were a part of the discussions at that time, but it was my understanding that RMA has already indicated it would agree to this condition.

Lastly, as you are aware, Signature finds itself in litigation with Telus in Federal Court in Delaware that arises from RMA's bus colliding with the Telus aircraft. A motion to have that case transferred to Virginia will be filed soon. If successful, Signature intends to file a Third-Party Complaint against RMA, assuming Telus does not sue RMA directly. In order to bring about an orderly resolution with all relevant/indispensable parties present in court, and if Signature is unsuccessful in securing transfer of the pending Telus litigation from the U.S. District Court for the District of Delaware, RMA will agree to waive all jurisdictional objections to litigation in Delaware. This is a limited concession by RMA, because I believe it operates a facility in Wilmington, Delaware, but Signature prefers to not leave this issue in doubt as it would further obstruct a full and final resolution of the primary concern.

This proposed resolution is offered as a good-faith effort to address RMA's concerns but to afford protection to Signature. It is extended **without prejudice or waiver** to any rights, defenses, or claims of Signature, and RMA and its insurer agree that neither this letter nor the accommodation it describes may be referenced, offered, or relied upon in any litigation. This was likewise something that Cam Beck and I previously discussed and agreed to, but I wanted to make that clear given your recent involvement.

Please convey this proposal to your client as soon as possible. I look forward to hearing from you.

With best regards, I am

Sincerely yours,

Jon A. Nichols

JAN/eet

cc:    Patrick Byrnes, Esq.
       Cam Beck, Esq.
       Signature Aviation

# Exhibit H

## RE: RMA re Signature Aviation

**From:** Byrnes, T. Patrick
Patrick.Byrnes@troutman.com
**To:** Jon Nichols jnichols@hccw.com
**Cc:** cbeck@lawmh.com cbeck@lawmh.com,
Lillian Spell lspell@hccw.com, Lowe, Michael S.
Michael.Lowe@troutman.com, Manning, Jason E.
Jason.Manning@troutman.com, Elizabeth Taylor
ltaylor@hccw.com
**Sent:** Friday, December 5 at 6:56 PM

Mr. Nichols:

We are in receipt of your letter of December 5, 2025. We note
that "[R]esponsibility for the damage to the Telus aircraft on
February 28, 2025," Nov. 5 Ltr. at 1, is being litigated in a
Delaware federal court. The matter at hand for which we
have been retained is securing return to the access practices
that were in place prior to your client's arbitrary ban of RMA
on November 20, 2025. Your conditional offer to restore
some, but certainly not the most important, of those access
practices is not consistent with your client's obligation to
provide uniform access to companies like RMA that play a
critical role in supporting aeronautical activity at
Charlottesville-Albemarle Airport Authority and airports
across the country. RMA requests that Signature retract in
full the ban that it imposed on November 20, 2025 and permit
RMA the access that it had prior to that ban.

To that end, your offer to only allow our client access to
"parking lots, waiting areas, pickup roundabouts in front of
Signature's facilities" does not provide our clients with either
the same access it enjoyed prior to Signature's arbitrary ban
nor the same access Signature affords to other ground
transportation companies with similar business models to
RMA. As such, it is a non-starter. As your client is well aware,
its lease with Charlottesville-Albemarle Airport Authority
requires Signature to use its best efforts to provide Sports
Charter Ground Handling, among other things. As Signature
is also aware, much of RMA's client base consists of college
athletics teams, bands, etc., which travel with massive
amounts of equipment that cannot reasonably be
transported from the aircraft through terminals to the non-
secure areas you are offering. Your client's refusal to provide
the same access as previously afforded, will interfere with
RMA's contractual and other obligations to its clients and will
prove devastating to its business particularly when Signature

affords RMA's competitors with the access it denies RMA.
Similarly, your client's conditioning such access on the sole
discretion of Signature and only upon written authorization of
the general manager of the facility is yet another example of
Signature treating RMA differently than RMA's competitors
and would permit Signature to deny access for no reason
whatsoever. Our client cannot and will not agree to such
conditions, which prove meaningless "concessions" given
the complete discretion your client demands.

