**V I R G I N I A :**

## IN THE CIRCUIT COURT FOR THE COUNTY OF ALBEMARLE

| | | |
|---|---|---|
| ERRANDS PLUS INC. D/B/A RMA WORLDWIDE CHAUFFEURED TRANSPORTATION, | ) ) ) | |
| *Plaintiff,* | ) ) | CL25-2385-00 |
| v. | ) ) | FILED |
| SIGNATURE FLIGHT SUPPORT LLC, | ) ) ) | DATE 12-12-25 TIME _____ CIRCUIT COURT CLERKS OFFICE ALBEMARLE COUNTY |
| Serve: Corporation Service Company, R/A 100 Shockoe Slip Fl 2, Richmond, VA 23219 | ) ) ) ) | JON R. ZUG, CLERK _____ DEP. CLERK |
| AND | ) ) | |
| SIGNATURE AVIATION SERVICES CORPORATION, | ) ) ) | |
| Serve: Corporation Service Company, R/A 100 Shockoe Slip Fl 2, Richmond, VA 23219 | ) ) ) ) | |
| *Defendants.* | ) ) | |

## EMERGENCY MOTION FOR TEMPORARY INJUNCTION

COMES NOW, Plaintiff Errands Plus Inc. d/b/a RMA Worldwide Chauffeured Transportation ("RMA"), by counsel and pursuant to Va. Code § 8.01-624, *et seq.* and Va. Sup. Ct. R. 3:26, respectfully moves the Court to enter an Emergency Temporary Injunction (i.e., Restraining Order) enjoining Defendants Signature Flight Support LLC ("Signature Flight") and Signature Aviation Services Corporation ("Signature Corp.") (collectively, "Signature" or "Defendants"), from continuing to engage in conduct more fully described in the Complaint and the Affidavit submitted herewith, and states as follows:

1

## INTRODUCTION

RMA moves for an emergency temporary injunction requiring Signature to retract the ban it has imposed barring RMA and its vehicles and employees from accessing Signature's leaseholds, including Signature's leasehold on the premises of the Charlottesville-Albemarle Airport Authority ("CAAA"), for purposes of carrying out RMA's business operations. The ban imposed by Signature has no basis in fact or law. To the contrary, Signature's ban has been imposed as a means of manufacturing duress for RMA in order to force RMA into agreeing to defend and indemnify Signature for its own negligence, which resulted in damage to a private aircraft at Charlottesville-Albemarle Airport ("CHO") in February 2025 ("February 28 Incident"). Signature manufactured the ban as a source of leverage to extract extraordinary, non-contractual concessions from RMA. That is wrong. It also contravenes Federal Aviation Administration ("FAA") mandated requirements regarding economic non-discrimination and uniform application of access standards and usurps airport authorities' role in supervising that access. Put simply, Signature has no authority to leverage access to extract monetary concessions and liability admissions from RMA.

Signature's arbitrary, nationwide ban of RMA has already resulted in irreparable harm to RMA, and those harms continue to mount with each passing day. In particular, because RMA's business model depends on timely, seamless pickup and delivery of passengers to and from private aircraft, RMA *cannot perform the services it has agreed to provide to those customers* if Signature bars RMA from Signature's leaseholds. Beyond the airside (secure) side of Signature's leaseholds, the ban covers the entire premises—including parking, driveways, and terminals. Moreover, the nationwide ban bars any third-party contractors working on RMA's behalf from accessing Signature's leaseholds, but that same contractor may access those leaseholds without

2

restriction when serving other transportation providers. In total, Signature's conduct jeopardizes over $20,000,000 in annual revenue (that is, $56,000 *each day*), threatens to impugn RMA's reputation in the industry, and virtually guarantees permanent destruction of RMA's fragile customer relationships.

Each factor warranting temporary injunctive relief is easily met here, and an emergency temporary injunction must issue. And, given that RMA suffers mounting irreparable harm *each day (and each hour)* that Signature's ban remains in effect, *immediate* injunctive relief is essential here in order to preserve the status quo until this Court has the opportunity to hold a preliminary injunction hearing.

## **FACTUAL BACKGROUND**

I. **SIGNATURE'S    NATIONWIDE    BUSINESS    OPERATIONS    AND LONGSTANDING BUSINESS RELATIONSHIP WITH RMA.**

1. Signature is a Fixed Based Operator ("FBO")that operates a network of private aviation terminals, including a fixed base operation at CHO in Charlottesville, Virginia. Signature operates at more than 200 locations internationally, with over 100 locations in the United States alone.

2. Among other services, Signature undertakes a duty to escort vehicles attempting to navigate Signature's leaseholds. Specifically, Signature escorts private vehicles, including buses and cars, to chauffeur passengers who are deplaning from private jets. Signature also offers long-term hangar space for corporate aircraft, short-term parking solutions for aircraft in travel, and a variety of other services.

3. Signature is subject to FAA standards, rules, obligations, and assurances ("Rules") that arise as a result of its status as a FBO with a lease agreement between it and CAAA (among other airport authorities around the country), including those that flow from CAAA's acceptance

3

of Federal Airport Improvement Program ("AIP") funds under 49 U.S.C. § 47107 for use at the CHO.

4.        Signature's operations at public airports are authorized only as a result of lease agreements between airport authorities, or other sponsors of airports, and Signature, including the lease agreement between such as CAAA and Signature. Those lease agreements, on information and belief, subject Signature to comply with all applicable FAA Rules, including FAA Grant Assurances that accompany airports accepting AIP funds, which include mandated economic non-discrimination and uniform application of standards for admission to Signature's leaseholds. 49 U.S.C. § 47107; *see, e.g.*, Airport Sponsor Assurances (2025) 22(a), 22(h), 23, and 36; *see also* FAA Order 5190.6B (Airport Compliance Manual) (2025) ¶¶ 14.1, 14.2, 14.3 (Restrictions Based on Safety and Efficiency Procedures and Organization) and Advisory Circular 150/5190-8 (Minimum Standards for Commercial Aeronautical Activities) (2025) ¶ 1.2.2 (Authority Vested in Airport Sponsors); *see also* **Ex. A**, Lease Agreement between CAAA and Signature ("Lease Agreement") ¶¶ 2.2, 2.16.[1]  While Signature has some autonomy to control access as part of its operations, it is not free to do so arbitrarily or in a discriminatory fashion.  Indeed, Signature has flouted these rules (and its agreements with various airports), by instituting a targeted, discriminatory ban against RMA without any basis.

