**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

|  |  |
|---|---|
| ERRANDS PLUS INC. *d/b/a* RMA WORLDWIDE CHAUFFEURED TRANSPORTATION,<br><br>        Plaintiff,<br><br>v.<br><br>SIGNATURE FLIGHT SUPPORT, LLC, and SIGNATURE AVIATION SERVICES CORPORATION,<br><br>        Defendants. | Civil Action No.  3:25-cv-00098-JHY<br><br>The Honorable Judge Jasmine H. Yoon<br><br><br>__JURY TRIAL DEMANDED__ |

## FIRST AMENDED COMPLAINT

Plaintiff Errands Plus Inc. d/b/a RMA Worldwide Chauffeured Transportation ("RMA"), by counsel, brings this Complaint against Defendants Signature Flight Support, LLC ("Signature Flight") and Signature Aviation Services Corporation ("Signature Corp.") (collectively, "Signature" or "Defendants"), (collectively, "Defendants").  RMA states as follows:

## INTRODUCTION

1.      Signature—a fixed-base operator ("FBO") that operates solely based on rights granted by various independent airport authorities via lease, including the Charlottesville-Albemarle Airport Authority ("CAAA")—has instituted a ***total ban*** on RMA's presence at or use of Signature's leaseholds at all of Signature's airport leaseholds nationwide.  Signature's sole motivation for this arbitrary, capricious, and total ban is to force RMA to take the fall for Signature's negligence, which resulted in substantial damage to a private jet then in the care, custody and control of Signature at the Charlottesville-Albemarle Airport ("CHO") almost a year ago.

1

2.     Signature's only purported reason for arbitrarily banning RMA from its leaseholds nationwide is a February 28, 2025 incident caused by Signature's negligence at CHO that resulted in damage to a private jet ("February 28 Incident" or the "Incident").  That is a pretextual excuse, and the record proves it.  Signature was fully aware of the February 28 Incident the day it occurred, yet allowed RMA to continue to utilize its leaseholds for nearly ***nine months*** after the Incident before instituting its total ban on November 20, 2025.  Therefore, neither the Incident itself nor RMA's purported involvement in the Incident triggered the ban.

3.     Signature has not, and cannot, identify any authority that permits it—a leaseholder that leases public land subject to lease agreements and government regulations—to leverage its access to public property to extort service providers.

4.     Federal law prohibits FBOs like Signature from discriminating against service providers and requires Signature to ensure the safety and security of areas on public property that Signature leases.

5.     Signature's ban flouts federal law and policy and makes airports ***more dangerous*** and ***less secure***.

6.     Signature's ban of RMA is not motivated by safety.  Instead, it is an attempt to (1) manufacture duress for RMA; and (2) extract an admission of liability for the February 28 Incident (among other concessions) from RMA by leveraging that duress.

7.     Signature intends to then deploy this strong-armed admission of liability in a federal court lawsuit filed by the owner of the private jet damaged as a result of Signature's negligence. *TELUS Communications, Inc. v. Signature Aviation Services Corporation*, No. 1:25-cv-01372 (D. Del. Nov. 11, 2025) (the "*TELUS* Litigation").  Significantly, it was only ***after*** Signature was sued

2

in federal court on November 11, 2025, that Signature abruptly banned RMA from its leaseholds on November 20, 2025.

8.      Rather than allowing the *TELUS* Litigation to proceed in due course, Signature seeks an end-run: Signature, apparently unnerved that TELUS Communications Inc. ("TELUS") chose not to sue RMA in the *TELUS* Litigation, demands bevy of unusual capitulations in exchange for lifting the arbitrary, manufactured total ban Signature has imposed.

9.      Signature's effort to wield the access granted to it by various airport authorities to gain a tactical advantage in litigation is wrong.  It also gives rise to several legal causes of action and warrants immediate injunctive relief.

10.     To be clear, RMA has suffered and will continue to suffer irreparable and largely immeasurable harm.  Each day that Signature blocks access to its leaseholds results in mounting harm to RMA's goodwill, reputation, and customer relationships.  That is why RMA has filed an emergency motion for a temporary restraining order, which the Court has since converted to a motion for a preliminary injunction.

## **PARTIES**

11.     RMA is a Maryland corporation with its principal place of business in Rockville, Maryland.

12.     Signature Flight is a Delaware limited liability company with members domiciled in Florida, Delaware, and the United Kingdom.  Signature was, and is, a flight support company, duly authorized to transact, and is transacting business in the Commonwealth of Virginia as a flight support company.

13.     Signature Corp. is a flight support company incorporated in the state of Delaware with its principal headquarters located in Orlando, Florida.  Signature Corp. is authorized to do business in the Commonwealth of Virginia.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction because RMA is diverse from all Defendants, and the amount in controversy exceeds $75,000.00. 28 U.S.C. § 1332(a).  *See* Dkt. No. 1 (Defendants' notice of removal).

15.     This Court has personal jurisdiction over Signature in this matter because, among other things, this action arises from Signature's transaction of substantial, continuous, and systematic business in the Commonwealth of Virginia. Signature contracts to supply services and things in the Commonwealth of Virginia, leases land in Virginia, operates FBOs in Virginia, and has caused tortious injury by an act or omission in this Commonwealth.  Signature's contacts exceed the minimum contacts necessary to satisfy the "notions of fair play and substantial justice" embodied in the due process clause of the Fourteenth Amendment.  *International Shoe Co. v. Washington*, 326 U.S. 310, 323–24 (1945).

16.     Venue is proper in this Court because Signature removed this case from the Albemarle County, Virginia, Circuit Court—over which this Court has removal jurisdiction.  28 U.S.C. § 1441(a).