Our client has also reviewed Signature's jurisdictional
consent request related to the TELUS litigation. We reiterate
that conditioning access on litigation concessions in an
unrelated lawsuit in which RMA is not a named party is
improper and violates Signature's uniform access
obligations. In any event, we are not counsel for RMA with
respect to the TELUS litigation and therefore cannot make
concessions with respect to that litigation. Please address
your requests regarding the TELUS litigation to RMA's
insurance defense counsel, Cameron Beck. We note,
however, that RMA takes significant issue with your client's
demand for concessions relating to the TELUS litigation as a
condition to obtaining the access to the secured gate/ramp
areas that it enjoyed for years prior to your client's clearly
retaliatory ban. Indeed, this demand is further evidence of
your client's discriminatory conduct against RMA contrary to
controlling uniform access requirements.

With respect to the insurance issue, our client is in
agreement with the spirit of this request. RMA is working on
your request with its insurance professionals and will revert
once it has confirmation of the specific terms of Signature
being named as an additional insured.

Finally, we do not agree (and have never agreed) to refrain
from using your correspondence in "any litigation." No such
agreement was ever made by any Troutman Pepper Locke
attorney nor our client in connection with the matter for
which we have been retained (i.e. voiding the access "ban").
To the extent that you may have had some oral
"understanding" or "agreement" with Cam Beck in the course
of attempting to resolve the TELUS litigation pending against
your client, that does not extend to the dispute we have been
retained to resolve.

In light of your client's refusal to remove the ban immediately
and restore the status quo that had existed prior to your
client's punitive and legally-invalid "ban" by immediately
allowing our client the same exact access it enjoyed prior to
Signature's implementation of the ban, we intend to proceed
with filing the complaint and TRO motion (and related
documents) on Monday. We have already drafted those

documents, and intend to finalize them over the weekend.
Please note that our complaint and motion for a temporary
restraining order will name Signature Flight Support LLC,
Signature Aviation Services Corporation, and Charlottesville-
Albemarle Airport Authority. Please confirm that you will
accept service via email on behalf of Signature.

Should your client choose to reconsider its position and
agree to drop the ban in full prior to Monday, please advise.

Regards,

Patrick

## T. Patrick Byrnes
Partner
### troutman pepper locke
Direct: 312.443.0286 | Mobile: 312.802.7244
patrick.byrnes@troutman.com

**From:** Elizabeth Taylor <ltaylor@hccw.com>
**Sent:** Friday, December 5, 2025 2:48 PM
**To:** Manning, Jason E. <Jason.Manning@troutman.com>
**Cc:** Byrnes, T. Patrick <Patrick.Byrnes@troutman.com>;
cbeck@lawmh.com; Jon Nichols <jnichols@hccw.com>;
Lillian Spell <lspell@hccw.com>
**Subject:** RMA re Signature Aviation

CAUTION: This message came from outside the firm. DO
NOT click links or open attachments unless you recognize
this sender (look at the actual email address) and confirm
the content is safe.

Good afternoon,

Please see attached letter.

Thank you,


LIZ E. TAYLOR  paralegal
ltaylor@hccw.com | **DIRECT** 804.612.7398

Harman Claytor Corrigan & Wellman

Post Office Box 70280  |  Richmond, VA 23255

4951 Lake Brook Dr.  |  Suite 100  |  Glen Allen, VA 23060

**OFFICE** 804.747.5200  |  **FAX** 804.747.6085  |  **WEB** hccw.com

member of the harmonie group

This message is intended only for the named recipient and may contain information that is confidential, subject to attorney-client privilege, the work-product doctrine and other privileges. If the reader of this message is not the intended recipient, you are hereby notified that any use, dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by return email and delete the original message at once. Thank you.