5.        Signature often leases substantial space at airports where it operates, and then oversees all ingress, egress, safety, and management in those areas.  As relevant here, Signature

---

[1] The Lease Agreement names Piedmont Hawthorne Aviation, LLC d/b/a Landmark Aviation ("Piedmont Aviation") as the lessee.  Piedmont Aviation is now owned by Signature and, therefore, Signature is bound by the Lease Agreement as a successor to the Lease Agreement and has continued to operate under it. *Id.*

entered into an agreement to lease 646,602 square feet from CAAA to operate a general FBO. Lease Agreement ¶¶ 1.1, 2.1.

6.      RMA operates on Signature's property to service mutual customers.  **Ex. B**, Declaration of Michael Fogarty ("Fogarty Decl.") ¶ 5.  Among other services, RMA provides a private chauffeur service for passengers who are deplaning from private jets.  RMA's operations are global in nature, and necessarily depend on the escort services offered by FBOs like Signature, both for purposes of accessing airfields and for purposes of safely navigating those airfields.  *Id.* ¶ 6.

7.      Signature agreed, as part of the Lease Agreement, to "use its best efforts to provide . . . [a]ir taxi[s] and charter[s]" in such a manner "that will achieve the *highest* level of customer service and maximize profits."  Lease Agreement ¶¶ 2.4(A), 2.8 (emphasis added).

8.      Signature has permitted RMA's vehicles and employees to enter its leaseholds for over 35 years. Fogarty Decl. ¶ 5.

9.      RMA, for its part, contracts with thousands of individuals and entities each year to guarantee fast, comfortable, and safe transportation on tarmacs worldwide.  RMA's ability to perform under these contracts, and indeed its very business model, depends on the assumption that FBOs—like Signature—will not unduly interfere with RMA's rights of ingress and egress on leaseholds operated by those FBOs.

10.     RMA has built its brand on convenience, comfort, safety, and timeliness.  When RMA's customers arrive on private jets, they know RMA will be waiting for them and that it will offer white-glove service, including picking them up directly at base of the ramp or elsewhere on Signature's leasehold—like the parking lot, driveway, or terminal. *Id.* ¶ 7.  RMA then whisks its

customers away to their next destination, without having to deal with the delays of navigating airports or transferring themselves or their equipment and luggage across multiple vehicles.

**II.      LONG AFTER THE FEBRUARY 28 INCIDENT, SIGNATURE CONTRACTUALLY GUARANTEES RMA ACCESS TO LEASEHOLDS NATIONWIDE, INCLUDING THE CHO.**

11.      Up until October 2, 2025, Signature permitted RMA to access its leaseholds throughout the United States with no requirements that RMA even execute a release—and prior to the February 28 Incident, RMA had accessed Signature leaseholds thousands of times. *Id.* ¶ 8. Then, on October 2, 2025, Signature suddenly requested that RMA sign a release before it would allow it to access its leasehold at CHO, and RMA did so. *Id.* ¶ 10. In that document, a Third Party Vendor Release (the "Release Agreement"), Signature guaranteed RMA the right to access its CHO leasehold. **Ex. C**, Release Agreement ¶ 2.

12.      In the Release Agreement, Signature agreed that RMA "shall enter Signature's Premises" to "perform[] Service at the request of Signature or its customer, Permittee, tenant, Aircraft owner, pilot or other designated representative." *Id.*

13.      RMA's customers are necessarily Signature's customers, meaning RMA was entitled to enter Signature's leasehold at CHO "at the request" of RMA's customers. *Id.*

14.      At no point in time prior to execution of the Release Agreement (or in the month thereafter) did Signature indicate that RMA was unwelcome or otherwise barred from entering any of Signature's leaseholds throughout the country, and as such RMA continued to service its customers' needs at Signature leaseholds throughout the United States, both before execution of the Release Agreement and after. *See* Fogarty Decl. ¶ 11.

15.      Pursuant to the terms of the Release Agreement, Signature guaranteed RMA the right to continue to enter Signature's leasehold at CHO in exchange for RMA indemnifying Signature per the terms of the Release Agreement. **Ex. C**, Release Agreement ¶¶ 2, 4. Until on

or about November 20, 2025, RMA continued to operate its business as it had for approximately 35 years at Signature leaseholds. Fogarty Decl. ¶¶ 5, 12.

16.     Signature never asked RMA to sign any similar release agreements in return for access at other Signature leaseholds, and RMA never refused or indicated any intention to refuse had such a request been made. *Id.* ¶ 11.

## III.    SIGNATURE ABRUPTLY BANS RMA FROM ALL OF ITS TERMINALS WORLDWIDE.

17.     In a sudden departure from 35 years of practice, on November 20, 2025, Signature abruptly informed RMA that RMA, its employees, its vehicles, its agents, and its subcontractors were banned from entering "any Signature Aviation leasehold nationwide." **Ex. D**, Signature's November 20, 2025 Letter at 1; *see* Fogarty Decl. ¶ 12. Thus, since November 20, 2025, RMA has been banned from "seek[ing] entry to any Signature property or driv[ing] on any signature ramp." **Ex. D**, Signature's November 20, 2025 Letter at 1.

18.     Signature's total ban came on the heels of a lawsuit filed against Signature in the United States District Court for the District of Delaware on November 11, 2025. *TELUS Communications, Inc. v. Signature Aviation Services Corporation*, No. 1:25-cv-01372 (D. Del. Nov. 11, 2025) ("*TELUS* Litigation"). In that lawsuit, the owner of a private jet, TELUS Communications Inc. ("TELUS"), sued Signature for damage sustained by the private jet while it was parked on a Signature leasehold at the CHO on February 28, 2025. **Ex. E**, Complaint, Dkt. 1, *TELUS Communications, Inc. v. Signature Aviation Services Corporation*, No. 1:25-cv-01372 (D. Del. Nov. 11, 2025) ("*TELUS* Complaint"). TELUS alleges that Signature's gross negligence caused the damage to its jet. *Id.* at ¶¶ 31-35.