## BACKGROUND

17.     Signature is an FBO that operates a network of public use airports that service Part 135 operations, including a fixed base operation at CHO in Charlottesville, Virginia.  Signature operates at more than 200 locations internationally, with over 100 locations in the United States alone.

18.     Among other things, Signature undertakes a duty to escort vehicles attempting to navigate Signature's leaseholds.  Specifically, Signature often escorts private vehicles, including buses and cars, to chauffeur passengers who are deplaning from private jets.  Signature also offers long-term hangar space for corporate aircraft, short-term parking solutions for aircraft in travel, and a variety of other services.

19.     Signature does not have outright ownership rights to any of the airport areas that it services.

20.     Signature is a lessee at CHO and at other airports where it conducts FBO operations.

21.     Signature is subject to Federal Aviation Administration ("FAA") standards, rules, obligations, and assurances ("Rules") imposed on Signature directly.

22.     Signature is also subject to FAA Rules imposed via its lease agreement with CAAA (among other airport authorities around the country).  These include standards and obligations that flow from CAAA's acceptance of Federal Airport Improvement Program ("AIP") funds under 49 U.S.C. § 47107 for use at the CHO.

23.     Signature's operations at public airports are authorized only as a result of lease agreements between airport authorities, or other sponsors of airports, and Signature, including the lease agreement between CAAA and Signature.  Those lease agreements, on information and belief, subject Signature to comply with all applicable FAA Rules, including FAA Grant Assurances that accompany airports accepting AIP funds, which include mandated economic non-discrimination and uniform application of standards for admission to Signature's leaseholds.  49 U.S.C. § 47107; *see, e.g.*, Airport Sponsor Assurances (2025) 22(a), 22(h), 23, and 36; *see also* FAA Order 5190.6B (Airport Compliance Manual) (2025) ¶¶ 14.1, 14.2, 14.3 (Restrictions Based on Safety and Efficiency Procedures and Organization) and Advisory Circular 150/5190-8

5

(Minimum Standards for Commercial Aeronautical Activities) (2025) ¶ 1.2.2 (Authority Vested in Airport Sponsors); *see also* **Ex. A**, Lease Agreement between CAAA and Signature ("Lease Agreement") ¶¶ 2.2, 2.16.[1]  Signature is not free to limit access unreasonably or in a discriminatory fashion.  Signature has flouted the FAA Rules (and its agreements with various airports) by instituting a targeted, discriminatory ban against RMA without any basis.

24.    Signature has also flouted its obligations under minimum standards prescribed by the various airport authorities where it operates.  For example, Signature has violated the minimum standards prescribed by CHO, which under the heading "Public Responsibility" require that Signature agree to "furnish all services authorizes or licensed on a fair, equal, and not unjustly discriminatory basis to all users."   Dkt. 45-4, *Minimum Standards for FBOs Providing Aeronautical Services to the Public at Charlottesville-Albermarle Airport, Charlottesville, Virginia* (Feb. 16, 2000), Section 13, Part 3, ¶ 2 ("CHO Minimum Standards").

25.    Signature often leases substantial space at airports where it operates.  As relevant here, Signature entered into an agreement to lease 646,602 square feet from CAAA to operate a general FBO.  Lease Agreement ¶¶ 1.1, 2.1.

26.    RMA operates on Signature's property to service mutual clients.  Among other services, RMA provides a private chauffeur service for passengers who are deplaning from private jets.  RMA services customers at the entity level and at the individual level, sometimes providing transportation for individuals or groups of individuals, and other times providing transportation for athletic teams and bands (as well as their equipment).

---

[1] The Lease Agreement names Piedmont Hawthorne Aviation, LLC d/b/a Landmark Aviation ("Piedmont Aviation") as the lessee.  Piedmont Aviation is now owned by Signature and, therefore, Signature is bound by the Lease Agreement as a successor to the Lease Agreement and has continued to operate under it.

27.    RMA employs over 400 individuals across the United States, whose livelihood depends on their ability to pick up and drop off passengers; many of those passengers are flying into or out of Signature leaseholds.

28.    Signature agreed, as part of the Lease Agreement, to "use its best efforts to provide . . . [a]ir taxi[s] and charter[s]" in such a manner "that will achieve the *highest* level of customer service and maximize profits."  Lease Agreement ¶¶ 2.4(A), 2.8 (emphasis added).

29.    Until November 20, 2025, Signature had permitted RMA's vehicles and employees to enter its leaseholds for over 35 years.

30.    RMA, for its part, contracts with thousands of individuals and entities each year to guarantee fast, comfortable, and safe transportation on airport ramp areas worldwide.  RMA's ability to perform under these contracts, and indeed its very business model, depends on the assumption that FBOs—like Signature—(1) will comply with the Federal Rules mandating uniform, nondiscriminatory access to FBOs; (2) will comply with their obligations under their lease agreements with various airport authorities; (3) will operate consistent with standard industry practices; and (4) will **not** attempt to extort RMA or manufacture duress as a means of obtaining significant monetary concessions.

31.    RMA's operations necessarily depend on FBOs like Signature providing safe and appropriate escort services on the airport ramp areas on the secure side of the airport for purposes of safely navigating the airfields.

32.    RMA has built its brand on convenience, comfort, safety, and timeliness.  When RMA's customers arrive on private jets, they know RMA will be waiting for them and that it will offer white-glove service dependent on the customers' needs, which often involves picking them and their luggage and/or equipment up directly at the base of the ramp or airstairs or elsewhere on

Signature's leasehold, again depending on the customer's needs. RMA then whisks its customers away to their next destination, without having to deal with the delays of navigating airports or transferring themselves or their equipment and luggage across multiple vehicles.