19.    Oddly, although RMA is not a named party in the *TELUS* Litigation, Signature accompanied its total ban with a demand that RMA indemnify Signature for any loss claimed in the *TELUS* Litigation.  *See* **Ex. D**, Signature's November 20, 2025 Letter at 1.

## IV.    SIGNATURE'S PRETEXTUAL EXCUSE FOR THE TOTAL BAN.

20.    Signature has not offered a direct reason for instituting the total ban of RMA. Fogarty Decl. ¶ 13.

21.    Signature appears to tether its total ban of RMA to the February 28 Incident.

22.    The February 28 Incident occurred 265 days before Signature instituted the total ban.

23.    To be clear, liability for the February 28 Incident will be determined in the *TELUS* Litigation.  This lawsuit is not about the February 28 Incident, and adjudicating this Emergency Motion for a Temporary Injunction does not require evaluating liability for that Incident.  Because, however, Signature relies on that Incident as an excuse for its total ban, the facts of the Incident are described in the Complaint.  Compl. ¶¶ 37-56.

24.    The February 28 Incident resulted from Signature's negligence.  *E.g.*, **Ex. E**, *TELUS* Complaint; Compl. ¶¶ 37-56.

25.    Signature was on notice of the February 28 Incident the moment it occurred.

26.    Signature continued to allow RMA to utilize Signature's leaseholds at CHO and nationwide at all times until on or about November 20, 2025.

## V.    SIGNATURE ATTEMPTS TO FORCE RMA TO ACCEPT ALL RESPONSIBILITY AND LIABILITY FOR THE FEBRUARY 28 INCIDENT UNDER DURESS.

27.    Until November 20, 2025, Signature never claimed or asserted that RMA was responsible for or liable for the February 28 Incident.

28.     Between February 28, 2025, and November 20, 2025, Signature continued to allow

RMA access to its leaseholds consistent with its prior practice. *See id.* ¶ 55.

29.     Neither before nor after the February 28 Incident has an RMA employee been

involved in a collision with an aircraft on a Signature-operated ramp or area.  Fogarty Decl. ¶ 8.

30.     On November 11, 2025, TELUS sued Signature in federal court, alleging millions

of dollars in damages resulting from Signature's negligence. *See* **Ex. E**, *TELUS* Complaint.

31.     RMA is not a party to the *TELUS* Litigation.

32.     After the *TELUS* Litigation was filed, Signature set its sights on RMA.

33.     Signature began by instituting the total ban on or about November 20, 2025.

Fogarty Decl. ¶ 12.

34.     The total ban is not limited to CHO.  The total ban applies to all Signature

leaseholds nationwide, constituting approximately over 100 airports. *Id.* ¶¶ 5, 12.

35.     Signature knew that the total ban would result in long-term damage to RMA's

brand, customer relationships, and income stream.  Signature had to know, because it knew that

some of the customers who used its facilities were transported to and from those facilities by RMA.

36.     With the total ban in place, Signature began to demand numerous concessions from

RMA.

37.     On November 20, 2025, Signature demanded that RMA provide a "full defense and

indemnification" for the February 28 Incident. **Ex. D**, Signature's November 20, 2025 Letter; **Ex.**

**F**, Declaration of Jason E. Manning ("Manning Decl.") ¶ 4.

38.     On November 20, 2025, Signature also demanded that RMA provide a "complete

copy of every [insurance] policy that may afford coverage for the" February 28 Incident. **Ex. D**,

Signature's November 20, 2025 Letter at 1.

## VI.    RMA ATTEMPTS TO REASON WITH SIGNATURE.

39.    RMA, surprised by Signature's unexpected total ban, responded on November 22, 2025, wherein RMA explicitly informed Signature that Signature's total ban was intentionally interfering with RMA's contracts and business, and was also unlawfully restraining RMA's trade. RMA requested that Signature lift the total ban immediately. **Ex. K**, RMA's November 22, 2025 Letter; Manning Decl. ¶ 5.

40.    RMA also offered to execute a Third Party Vendor Release for any Signature-operated facilities. RMA further offered to provide applicable insurance policies for the February 28 Incident, and to provide a Certificate of Insurance for future events (items that Signature had never before requested). *Id.*

## VII.    SIGNATURE REFUSES TO LIFT THE BAN AND ATTEMPTS TO TAKE ADVANTAGE OF THE MANUFACTURED DURESS IT IMPOSED ON RMA.

41.    On November 26, 2025, Signature responded to RMA's offers with more demands. **Ex. G**, Signature's November 26, 2025 Letter; Manning Decl. ¶ 6.

42.    Signature refused to lift the total ban, contravening the FAA uniformity and economic non-discrimination rules described above. **Ex. G**, Signature's November 26, 2025 Letter.

43.    Signature offered to lift the ban for just six days on a "temporary" basis, but only if RMA capitulated to extraordinary demands including that RMA:

    a.    Execute a prospective release and indemnity agreement;

    b.    Obtain insurance coverage of at least $5 million for incidents arising on Signature's properties;

    c.    Arrange for a call between counsel for TELUS to ask TELUS why TELUS did not sue RMA in the *TELUS* Litigation;

10

d.  Arrange for an interview of RMA's driver who was involved in the February 28 Incident;

e.  Waive all jurisdictional objections and accept third-party practice in the United States District Court for the District of Delaware in the *TELUS* Litigation;

f.  Agree to $10,000 in liquidated damages for violating any of these requirements;

g.  Provide written witness statements of RMA employees present during the February 28 Incident; and

h.  Execute a non-disclosure agreement.