### Long After the February 28 Incident, Signature Contractually Guarantees RMA Access to Leaseholds Nationwide, Including Signature's CHO Leasehold

33.    Up until October 2, 2025, Signature permitted RMA to access its leaseholds throughout the United States with no requirements that RMA even execute a release—and prior to the February 28 Incident, RMA had accessed Signature leaseholds thousands of times. Then, on October 2, 2025, Signature suddenly requested that RMA sign a document styled as a Third Party Vendor Release, before Signature would allow RMA to access its leasehold at CHO, and RMA did so. In that document (the "Vendor Release Agreement"), Signature guaranteed RMA the right to access its CHO leasehold. **Ex. B**, Vendor Release Agreement ¶ 2.

34.    In the Vendor Release Agreement, Signature agreed that RMA "***shall enter*** Signature's Premises" to "perform[] Service at the request of Signature or its ***customer, Permittee, tenant, Aircraft owner, pilot or other designated representative***." *Id.* (emphases added).

35.    RMA's customers are necessarily Signature's customers, meaning RMA was entitled to enter Signature's leasehold at CHO "at the request" of RMA's customers. *Id.*

36.    In exchange for the guaranteed right of access, RMA agreed in the Vendor Release Agreement to maintain certain insurance in place and have Signature named as an additional insured on certain of said insurance. The Vendor Release Agreement also included an indemnification clause running in favor of Signature in respect of incidents that might occur at CHO on a going forward basis, subject to the specific terms and conditions of the Vendor Release Agreement.

8

37.     At no point in time prior to execution of the Vendor Release Agreement (or in the month thereafter) did Signature indicate that RMA was unwelcome or otherwise barred from entering any of Signature's leaseholds throughout the country, and as such RMA continued to service its customers' needs at Signature leaseholds throughout the United States, both before and after execution of the Vendor Release Agreement.

38.     Until on or about November 20, 2025, RMA continued to operate its business as it had for approximately 35 years at Signature leaseholds.

39.     Signature never asked RMA to sign any similar release agreements in return for access at other Signature leaseholds, and RMA never refused or indicated any intention to refuse had such a request been made.

### Signature Abruptly Bans RMA From All of Its Terminals Worldwide

40.     In a sudden departure from 35 years of practice, on November 20, 2025, Signature abruptly informed RMA that RMA, its employees, its vehicles, its agents, and its subcontractors were banned from entering "any Signature Aviation leasehold nationwide." **Ex. C**, Signature's November 20, 2025 Letter at 1.  Thus, since November 20, 2025, RMA has been banned from "seek[ing] entry to any Signature property or driv[ing] on any signature ramp." *Id.*

41.     Signature's total ban came on the heels of a lawsuit filed against Signature in the United States District Court for the District of Delaware on November 11, 2025.  *See TELUS Litigation*.  In that lawsuit, the owner of a private jet, TELUS, sued Signature for damage sustained by the private jet while it was parked at the Signature leasehold at CHO and in the care, custody, and control of Signature on February 28, 2025.  **Ex. D**, Complaint, Dkt. 1, *TELUS Communications, Inc. v. Signature Aviation Services Corporation*, No. 1:25-cv-01372 (D. Del.

Nov. 11, 2025) ("*TELUS* Complaint").  TELUS alleges that Signature's gross negligence caused the damage to its jet.  *Id.* at ¶¶ 31-35.

42.    Although RMA is not a named party in the *TELUS* Litigation, and although there existed no written agreement between RMA and Signature that obligated RMA to do so, Signature accompanied its total ban with a demand that RMA indemnify Signature for any loss claimed in the *TELUS* Litigation.  **Ex C**, Signature's November 20, 2025 Letter at 1.

**Signature's Pretextual Excuse for the Total Ban**

43.    Signature has not offered a direct reason for instituting the total ban of RMA.

44.    In its correspondence to RMA, at no point in time did Signature state that it was concerned about whether RMA could operate on Signature FBOs safely on a prospective basis.

45.    At no point in time has Signature requested that RMA provide additional safety training to RMA's employees.

46.    At no point in time has Signature requested that the driver who was involved in the February 28 Incident no perform transfers at Signature's leaseholds.

47.    RMA is not aware of any ban imposed by any FBO in the nation that is as broad as the ban imposed by Signature on RMA.

48.    The February 28 Incident occurred ***265 days*** before Signature instituted the total ban.

49.    Signature was on notice of the February 28 Incident the day it occurred.

50.    To be clear, liability for the February 28 Incident will be determined in the *TELUS* Litigation.  This lawsuit is not about the February 28 Incident.  Because, however, Signature evidently relies on that Incident as an excuse for its total ban, the facts of the Incident are detailed below.

51.     The February 28 Incident resulted from Signature's negligence.  *E.g.*, **Ex. D**, *TELUS* Complaint.

52.     On February 28, 2025, Signature's client, TELUS, parked a Gulfstream G550 (the "TELUS Gulfstream") at a terminal operated by Signature at the CHO.

53.     The TELUS Gulfstream was taxied and parked at a terminal under Signature's direction.

54.     At all relevant times, the TELUS Gulfstream was under Signature's care, custody and control.

55.     At approximately 2:00 a.m., RMA's charter bus chauffeur relied upon Signature's escort for access to the ramp and for direction receiving arriving passengers from another jet—an Embraer 190, which Signature had caused to be parked close to the TELUS Gulfstream.

56.     Signature directed RMA to travel between the two aircraft, which were parked 105 feet from wingtip to wingtip.

57.     Signature failed to provide any warning about the unlit TELUS Gulfstream.

58.     Signature failed to provide adequate lighting around the TELUS Gulfstream.

59.     Signature failed to provide flares or lights on the ground that would show where the TELUS Gulfstream's wingtip ended.

60.     Signature failed to inform RMA that the TELUS Gulfstream was on the tarmac.

61.     Signature failed to enlist a "wing walker" to walk to the end of the TELUS Gulfstream's wingtip and only provided one for the corresponding Embraer 190 wingtip.