*Id.*

44.     Signature's November 20 and November 26 demands represent a naked attempt to (a) leverage its leasehold grants to obtain an admission of liability from RMA where it has no such liability; (b) retaliate against RMA for refusing to capitulate to Signature's baseless demands; and (c) take advantage of the duress Signature manufactured in order to harm RMA's business.

**VIII.    FURTHER ATTEMPTS TO RESOLVE THE DISPUTE BETWEEN SIGNATURE AND RMA.**

45.     On December 3, 2025, undersigned counsel responded to Signature's letter with RMA's notice and request to meet and confer prior to filing a motion for emergency injunctive relief pursuant to Va. Code § 8.01-624, *et seq.* and Va. Sup. Ct. R. 3:26. **Ex. H**, December 3, 2025 Demand Letter; Manning Decl. ¶ 8. As part of that correspondence, undersigned counsel requested that Signature immediately retract the total ban and return to the status quo as it existed prior to imposition of the ban. **Ex. H**, December 3, 2025 Demand Letter.

46.     On December 4, 2025, undersigned counsel and Signature's counsel held a telephonic meet-and-confer. Manning Decl. ¶ 9. In a follow-up email, undersigned counsel stated

that, absent confirmation by December 5, 2025 that Signature had retracted its total ban, RMA would file a motion for emergency relief. *Id.*

47.    On December 5, 2025, Signature's counsel reiterated its position that Signature is "within its rights to impose and maintain its ban of RMA from its FBOs." **Ex. I**, Signature's December 5, 2025 Letter; Manning Decl. ¶ 10.

48.    In that letter, Signature maintained that the total ban would remain in place absent RMA's compliance with certain conditions and that, even if RMA complied with those conditions, Signature would still maintain total discretion to bar RMA from accessing its ramps and relegate RMA (and its customers) to curbside pickup. **Ex. I**, Signature's December 5, 2025 Letter; Manning Decl. ¶ 10.

49.    That is obviously not what RMA's customers pay for. RMA's customers pay for convenience and accessibility, which includes seamless delivery to and from private aircraft parked on the airside (secured) side of Signature leaseholds at CHO and other airports. For example, a significant portion of RMA's services involve transporting band members and their large, heavy equipment to and from Signature's leasehold, making airside access to pickup and drop-off customers imperative. More importantly, on information and belief, Signature has not made other chauffeur services' access to its ramps conditional on Signature's approval, contravening the FAA Rules' uniformity requirements.

50.    Thus, RMA's counsel responded that Signature's "conditional offer" was "not consistent with [its] obligation to provide uniform access to companies like RMA that play a critical role in supporting aeronautical activity at [CAAA] and airports across the country," and reiterated that RMA intends to immediately file a complaint and emergency motion for temporary

injunction if the ban is not removed. **Ex. J**, RMA's December 5, 2025 Response; Manning Decl.
¶ 11.

## STANDARD OF REVIEW

At the threshold, the Court may grant a temporary injunction when the Court concludes that the movant is more likely than not to suffer irreparable harm absent temporary injunctive relief. *See* Va. Sup. Ct. R. 3:26(c). Once that determination is made, the Court must determine whether: (1) the movant has asserted a legally viable claim based on credible facts demonstrating that the underlying claim will more likely than not succeed on the merits; (2) whether the balance of hardships—the harm to the movant without the preliminary injunction compared with the harm to the nonmovant with the preliminary injunction—favors granting the preliminary injunction; and (3) whether the public interest, if any, supports the issuance of a preliminary injunction. *See* Va. Sup. Ct. R. 3:26(d)(i)-(iii). If these factors favor injunctive relief, the Court must grant it. *CG Riverview, LLC v. 139 Riverview, LLC*, 98 Va. Cir. 59, 62 (Cir. Ct. 2018) ("According to this test, a clear showing of an affirmative answer to all four inquiries must be established by the movant in order for a preliminary injunction to be granted.").

Furthermore, the Court may grant a temporary restraining order without written or oral notice to the adverse party if specific facts in an affidavit show that immediate and irreparable harm will result before the adverse party can be heard on a temporary injunction, and the movant certifies in writing any efforts made to give notice and the reasons why it should not be required. Va. Sup. Ct. R. 3:26(b).

Ultimately, an injunction is "meant to preserve the status quo between the parties while the litigation is ongoing." *Loudoun Cnty. Sch. Bd. v. Cross*, No. 210584, 2021 WL 9276274, at *5 (Va. Aug. 30, 2021).

# ARGUMENT

Because RMA is more likely than not to suffer irreparable harm absent injunctive relief, and because each of the remaining injunctive relief factors weigh clearly in RMA's favor, an emergency temporary injunction must issue.

## I.    ABSENT IMMEDIATE INJUNCTIVE RELIEF, RMA IS MORE LIKELY THAN NOT TO SUFFER IRREPARABLE HARM.

At the threshold, the movant must demonstrate that "it is likely to be irreparably harmed absent preliminary relief." *Freemason St. Area Ass'n, Inc. v. City of Norfolk*, 100 Va. Cir. 172, 182 (Va. Cir. Ct. Norfolk 2018) (internal quotation marks omitted). As relevant here, "courts are more inclined to grant temporary injunction if the harm is of the unique type that monetary damages would be insufficient to make the plaintiff whole again." *CG Riverview, LLC*, 98 Va. Cir. at 63. "Money damages are inadequate to compensate an aggrieved party for competitive injuries, such as loss of customers to a competitor." *HotJobs.com, Ltd. v. Digital City, Inc.*, 53 Va. Cir. 36, 41 (Va. Cir. Ct. Fairfax 2000). As a result, the "possibility of permanent loss of customers to a competitor or the loss of goodwill" necessarily satisfies the irreparable injury prong. *Id.* at *45.

By instituting a total ban on RMA's presence at or access to Signature premises, Signature has guaranteed that RMA will suffer irreparable harm, including the loss of customers and goodwill. In particular, Signature's national ban means that RMA cannot pick up or drop off *any of its customers* who are boarding flights or deplaning from flights on Signature leaseholds. Moreover, the nationwide ban applies to RMA's contractors. A third-party contractor working on RMA's behalf is barred from Signature's leaseholds, but that same contractor may access those leaseholds without restriction when serving other transportation providers. As a result, RMA

cannot provide the very services that are at the center of its business model, that are the source of its revenues, and that its customers are paying for.