62.     Signature's escort driver led RMA's charter bus chauffeur driver directly into the TELUS Gulfstream's wing.

63.     Signature failed to safely escort RMA's charter bus chauffeur driver.

64.    As a result of Signature's negligence, RMA's charter bus chauffeur driver collided with the right wing of the TELUS Gulfstream.

65.    RMA's charter bus and the TELUS Gulfstream sustained damage.

66.    After the collision, RMA's charter bus chauffeur driver was informed by Signature employees that Signature was short staffed and had recently brought on new, inexperienced employees.

67.    Signature was on notice of the February 28 Incident the moment it occurred.

68.    Signature continued to allow RMA to utilize Signature's leaseholds at CHO and nationwide at all times without any requested change in operations until on or about November 20, 2025.

69.    Neither before nor after the February 28 Incident has an RMA employee been involved in a collision with an aircraft on a Signature-operated ramp or area.

70.    On information and belief, Signature has never instituted a nationwide ban of a service provider on Signature's FBOs for the purpose of extracting a monetary payment or admission of liability in a lawsuit.

71.    Signature's ban is not tailored to the facts surrounding the February 28 Incident. The ban is not limited to CHO, where the incident occurred. The ban is not limited to charter buses, which is the RMA vehicle that was involved in the Incident. The ban is not limited to nighttime activities, which is when the Incident occurred. The ban is not limited to the secure side of airports, which is where the Incident occurred.

**Signature Attempts to Force RMA to Accept All Responsibility and Liability for the
February 28 Incident Under Duress**

72.    Until November 20, 2025, Signature never claimed or asserted that RMA was
responsible for or liable for the February 28 Incident.

73.    Between February 28, 2025, and November 20, 2025, Signature continued to allow
RMA access to its leaseholds consistent with its prior practice.

74.    On November 11, 2025, TELUS sued Signature in federal court, alleging millions
of dollars in damages resulting from Signature's negligence.  *See* **Ex. D**, *TELUS* Complaint.

75.    RMA is not a party to the *TELUS* Litigation.

76.    After the *TELUS* Litigation was filed, Signature set its sights on RMA.

77.    Signature began by instituting the total ban on or about November 20, 2025.

78.    The total ban is not limited to CHO.  The total ban applies to all Signature
leaseholds nationwide, constituting over 100 airports.

79.    Signature knew that the total ban would devastate RMA's brand, customer
relationships, and income stream.  Signature knew this because it knew that some of the customers
who used its facilities were transported to and from those facilities by RMA.

80.    With the total ban in place, Signature began to make numerous demands of RMA,
seeking to use the duress created by the total ban to strong-arm significant financial concessions
from RMA.

81.    On November 20, 2025, Signature demanded that RMA provide a "full defense and
indemnification" for the February 28 Incident. **Ex. C**, Signature's November 20, 2025 Letter.

82.    On November 20, 2025, Signature also demanded that RMA provide a "complete
copy of every [insurance] policy that may afford coverage for the" February 28 Incident.  *Id.* at 1.

**RMA Attempts to Reason with Signature**

83.    RMA, surprised by Signature's unexpected total ban, responded on November 22, 2025, wherein RMA explicitly informed Signature that Signature's total ban was "intentionally interfering with [RMA's] contracts and business, and also unlawfully restraining" RMA's trade. **Ex. E**, RMA's November 22, 2025 Letter at 1.  RMA requested that Signature lift the total ban immediately.  *Id.*

84.    RMA also offered to execute a Third-Party Vendor Release for any additional Signature-operated facilities.  *Id.*  RMA further offered to provide applicable insurance policies in effect at the time of the February 28 Incident, and to provide a Certificate of Insurance for future operations.  *Id.*

**Signature Refuses to Lift the Ban and Attempts to Take Advantage of the Manufactured Duress It Imposed on RMA**

85.     On November 26, 2025, Signature responded to RMA's offers with more demands.  **Ex. F**, Signature's November 26, 2025 Letter.

86.    Signature refused to lift the total ban, in contravention of the FAA uniformity and economic non-discrimination rules described above.

87.    Signature offered to lift the ban for just ***six days*** on a "temporary" basis, but only if RMA capitulated to extraordinary demands including that RMA:

a.   Execute a prospective release and indemnity agreement;

b.   Obtain insurance coverage of at least $5 million for incidents arising on Signature's properties;

c.   Arrange for a call between counsel for TELUS to ask TELUS why TELUS did not sue RMA in the *TELUS* Litigation;

     d.   Arrange for an interview of RMA's driver who was involved in the February 28 Incident;

     e.   Waive all jurisdictional objections and accept third-party practice in the United States District Court for the District of Delaware in the *TELUS* Litigation;

     f.   Agree to $10,000 in liquidated damages for violating any of these requirements;

     g.   Provide written witness statements of RMA employees present during the February 28 Incident; and

     h.   Execute a non-disclosure agreement.

*Id.*

88.    Signature's November 20 and November 26 demands represent a naked attempt to (a) leverage its leasehold grants to obtain an admission of liability from RMA; (b) retaliate against RMA for refusing to capitulate to Signature's baseless demands; and (c) take advantage of the duress Signature manufactured in order to harm RMA's business.[2] *See id.*

---

[2] On December 5, 2025, Signature's counsel reiterated its position that Signature is "within its rights to impose and maintain its ban of RMA from its FBOs." **Ex. G**, Signature's December 5, 2025 Letter. In that letter, Signature maintained that the total ban would remain in place absent RMA's compliance with certain conditions and that, even if RMA complied with those conditions, Signature would ***still*** maintain total discretion to bar RMA from accessing its ramps and relegate RMA (and its customers) to curbside pickup only. *Id.* That is obviously not what RMA's customers pay for. RMA's customers pay for convenience and accessibility, which includes seamless delivery to and from private aircraft parked on the airside (secured) side of Signature leaseholds at CHO and other airports. For example, a significant portion of RMA's services involve transporting band members and their ***large, heavy*** equipment to and from Signature's leasehold, making airside access, and property access generally, to pickup and drop-off customers imperative. More importantly, on information and belief, Signature has not made other chauffeur services' access to its ramps conditional on Signature's approval, again contravening the FAA Rules' uniformity requirements. Thus, RMA's counsel responded that Signature's "conditional offer" was "not consistent with [its] obligation to provide uniform access to companies like RMA that play a critical role in supporting aeronautical activity at [CHO] and airports across the country," and reiterated that RMA intends to immediately file a complaint and emergency motion for temporary injunction if the ban is not removed. **Ex. H**, RMA's December 5, 2025 Response.