Critically, irreparable harm is not at all speculative here. The harm has ***already begun***. The following are but a few examples:

- At a Signature leasehold in Roanoke, Virginia in mid-November 2025, Signature informed American Airlines (in its capacity as the charter of a private aircraft) that RMA buses were barred from picking up passengers. Fogarty Decl. ¶ 21. Indeed, Signature went so far as to proactively inform American Airlines that RMA was embargoed from all Signature locations. *Id.* Signature's unilateral notice of a total ban on RMA's access to its leaseholds has raised concerns from American Airlines and other third parties regarding customer and operational impacts, inevitably pushing charter companies toward competitors. Worse, because air charter companies often select a chauffeur upon arrival, Signature's decision to inform air charter companies of its total ban of RMA means quantifying RMA's ongoing losses as a result of pushing air charters away from using RMA is extremely challenging. *Id.* ¶ 22.

- In mid-November 2025, RMA had contracted with the University of Miami football team to provide transportation to and from the Signature leasehold at the Roanoke airport located in Roanoke, Virginia. *Id.* ¶ 23. Signature prohibited RMA's buses from entering the ramp upon arrival and departure of the aircraft transporting the University of Miami football team. RMA could not provide its standard level of services, because it was barred from entering the ramp. *Id.* Signature's ban resulted in considerable inconvenience and disruption for RMA's customers, who considered canceling their return transportation. *Id.* The University of Miami football team—and other teams impacted by Signature's total

ban—are likely to pursue other, more convenient, chauffeur options for their future needs. *Id.*

- RMA's competitors, seizing on knowledge that RMA is barred from all Signature locations, have begun targeting RMA's customers. For example, the General Manager of one of RMA's major competitors has begun soliciting RMA's ***largest customer***, with revenues to RMA surpassing $6,000,000 a year. *Id.* ¶ 24. RMA's competitors use the fact that RMA is barred from Signature's leaseholds as a hook for their solicitation. *Id.*

- Signature is ***actively (and prospectively) informing*** RMA's customers that RMA is barred from picking them up at Signature leaseholds. *Id.* ¶ 25. For example, on December 2, 2025, RMA was scheduled to pick up passengers at Washington-Dulles International Airport. *Id.* In the course of communicating with those customers, RMA learned that the customers were explicitly informed by Signature that RMA was prohibited from picking them up. *Id.* As a result, the customers were forced to call Ubers for their means of transit. *Id.*

Unmistakably, money damages are inadequate here because "it will be nearly impossible for [RMA] to quantify the amount of [money it lost stemming from the loss of] confused or irate [customers]." *HotJobs.com, Ltd.*, 53 Va. Cir. at 42 (internal quotation marks omitted) (quoting *Seniors Coal., Inc. v. Seniors Found., Inc.*, 39 Va Cir. 344, 350 (Va. Cir. Ct. Fairfax 1996)). The quantifiable damages are, of course, monumental. Indeed, in the first 11 months of 2025 alone, RMA did over $1,000,000-worth of business for passengers needing transports to and from Signature leaseholds. Fogarty Decl. ¶ 16. Those same customers are responsible for more than $20,000,000 of overall revenue for RMA in the last year alone. *Id.* But it is the immeasurable damages that warrant injunctive relief here. Each day that passes under Signature's nationwide,

arbitrary ban of RMA is another day that RMA suffers unimaginable damage to its goodwill, reputation, and fragile customer relationships. RMA has built its name on providing quality, timely, seamless, accessible, and safe chauffeur services for customers no matter where they are flying to or arriving from. *Id.* ¶ 17. Those qualities are what RMA's customers pay for. *Id.* RMA's customers depend on safety, convenience, and accessibility. *Id.* And, in this competitive industry servicing high-net worth individuals, corporate entities, and universities, an inability to provide those services necessarily destroys the vendor's reputation. *Id.* ¶ 18. One missed pick up or one missed departure means losing customers forever. *Id.* And, for many of RMA's customers, this means losing not only the specific person or group of people who RMA was supposed to chauffeur, but all future business for every person or entity associated with the harmed passengers. *Id.* ¶ 19.

To be sure, the harm to RMA is not limited to customers who fly into or out of Signature leaseholds during pendency of the ban. The ban also means that RMA will lose future customers, the loss of which is necessarily difficult to quantify. That is because RMA's customers are considering a variety of chauffeur options. *Id.* ¶ 27. As nationwide and often global travelers, RMA's customers are looking for the chauffeur service that can provide them with the ***most nationwide and global accessibility***. *Id.* During pendency of the ban, RMA cannot meaningfully compete, because it is banned from over 100 leaseholds around the United States. This places RMA at a distinct competitive disadvantage, foisted on it by Signature. *Id.*

And, of course, even if the ban were slightly narrowed such that it permitted RMA to access curbs but not ramps, the harm would not be remedied. Many of RMA's customers are bands and sports teams. *Id.* ¶ 28. They travel with equipment all over the country. *Id.* When they land, they need a chauffeur who meets them directly at the ramp, so that they do not have to contend with

loading their equipment on a transfer vehicle, then unloading it, then loading it onto another vehicle. *Id.* RMA's services, at their best, are a door-to-door deal. Thus, even if Signature barred RMA only from its ramps, the same irreparable harm would occur.

It is settled law that the "possibility of permanent loss of customers to a competitor or the loss of goodwill" necessarily satisfies the irreparable injury prong. *HotJobs.com, Ltd.*, 53 Va. Cir. at 42. RMA has amply demonstrated that the injuries it will sustain absent an emergency temporary injunction meet that standard. And, clearly, the irreparable harm described here will continue before any hearing on a preliminary injunction could possibly be held and while awaiting a response from Signature, warranting *immediate* injunctive relief in the form of a temporary injunction.[2] Va. Sup. Ct. R. 3:26(b) (noting that a temporary injunction is meant to preserve "the status quo between the parties pending a hearing on a motion for a preliminary injunction").