**Signature's Unlawful, Arbitrary Exclusion of RMA Threatens Irreparable Harm to RMA's Reputation, Goodwill, and Business Relationships**

89.     RMA's customers depend on RMA to deliver them to their aircraft and pick them up at the aircraft when they deplane.

90.     RMA contracts with thousands of individuals and entities for chauffeur services. Some of these entities include Anthony Travel, NetJets, American Airlines Charters, GE Aerospace Business Flights Operations, and many others.

91.     RMA's contracts with its customers require RMA to pick them up and drop them off at specified locations, often on the secured (airside) of an airport, and sometimes on a Signature leasehold.

92.     Signature's total ban of RMA makes it impossible for RMA to provide the services it has contractually agreed to provide to its customers when they land or depart from a Signature leasehold.

93.     Signature has also deliberately taken steps to broadcast its ban directly to RMA's existing customers and potential customers.  Signature has repeatedly informed RMA's existing customers and potential customers of the ban in an effort to deliberately interfere with RMA's contractual relationships and prospective business relationships.

94.     Signature's attempt to damage RMA has worked.

95.      Monetarily, the harm already caused by Signature's misconduct is substantial.  In the first eleven months of 2025, RMA's contractual revenue at Signature leaseholds alone exceeded $1,000,000.  So long as the total ban is in place, that revenue cannot be generated.

96.     Much of the revenue and associated customers described above are part of larger mutual client relationships with RMA.  Mutual client relationships are contractual relationships under which RMA has contracted to be the service provider for a customer at any location where

its passengers have a demand for ground transportation, and at least one of the locations it has serviced within the past year is a Signature leasehold.  For those broader, mutual client relationships, RMA's revenue exceeds $20,000,000 annually.  All of those mutual client relationships are threatened by Signature's total ban.

97.    For just a *single* customer over a *16-day* period (December 1 through December 16), RMA suffered an *87%* year-over-year revenue loss and an *86.7%* year-over-year drop in ordered rides.  These statistics leave no doubt that Signature's ban is damaging RMA's customer relationships and causing a permanent loss of business.

98.    RMA's customers are paying for convenience.  Part of that convenience is knowing that RMA can supply services to customers *anywhere*.  Because Signature's total ban makes doing so impossible, it threatens RMA's contractual relationships not only with customers who have flown into or out of a Signature leasehold in the last year, but *any* RMA customer who needs assurance that RMA can chauffeur them no matter where they may land.

99.    RMA's largest customers often book travel and transportation for hundreds of individuals and sometimes for entire entities.  These customers require chauffeur services that are available at a broad range of geographic locations and airports.  Because of Signature's ban, RMA cannot service customers at over 100 airport locations across the United States.  As a result, RMA cannot meaningfully compete for these large customers, who are seeking chauffeur services that they can contract with on a nationwide basis.

100.    RMA's reputation has also been damaged by Signature's total ban.  Customers have been forced to arrange for alternative transportation upon arrival at Signature leaseholds. Customers have been told that RMA cannot chauffeur them on Signature leaseholds.  Signature's conduct has brought irreparable damage to RMA's brand and reputation, which is built on a

17

guarantee that RMA will timely and without fail pick up its customers upon deplaning and deliver them for departure.

101.    Meanwhile, RMA's competitors have taken advantage of Signature's total ban by contacting RMA's customers to offer and arrange for alternative transportation.

102.    Just a few examples of these impacts are listed below:

a.    At a Signature leasehold in Roanoke, Virginia in mid-November 2025, Signature informed American Airlines that RMA buses were barred from picking up passengers.  Indeed, Signature went so far as to claim that RMA was embargoed from all Signature locations.  Signature's unilateral notice of a total ban on RMA's access to its leaseholds has raised concerns from American Airlines and other third parties regarding customer and operational impacts, inevitably pushing charter companies toward competitors.  Worse, because air charter companies often select a chauffeur upon arrival, Signature's decision to inform air charter companies of its total ban of RMA means quantifying RMA's ongoing losses as a result of pushing air charters away from using RMA is extremely challenging.

b.    In mid-November 2025, RMA had contracted with the University of Miami football team to provide transportation to and from the Signature leasehold at the Roanoke airport located in Roanoke, Virginia.  Signature prohibited RMA's buses from entering the ramp upon arrival and prior to departure of the aircraft transporting the University of Miami football team and the significant amount of equipment with which it travels.  RMA could not provide its standard level of services because it was barred from entering the ramp as necessary to allow for immediate transfer of passengers, baggage and equipment from the aircraft to the Signature vehicles.