## II.    RMA IS MORE LIKELY THAN NOT TO PREVAIL ON ITS TORTIOUS INTERFERENCE AND BUSINESS CONSPIRACY CLAIMS.

Entry of an emergency injunction is appropriate here because RMA is more likely than not to succeed on the merits of its tortious interference with contract and business relations and statutory business conspiracy claims. Va. Sup. Ct. R. 3:26; *Zachary Piper LLC v. Popelka*, 109 Va. Cir. 71, 73 (Va. Cir. Ct. Fairfax 2021) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 21 (2008)). To prevail as to this factor, RMA "need not prove that it is entitled to the remedy it seeks," and only needs to "raise a question 'going to the merits so serious, substantial, difficult, and doubtful' as to be fair ground for litigation." *HotJobs.com, Ltd.*, 53 Va. Cir. 36 at 41. If the Court finds that RMA is more likely than not to prevail on just *one* of its claims, this factor is satisfied. Here, RMA is more likely than not to prevail on all of its claims, leaving no doubt.

---

[2] RMA's counsel has also certified in writing its efforts to provide notice to Signature and the reasons notice should not be required. *See* Manning Decl. ¶¶ 7-12.

### A.    RMA Is More Likely Than Not to Prevail on Its Tortious Interference with Contract Claim.

In Virginia, the elements for a tortious interference with contract are (1) "the existence of a valid contractual relationship or business expectancy;" (2) "knowledge of the relationship or expectancy on the part of the interferor;" (3) "intentional interference inducing or causing a breach or termination of the relationship or expectancy;" and (4) "resultant damage to the party whose relationship or expectancy has been disrupted." *Schaecher v. Bouffault*, 290 Va. 83, 106 (2015) (citing *Chaves v. Johnson*, 230 Va. 112, 120 (1985)).

Here, RMA is likely to prevail on its tortious interference with contract claim. *First*, RMA has valid contractual relationships with thousands of customers that are jeopardized by Signature's conduct. Fogarty Decl. ¶ 14. *Second*, Signature is well aware of RMA's contractual relationships, because for many years, RMA has transported RMA's and Signature's mutual customers to and from aircraft across the country. *Id.* ¶ 15. And if Signature were somehow unaware of these contractual relationships, it certainly became aware of them as of November 22, 2025, when RMA's counsel explicitly informed Signature about the contracts it was interfering with. **Ex. K**, RMA's November 22, 2025 Letter. *Third*, Signature has obviously intentionally interfered with those contracts by barring RMA from its leaseholds, and that interference is bound to induce RMA's customers (who have literally bargained for the very services that Signature is now barring RMA from performing) to terminate those contracts. Indeed, that has already begun to happen. *See* Fogarty Decl. ¶¶ 20-26. *Fourth*, RMA has suffered and will continue to suffer damage as a result of Signature's intentional interference, including the loss of revenues, customers, goodwill, and damage to its reputation. *Id.* ¶ 29. *Finally*, to the extent RMA has the burden of proving the impropriety of Signature's interference, it is more likely than not that RMA will do so— Signature's total ban was imposed in an improper attempt to extract indemnification for the

February 28 Incident from RMA, departed from standard industry practice, and flouted FAA Rules. *E.g.*, *Duggins v. Adams*, 234 Va. 221, 228 (1987) (violating regulations, violating established standard of a trade or profession, and "[s]harp dealing" or "overreaching" satisfy impropriety prong).

To be clear, there is no justification (legal or otherwise) for Signature's intentional interference. As demonstrated above, reliance on the February 28, 2025 Incident is entirely pretext.[3] Signature permitted RMA access to its leaseholds for ***nine months*** after the Incident. Fogarty Decl. ¶ 12. It was only after Signature was sued for the February 28 Incident that it decided to leverage access to its leaseholds to extract indemnification from RMA. *Id.* The purported grounds for this ban and the terms demanded to lift it have not been made to any of RMA's competitors as they are obviously tied to a lawsuit that does not involve any of these competitors. That is the *sine qua non* of economic discrimination.

**B.    RMA Is More Likely Than Not to Prevail on Its Tortious Interference with Business Relations Claim.**

Virginia has also recognized a cause of action for "interference with a prospective business or economic advantage" without requiring proof of a breached contract. *Glass v. Glass*, 228 Va. 39, 51–52 (1984). To claim tortious interference with business relations, a plaintiff must prove (1) "the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff;" (2) "defendant's knowledge of the relationship or expectancy;" (3) "a

---

[3] To be sure, this action is neither the time nor the place to litigate liability for the February 28 Incident. That incident is the subject of a pending federal court lawsuit that will be resolved in due course. *TELUS Communications, Inc. v. Signature Aviation Services Corporation*, No. 1:25-cv-01372 (D. Del. Nov. 11, 2025) (the "*TELUS* Litigation"). Tellingly, RMA is not a party to that lawsuit, which may explain why Signature is attempting to coerce RMA to indemnify it. In any event, RMA bears no responsibility for Signature's negligent management of its leasehold and resulting damage. Compl. ¶¶ 37-55.

reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy;" and (4) "damage to plaintiff." *Id.* And, in cases involving a business expectancy, a plaintiff must also allege "that the defendant employed '*improper*' methods" in causing the alleged interference. *Duggins*, 234 Va. 221 at 226–27 (emphasis in original).