18

Signature's ban resulted in considerable inconvenience and disruption for RMA's customer, which considered canceling the return transportation. The University of Miami football team—and other teams impacted by Signature's total ban—are likely to pursue other, more convenient, chauffeur options for their future needs.

c. In January 2026, the University of Connecticut ("UConn") women's basketball team (via its travel agent, Anthony Travel, who is a major customer of RMA) cancelled their pickup at Washington Dulles International Airport after RMA already expended resources hiring an unaffiliated sub-contractor to assist with transport of the team—a short-term solution that abided by Signature's ban but preserved RMA's relationship with UConn. Signature intentionally undermined RMA's efforts by proactively informing Anthony Travel, ***on or around the day the pickup was scheduled***, that RMA was banned from Signature's leaseholds. Even though RMA had arranged for a third-party contractor to assist with the pickup, because Signature informed Anthony Travel that RMA was prohibited from entering Signature's leaseholds, Anthony Travel cancelled the pickup on behalf of UConn. Signature ***withheld*** this information from Anthony Travel for four days, instead waiting until just before the prescheduled pickup to inform Anthony Travel of the ban. In doing so, Signature maximized UConn's inconvenience, Anthony Travel's inconvenience, and RMA's losses. Signature also attributed the manufactured exigency to RMA, damaging its relationship and reputation with Anthony Travel, who accounts for over $6 million in revenue for RMA per year. UConn's representative at Anthony Travel refuses to do further business with RMA until the ban is resolved—if ever again. UConn's representative at Anthony Travel

said *specifically* RMA's inability to pick up *plane side* was the determinative factor in cancelling its buses and future pickups.

d.  In January 2026, RMA lost a contract with the VCU Men's Basketball team worth thousands of dollars because RMA was prohibited by Signature's ban from picking up the team at Norfolk Airport.  The services RMA would have provided included a multi-day bus transfer service from the airport, to various locations across multiple days, and back to the airport.

e.  RMA's competitors, seizing on knowledge that RMA is barred from all Signature locations, have begun targeting RMA's customers.  For example, the General Manager of one of RMA's major competitors has begun soliciting RMA's *largest customer*, with revenues to RMA surpassing $6,000,000 a year.  RMA's competitors use the fact that RMA is barred from Signature's leaseholds as a hook for their solicitation.

f.  Signature is *actively (and prospectively) informing* RMA's customers that RMA is barred from picking them up at Signature leaseholds.  For example, on December 2, 2025, RMA was scheduled to pick up passengers at Washington-Dulles International Airport.  In the course of communicating with those customers, RMA learned that the customers were explicitly informed by Signature that RMA was prohibited from picking them up.  As a result, the customers were forced to call Ubers for their means of transit.

g.  Signature has directly informed NetJets that RMA is banned from Signature leaseholds.  Signature's conduct has jeopardized RMA's entire business

relationship with NetJets and the passengers whom NetJets might otherwise recommend using RMA's services.

h.   Other air charters, including American Airlines Charters and GE Aerospace Business Flights Operations ("GE Aerospace") have been informed of the ban and have expressed concerns about RMA's ability to pick up or drop off passengers. Signature's conduct has jeopardized RMA's entire business relationship with GE Aerospace and the passengers who it might otherwise recommend using RMA's services.

103.   To be clear, the harm to RMA resulting from these incidents is not isolated.  When RMA agrees to transport one passenger, the impacts of its failure to do so extend beyond that individual.  Many of the individuals RMA transports are but one member of a much larger organization, such as a university or corporation, that has contracted with RMA to timely transports their agents and employees.  Failure to do so on even one occasion jeopardizes RMA's *entire business relationship* with those broader organizations.

104.   The harm to RMA is not limited to customers who fly into or out of Signature leaseholds during pendency of the ban.  The ban also means that RMA will lose future customers, the loss of which is necessarily difficult to quantify.  That is because RMA's customers are considering a variety of chauffeur options.  As nationwide and often global travelers, RMA's customers are looking for the chauffeur service that can provide them with the *most nationwide and global accessibility*.  During the pendency of the ban, RMA cannot meaningfully compete, because it is banned from over 100 leaseholds around the United States.  This places RMA at a distinct competitive disadvantage, foisted on it by Signature, the full impact of which will be difficult to quantify.

105.    RMA's customers are paying for white-glove service at airports around the country (and around the world, for that matter).  Signature's retaliatory conduct makes delivering that service near-impossible at Signature leaseholds, and has reverberating, exponential effects across RMA's entire business.

**Signature Does Not Have an Unfettered Right to Exclude**

106.    Signature's ban is premised on the baseless concept that, as a lessee of public land, it has an unfettered right to exclude anyone it wants for any reason or no reason at all.

107.    Signature has no such right.  If it did, it could leverage its virtual monopoly over airport property to engage in all manner of improper conduct, including self-dealing, extortion of service providers, unfair and unreasonable pricing demands for service providers and other entrants, and blatant discrimination based purely on Signature's whim or self-interest.

108.    In the aviation industry, it is standard industry practice to authorize entry to public airports operated by an FBO on a uniform, non-discriminatory basis.

109.    Signature's ban is unprecedented and entirely unheard of in the aviation industry, both because of its breadth and because of its underlying purpose.

110.    Signature's ban is inconsistent with standard industry practice and norms.

111.    Signature does not own the land it leases in fee simple.

112.    The land where Signature operates its FBOs is leased to Signature by various airport authorities.

113.    Signature's lease agreements with various airport authorities subject Signature to restrictions on its ability to exclude individuals and entities from the FBOs it operates.  Likewise, minimum standards prescribed by those airport authorities (e.g., the CHO Minimum Standards) require non-discriminatory, uniform treatment of airport users by Signature and other FBOs.

22

114.    As a result, Signature does not have unfettered discretion to exclude or restrict access.  Instead, it must be do so in a uniform, non-discriminatory fashion, particularly when the services at issue contribute to or make possible the safety of aircraft operations, including as part of air taxi and charter operations, taking place on and around FBOs.

115.    RMA's services are integral to air taxi and charter operations as RMA's services provide the means by which, upon arrival at the FBO, passengers are transported, along with their luggage (or equipment, in the case of athletic teams and bands) from the ramp on the secure side of the airport to the non-secure side of the airport.