Again here, RMA is more likely than not to prevail on its tortious interference with business relations claim. *First*, RMA expects future business from its customers who land at or depart from Signature leaseholds, as amply demonstrated by the fact that RMA has derived over $1,000,000 in revenues from these customers in the first 11 months of 2025 alone. Fogarty Decl. ¶ 16. *Second*, as detailed above, *supra*, Section I, Signature is well aware of these expected and ongoing relationships. *Third*, if not for Signature's intentional misconduct of barring RMA from Signature's leaseholds, RMA would have realized its expected future business relationships with not only its existing customers who would have returned for additional services, but new customers pursuing RMA's services. As discussed, RMA's clientele demands a high level of service that includes accessibility, convenience, and white-glove service wherever they land or depart— services RMA cannot provide if it is barred from Signature leaseholds. Fogarty Decl. ¶¶ 17, 30. *Fourth*, RMA has been damaged by Signature's conduct, including because it has lost and will continue to lose customers, goodwill, and suffer damage to its reputation. *Id.* ¶ 29. *Finally*, there is no question here that Signature's conduct is improper, as it flouts the FAA Rules and finds no basis in any contract with RMA or otherwise. Signature's conduct is also part of a clearly improper campaign to manufacture leverage over RMA and extract indemnification for the February 28 Incident. *Supra*, Section I. Calling Signature's conduct "improper" is a gross understatement.

*E.g.*, *Duggins*, 234 Va. at 228 (violating regulations, violating established standard of a trade or profession, and "[s]harp dealing" or "overreaching" satisfy impropriety prong).

    **C.**    **RMA Is More Likely Than Not to Prevail on Its Business Conspiracy Claim.**

    To prevail on a business conspiracy claim, a plaintiff must establish: (1) "a combination of two or more persons;" (2) "for the purpose of willfully or maliciously injuring plaintiff in his business;" and (3) "resulting damage to plaintiff." *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 214 (2014). Moreover, "an allegation of conspiracy, whether criminal or civil, must at least allege an unlawful act or an unlawful purpose." *Id.* at 215 (internal quotation marks omitted). The Virginia Supreme Court has expressly held that "tortious interference with contract and tortious interference with business expectancy each constitute the requisite 'unlawful act' to proceed on a business conspiracy claim under Code §§ 18.2–499 and –500." *Id.* at 218–19.

    The Court need not reach the question of whether RMA is more likely than not to prevail on its business conspiracy claim, because RMA has demonstrated that it is more likely than not to prevail on at least one of its tortious interference claims. But if the Court does reach this question, it will find that RMA is more likely than not to prevail on this claim, too. There is no dispute that Signature Corp. and Signature Flight have acted in concert to harm RMA, because they mutually imposed the total ban on RMA. There is also no question that Signature wanted to harm RMA by imposing the total ban. Indeed, the entire purpose of the total ban was to manufacture leverage (i.e., the imminent threat of lost business and customers) over RMA so that Signature could extract an under-duress indemnification agreement from RMA for the February 28 Incident. And, in enacting the ban, Signature Corp. and Signature Flight conspired to deprive RMA of its lawful right to non-discriminatory, equal access to Signature leaseholds, as mandated by the FAA Rules. Finally, the resulting damage to RMA stemming from the total ban is patent, as described above,

because it prevents RMA from performing its contracts with the parties' mutual customers nationally. To top it off, Signature's conduct was for an unlawful purpose—to force RMA into a corner and extract an indemnification agreement while RMA was under duress. RMA is more likely than not to prevail on its business conspiracy claim.

## III.    THE BALANCE OF EQUITIES SOLELY FAVOR RMA.

The balance of equities weighs entirely in RMA's favor. When balancing the equities, the court must "compar[e] the petitioner's likely harm absent preliminary relief with the potential harm to the respondent if the preliminary relief is granted." *Legacy Invs., LLC v. Norfolk City Council*, 110 Va. Cir. 393, 403 (Va. Cir. Ct. Norfolk 2022) (citing *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd P'ship*, 918 F.3d 353, 366 (4th Cir. 2019)).

The harm to RMA absent injunctive relief is staggering. RMA will lose customers and associated revenues. *Supra*, Section I. RMA's reputation will be irreparably scarred. *Id.* RMA will not be able to provide the quality of services it must provide to remain competitive in the high-end chauffeur industry. *Id.* RMA's goodwill with existing customers and future customers will evaporate. *Id.* RMA's competitors will swoop in to offer their services to RMA's customers because RMA is barred from providing those services at Signature leaseholds. *Id.*

On the other side of the scale, Signature has no identifiable harm to speak of. If an emergency injunction issues, it will merely return the parties to the status quo as it has existed for years and as it existed for ***nine months*** following the February 28 Incident. Indeed, Signature allowed RMA to utilize its leaseholds nationwide for ***265 days*** after the Incident before instituting its total ban on November 20, 2025. It was only ***after*** Signature was sued in federal court on November 11, 2025 that Signature abruptly banned RMA from its leaseholds on November 20, 2025. Therefore, it was the *TELUS* Litigation—not the incident itself nor RMA's purported involvement—that triggered the ban. This alone demonstrates that Signature had no concerns

about RMA continuing to operate its business or using Signature's leaseholds for nine months following the incident. The only intervening change was the *TELUS* Litigation, alleging millions of dollars in damages resulting from Signature's, not RMA's, negligence during the incident. Accordingly, RMA merely seeks to "preserve the status quo"—uninterrupted access to Signature's leaseholds—while this litigation proceeds. *Loudoun Cnty. Sch. Bd.*, No. 210584, 2021 WL 9276274 at *5; *May v. R.A. Yancey Lumber Corp.*, 297 Va. 1, 18 (2019) ("A temporary injunction allows a court to preserve the status quo between the parties while litigation is ongoing.").

To the extent Signature contends that an emergency injunction against Signature's total ban would harm Signature's ability to operate safely, the record belies that assertion. RMA had uninterrupted access to Signature's leaseholds for nearly a year after the incident. At no point during that nine-month period did Signature express safety concerns to RMA, because there were none. And, notably, neither before nor after the February 28 Incident has RMA been involved in a ***single*** incident involving aircraft collisions on Signature leaseholds. Fogarty Decl., ¶ 8. Signature's only motivation for banning Signature is to extract an under-duress indemnification agreement from RMA for the February 28 Incident. An emergency injunction that simply foils Signature's improper plan does not cause any cognizable harm to Signature.