116.    RMA's services also contribute to and are required for the safe operation of air taxi and charter operations.  Absent a chauffeur service transporting passengers, and their baggage and equipment, from the ramp to the non-secure portion of the airport, passengers departing the aircraft are met with a new environment and forced to navigate the ramp, which is a dynamic, high-activity operational environment that involves the simultaneous coordination of aircraft movements, ground support equipment and other vehicles, personnel, and servicing activities within confined spaces, creating an inherently elevated risk environment.

117.    Passengers transferring on foot to and from aircraft on the ramp to the non-secure side of the airport also raises potential security concerns.

**Signature's Ban Makes Airports More Dangerous and Less Secure**

118.    Signature may contend that its ban of RMA is motivated by a safety concern.

119.    Signature's ban makes airports more dangerous and less secure.

120.    By banning one of the most prominent and popular chauffeur services available to private air charter passengers, Signature reduces the options available to passengers for safely navigating FBOs where they land and depart.

23

121.     Signature's ban increases the likelihood that passengers will be left without transportation from the arriving aircraft to the non-secure side of airports, and will have to navigate this transfer on foot, including transporting all baggage and equipment.  The same risk exists for passengers transferring to departing aircraft.

122.     Signature's ban increases exponentially the likelihood that passengers will be exposed to hazards and potentially injury or death while transferring from an aircraft across a dynamic, operational ramp area and then finally to the public side of the airport.  And again, this same risk exists for passengers transferring to departing aircraft.  Passengers navigating the secure side of the ramp also present hazards to other operations being performed concurrently on the ramp.

## COUNT I
## TORTIOUS INTERFERENCE WITH CONTRACT

123.     RMA repeats and incorporates by reference the allegations in preceding paragraphs above as if fully set forth herein.

124.     RMA has valid contractual relationships with its customers, including customers who have arrived at or departed from Signature leaseholds for which RMA provides chauffeur services.  By way of example, RMA has valid contractual relationships with Anthony Travel.

125.     Signature has knowledge of RMA's contractual relationships with its customers, including because Signature is aware that RMA contracts with Signature's customers to chauffeur them to, from, and within Signature leaseholds.  Signature is also aware of RMA's contractual relationships with its customers because RMA explicitly informed Signature of these contractual relationships immediately upon imposition of the ban.

24

126.    Signature has intentionally interfered with RMA's contractual relationships with its customers, including by instituting a total ban on RMA's ability to chauffeur RMA's customer to, from, and within Signature leaseholds nationwide.

127.    Signature's interference has induced or caused termination of RMA's contractual relationships with its customers, including because the total ban encourages and induces RMA's customers to terminate their contractual relationships with RMA, given that RMA cannot provide its offered services—chauffeuring its customer to, from, and within Signature leaseholds nationwide.

128.    Signature's interference has also induced or caused RMA's customers to substantially reduce their demand for RMA's services.

129.    Signature's total ban was imposed by improper means and for an improper purpose, including because it was imposed in contravention of the FAA's uniformity and non-discrimination rules, and because it was imposed in a bare effort to extract indemnification for the February 28 Incident.

130.    Signature's ban was also imposed by improper means because it violates minimum standards prescribed by the various airport authorities where Signature operates, including for example the CHO Minimum Standards.

131.    Signature's interference was also imposed by improper means because it is extortionate in nature, as it is intended to compel payment by means of threats of injury to property or reputation.

132.    Signature's interference was also imposed by improper means because the imposition of the ban is an unprecedented departure from standard industry practices and norms.

133.    Signature acted with malice toward RMA's business in that its wrongful actions in this matter were committed without just cause or excuse, warranting punitive damages.

134.    As a result of Signature's willful and malicious conduct, RMA has suffered and will continue to suffer irreparable harm and substantial damages, including the loss of customers, loss of customer relationships, lost profits, loss of goodwill, and damage to RMA's brand and reputation.

135.    RMA is entitled to compensatory and punitive damages.

136.    RMA is entitled to injunctive relief.

137.    RMA is entitled to attorneys' fees and costs.

## COUNT II
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

138.    RMA repeats and incorporates by reference the allegations in preceding paragraphs above as if fully set forth herein.

139.    RMA expects additional contracts with new and existing customers who wish to engage RMA for its services, including future business relationships that would result in economic advantage for RMA.

140.    Signature has knowledge of RMA's expected contractual relationships with new and existing RMA customers, including knowledge of future business relationships that—if interfered with—would result in the loss of an economic advantage for RMA.  Indeed, RMA has explicitly informed Signature that it has existing and future business relationships that have been and are being damaged by Signature's total ban.

141.    Absent Signature's intentional total ban on RMA's presence at Signature leaseholds, RMA would have continued existing relationships with its customers and would have

realized expected future relationships, because RMA would have been able to continue servicing its existing customer base, growing its existing customer base, and obtaining additional customers.

142.    Signature used improper means or methods to intentionally interfere with RMA's contract expectancy, prospective business relationships and economic advantage, including by instituting a total ban on RMA's ability to service its customers at Signature leaseholds nationwide, which contravened standard industry practice and FAA Rules, thus violating Signature's agreements with various airport authorities.

143.    Signature's ban was also imposed by improper means because it violates minimum standards prescribed by the various airport authorities where Signature operates, including for example the CHO Minimum Standards.

144.    Signature's interference was also imposed by improper means because it is extortionate in nature, as it is intended to compel payment by means of threats of injury to property or reputation.

145.    Signature's interference was also imposed by improper means because the imposition of the ban is an unprecedented departure from standard industry practices and norms.

146.    Signature acted with malice towards RMA's business in that its wrongful actions in this matter were committed without just cause or excuse.