Signature is also unlawfully leveraging the total ban to extract concessions from RMA. Specifically, Signature has refused to release the ban unless RMA accepts certain extortive conditions. Manning Decl. ¶¶ 6, 10. Having implemented this total ban on November 20, 2025, Signature immediately conveyed that it would "reevaluate this prohibition only in the event" that RMA provided a full defense and indemnification for the incident, "a copy of every policy that may afford coverage" for the incident, and certification that RMA "holds a policy of insurance with sufficient coverage for any future incidents." *See* **Ex. D**, Signature's November 20, 2025

24

Letter.  Shortly thereafter, on November 26, 2025, Signature again sought to leverage RMA's "current predicament" to coerce RMA into accepting outrageous "Required Conditions" in exchange for a "temporary" release of the ban.  *See* **Ex. G**, Signature's November 26, 2025 Letter. The "Required Conditions" include a "release/waiver/hold harmless agreement," the addition of Signature as an additional insured on RMA's insurance policies, a telephone conference with counsel for TELUS to identify "why [TELUS] elected not to assert claims against RMA," and jurisdictional consent.  *Id.*  In addition to being extremely exploitative of RMA's "current predicament," none of the "Required Conditions" address any safety concerns relating to RMA's operations that may have warranted a total ban.  *Id.*  Instead, these "Required Condition" are a blatant attempt by Signature to gain an unlawful advantage in the *TELUS* Litigation and over RMA, which is wholly improper.  *See id.*

Consequently, the balance of equities weighs solely in RMA's favor.  Without uninterrupted access to the leaseholds, RMA faces immediate and irreparable harm, whereas preserving access, or the "status quo," merely maintains existing operations and prevents further coercion pending resolution of this litigation.

## IV.    INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST.

The final factor for granting temporary injunctive relief—whether such relief is in the public interest—decidedly favors RMA.  *Zachary Piper*, 109 Va. Cir. at 73 (citing *Winter*, 555 U.S. at 21).  To satisfy this factor, RMA need show only that the "public interest in granting the injunction outweighs the interest in denying it between now and trial."  *State Bd. of Health v. Gourmeltz, LLC*, 107 Va. Cir. 371, 377 (Va. Cir. Ct. Spotsylvania 2021).  That test is easily met here.

The public's interest in injunctive relief here could not be greater, for four reasons:  (1) the public interest is served by improved mobility at public airports; (2) the public interest is served

by injunctions that prevent extortionate conduct; (3) the public interest is served by requiring Signature to comply with its lease obligation of providing the highest quality customer service to traveling passengers at CHO; and (4) the public interest is served by maintaining the status quo— no ban of RMA—because Signature's conduct violates the public's interest in uniform, non-discriminatory access to FBO leaseholds.

*First*, absent an emergency injunction, Signature's total ban threatens the public's basic ability to safely and conveniently travel to, from, within, and out of public airports. That is because Signature's total ban of RMA means that RMA, who has agreed to pick up deplaning passengers and transports boarding passengers, cannot do so. In the meantime, passengers around the country who are doing business with RMA face the vagaries of finding alternative transportation, making new arrangements, and altering their plans. This results in cascading operational and financial impacts and underscores the need to preserve access. These threats to the public interest are not speculative. Indeed, RMA's customers have already been forced to arrange alternative transportation upon arrival at Signature's leaseholds. Fogarty Decl. ¶ 25. RMA has also received correspondence from frustrated customers about incidents where RMA was not allowed onto Signature's leasehold to pick up customers. *Id.* ¶ 23. Those instances will only increase while the ban is in place. Moreover, public's interest in mobility at public airports—including the ability to choose their preferred chauffeur service—clearly favors injunctive relief here.

*Second*, Signature's nationwide ban on RMA was arbitrary and not grounded in any safety concerns regarding RMA's operations. Instead, the ban is pure economic discrimination used to coerce RMA into indemnifying and holding Signature harmless in the *TELUS* Litigation. Because there is no public safety concern in allowing RMA continued access to Signature's leaseholds, and

because the public interest necessarily abhors extortionate conduct of the kind Signature has engaged in, this factor weighs in favor of an emergency injunction.

*Third*, Signature's lease agreement with CAAA expressly provides that Signature is to "use its best efforts to provide . . . [a]ir taxi[s] and charter[s]" in such a manner "that will achieve the **highest** level of customer service and maximize profits." **Ex. A**, Lease Agreement ¶¶ 2.4(A), 2.8 (emphasis added). Signature's arbitrary ban clearly violates that public-minded provision. Because Signature has chosen to ban RMA from its CHO leasehold, neither Signature nor CAAA can provide the "**highest** level of customer service." *See id.* Thus, the total ban adversely impacts not only RMA but also the general public—the primary users of chauffeur services. The ban also harms CAAA, who relies on Signature to provide the best possible customer service and to comply with its lease obligations.

*Fourth*, because Signature's arbitrary ban contravenes the economic nondiscrimination policy and FAA Rules, it is in the public's interest to enjoin that ban. Permitting continued access will benefit, not prejudice, the public interest.

On the other side of the scale, the public interest is not only disserved, but actively harmed by, Signature's conduct. This factor clearly favors temporary injunctive relief.

**CONCLUSION**

WHEREFORE, for the reasons set forth herein, Plaintiff Errands Plus Inc. d/b/a RMA Worldwide Chauffeured Transportation moves for entry of an Order requiring Defendants Signature Flight Support LLC and Signature Aviation Services Corporation to retract their ban of RMA on Signature leaseholds and to permit RMA access to Signature leaseholds consistent with the access it enjoyed prior to November 20, 2025. RMA respectfully requests that this Court

*immediately* enter a temporary injunction and set this matter for a preliminary injunction hearing on the earliest available date and thereafter issue a preliminary injunction.

Date: December 12, 2025

**ERRANDS PLUS, INC. D/B/A RMA**
**WORLDWIDE CHAUFFEURED**
**TRANSPORTATION**

/s/ _____

Jason E. Manning (VSB No. 74306)
David M. Asbury (VSB No. 88977)
TROUTMAN PEPPER LOCKE LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Telephone: 757.687.7564
Facsimile: 757.687.1524

*Counsel for Plaintiff*