147.    As a result of Signature's willful and malicious conduct, RMA has suffered and will continue to suffer irreparable harm and substantial damages, including the loss of customers, loss of customer relationships, loss of expected future customers, loss of expected future business relationships, lost profits, loss of goodwill, and damage to RMA's brand and reputation.  RMA is entitled to compensatory and punitive damages.

148.    RMA is entitled to injunctive relief.

27

149.    RMA is entitled to attorneys' fees and costs.

## COUNT III
## BUSINESS CONSPIRACY
**(Statutory Business Conspiracy Under Virginia Code §§18.2-499, 48.2-500)**

150.    RMA repeats and incorporates by reference the allegations in preceding paragraphs above as if fully set forth herein.

151.    Signature Flight and Signature Corp. concertedly conspired to interfere with RMA's access to all Signature fixed base operations and concertedly conspired to interfere with RMA's contractual and business relationships.

152.    On information and belief, Signature Flight and Signature Corp. are not wholly owned subsidiaries of the same parent corporation.

153.    Signature's interference was willful, reckless, and malicious, which endangered RMA's business operations.

154.    Signature acted with legal malice toward RMA's business in that their wrongful actions in this matter were committed without just cause or excuse.

155.    As a result of Signature's willful and malicious conduct, RMA has suffered and will continue to suffer irreparable harm and substantial damages. RMA is entitled to compensatory and punitive damages.

156.    RMA is entitled to injunctive relief.

157.    RMA is entitled to treble damages pursuant to Va. Code § 18.2-500.

158.    RMA is entitled to attorneys' fees and costs.

## COUNT IV
## BREACH OF CONTRACT

159.    RMA repeats and incorporates by reference the allegations in preceding paragraphs above as if fully set forth herein.

160.    RMA entered into a valid and enforceable agreement with Signature Flight Support LLC in the form of the Third Party Vendor Release.

161.    Signature Flight Support LLC breached the Third Party Vendor Release by imposing the total ban of RMA.

162.    RMA has suffered damages, including the loss of customers and revenue, as a result of Signature Flight Support LLC's breach.

163.    RMA is entitled to compensatory damages and consequential damages.

164.    RMA is entitled to attorneys' fees and costs.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), RMA demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Errands Plus Inc. d/b/a RMA Worldwide Chauffeured Transportation prays for the following:

A.  Judgment in RMA's favor as to each claim pled herein;

B.  Judgment for RMA for damages caused by Defendants, including an award of compensatory, punitive, and treble damages;

C.  An emergency temporary restraining order requiring Signature to retract its ban of RMA from Signature's leaseholds and to permit RMA access to Signature leaseholds consistent with the access it enjoyed prior to November 20, 2025;

D.  An emergency preliminary injunction preliminarily requiring Signature to retract its ban of RMA from Signature's leaseholds and to permit RMA access to Signature leaseholds consistent with the access it enjoyed prior to November 20, 2025;

E.  A permanent injunction permanently requiring Signature to retract its ban of RMA from Signature's leaseholds and to permit RMA access to Signature leaseholds consistent with the access it enjoyed prior to November 20, 2025;

F.  Pre-judgment and post-judgment interest as allowed by law;

G.  Judgment for RMA for attorneys' fees and costs; and

H.  Judgment for RMA for such further relief as this Court may deem just and equitable.

Date: January 28, 2026                    **ERRANDS PLUS, INC. D/B/A RMA
                                          WORLDWIDE CHAUFFEURED
                                          TRANSPORTATION**

                                          */s/ Jason E. Manning*
                                          Jason E. Manning (VSB No. 74306)
                                          David M. Asbury (VSB No. 88977)
                                          TROUTMAN PEPPER LOCKE LLP
                                          222 Central Park Avenue, Suite 2000
                                          Virginia Beach, VA 23462
                                          Telephone: 757.687.7564
                                          Facsimile: 757.687.1524
                                          Jason.Manning@troutman.com
                                          David.Asbury@troutman.com

                                          Michael S. Lowe (admitted *pro hac vice*)
                                          TROUTMAN PEPPER LOCKE LLP
                                          3000 Two Logan Square
                                          Eighteenth & Arch Streets
                                          Philadelphia, PA 19103
                                          Telephone: 215.981.4364
                                          Facsimile: 215.981.4750
                                          Michael.Lowe@troutman.com

                                          T. Patrick Byrnes (admitted *pro hac vice*)
                                          TROUTMAN PEPPER LOCKE LLP
                                          111 South Wacker Drive, Suite 4100
                                          Chicago, IL 60606
                                          Telephone: 312.443.0286
                                          Facsimile: 312.443.0336
                                          Patrick.Byrnes@troutman.com

                                          *Counsel for Plaintiff*

30

## CERTIFICATE OF CM/ECF SERVICE

The undersigned attorney hereby certifies that on January 28, 2026, the foregoing **First Amended Complaint**, and the exhibits attached thereto, were filed via the CM/ECF system for the Western District of Virginia, which electronically sent notice to the following counsel of record:

Danielle Deanna Giroux
**HARMAN CLAYTON CORRIGAN & WELLMAN**
1900 Duke Street, Suite 210
Alexandria, Virginia 22314
Tel.: (804) 747-5200
dgiroux@hccw.com

Jon Allon Nichols, Jr.
**HARMAN CLAYTON CORRIGAN & WELLMAN**
P.O. Box 70280
Richmond, Virginia 23255
Tel.: (804) 762-8039
Fax: (804) 747-6085
jnicols@hccw.com

Mark E. McKinnon
**FOX ROTHSCHILD LLP**
2020 K Street N.W., Suite 500
Washington, D.C. 20006
Tel.: (202) 794-1214
mmckinnon@foxrothschild.com

*Counsel for Signature Defendants*

*/s/ Jason E. Manning*
Jason E. Manning

31