CLERKS OFFICE
US DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED
3/16/2026
LAURA A. AUSTIN, CLERK
BY: s/J. Lopez
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| Errands Plus, Inc., | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 3:25-cv-00098 |
| Signature Flight Support, LLC | ) |
| and | ) |
| Signature Aviation Services Corporation, | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

In February 2025, a charter bus struck a parked private jet in the early hours of the morning at Charlottesville Albemarle Airport ("CHO"). The fallout from this accident has caused a rift between a fixed-based operator ("FBO") and a white-glove chauffer company. Starting in November 2025, the FBO, Signature Flight Support, LLC ("Signature"), banned the chauffeur company, Errands Plus, Inc., d/b/a RMA World Chauffeured Transportation ("RMA"), from operating on its leaseholds throughout the country. RMA filed for emergency injunctive relief, (Dkt. 6), claiming the ban is illegal and asking the court to compel Signature to retract the ban. For the reasons stated below, the court will deny RMA's motion for a temporary restraining order and preliminary injunction.

I.  Background

Signature[1] operates a network of over 200 private aviation terminals, including a fixed base operation at CHO in Charlottesville, Virginia. (Am. Compl. ¶ 17 (Dkt. 48).) In many of these locations, like at CHO, Signature leases the space from the airport authorities. (*Id.* ¶¶ 1, 20.) Signature often escorts private vehicles navigating the leasehold. (*Id.* ¶ 18.) RMA operates on Signature's leaseholds around the country, providing, among other services, a "private chauffeur service for passengers who are deplaning from private jets." (*Id.* ¶ 26.) RMA serves thousands of individuals and entities every year and has operated on Signature's leaseholds for over 35 years. (*Id.* ¶ 29–30.) Throughout the decades of operating on Signature's leaseholds, RMA had never accessed those leaseholds pursuant to any written agreement. (*See id.* ¶ 33.)

Early in the morning on February 28, 2025, one of RMA's charter buses, escorted by Signature employees, collided with a parked TELUS Gulfstream private jet at CHO. (*See id.* ¶¶ 52–65.) Despite the accident, Signature continued to allow RMA to operate on its leasehold there. (*Id.* ¶ 68.) On October 2, 2025, RMA signed a Third Party Vendor Release agreement ("Release"), which allowed RMA to access Signature's CHO leasehold "on a temporary basis" provided RMA indemnified Signature from future liability and evidenced certain types of insurance. (*Id.* ¶ 33; Dkt. 48-2.)

On November 11, 2025, TELUS filed suit against Signature in federal district court in Delaware for damages related to the February 28 incident. (*Id.* ¶¶ 7, 41.) Shortly thereafter,

---

[1] RMA named "Signature Flight Support, LLC" and "Signature Aviation Services Corporation" as defendants in this matter. (Am. Compl. at 1.) Signature's in-house counsel, Matthew Klein, represented that "Signature Aviation Services Corporation" is a "dormant company" with no employees that is a holdover "from a prior corporate structure." (Mar. 4 Hearing Transcript at 43:9–17.) Accordingly, the court will refer to Signature as a singular defendant.

on November 20, Signature sent RMA a letter demanding a "full defense and indemnification for the February 28, 2025 loss" and notifying RMA that it was "prohibited from entering any Signature Aviation leasehold nationwide," "effectively immediately." (Dkt. 48-3 at 2.) Signature offered to suspend the ban if RMA agreed to a host of demands, including arranging a call with TELUS to discuss why TELUS did not sue RMA, signing a non-disclosure agreement, and waiving jurisdictional objections to the TELUS litigation. (Am. Compl. ¶ 87.) RMA refused to comply, and Signature continued to enforce the ban, in some instances notifying mutual customers of the ban. (*See, e.g.*, Pl.'s Br. at 15 (Dkt. 7).)

RMA filed a complaint and emergency motion for a temporary injunction in Virginia state court on December 12, 2025. (*See* Dkt. 1-1.; Dkt. 1-2.) After Signature removed the case to federal court, RMA re-filed an emergency motion for a temporary restraining order and preliminary injunction on December 19, 2025. (Dkt. 6.) RMA asks the court to compel Signature to retract its blanket ban of RMA from accessing its leaseholds nationwide. (*Id.* at 2.) Defendant filed its opposition on December 20, 2025. (Def.'s Br. (Dkt. 10).) At the court's direction, (*see* Dkt. 11), both parties submitted supplemental briefs in the following two weeks, (Def.'s Supp. Br. I (Dkt. 17)[2]; Pl.'s Supp. Br. I (Dkt. 18)). Considering the sufficient notice provided to Signature and the opportunity to file briefs, the court converted the instant motion to one for preliminary injunction. (Dkt. 24.) RMA filed an amended complaint on January 28, 2025—one day before the motion was scheduled to be heard—which added a breach of contract claim. (Am. Compl. (Dkt. 48).) In the amended complaint, RMA claims

---

[2] Regrettably, citation errors in this particular brief are the subject of show cause orders from the court. (*See* Dkts. 59, 65.) Those identified citations did not impact the court's analysis of the instant motion as the court did not rely on those cases. The court will address and resolve the issues that were raised in the show cause orders in a separate order.

that Signature tortiously interfered with its customer contracts (Count I) and business relationships (Count II), conspired against it in violation of Virginia's business conspiracy statute (Count III), and breached the Third Party Vendor Release (Count IV). (*See id.* ¶¶ 123–164.) The court continued the hearing and ordered supplemental briefing on the added breach claim. (Dkt. 49.) The parties submitted supplemental briefs in the following two weeks. (Def.'s Supp. Br. II (Dkt. 53); Pl.'s Supp. Br. II (Dkt. 54).) The court held a hearing on the motion on February 23 and March 4, 2026. (Dkts. 63, 75.)

## II.     Standard of Review

Federal Rule of Civil Procedure 65 authorizes federal courts to issue temporary restraining orders and preliminary injunctions. The standard for granting a temporary restraining order is the same as the standard for granting a preliminary injunction. *Young v. Draper*, No. 4:17-cv-00001, 2017 WL 598510, at *2 (W.D. Va. Feb. 14, 2017); *see also Virginia v. Kelly*, 29 F.3d 145, 147–48 (4th Cir. 1994) (applying the preliminary injunction standard to a request for temporary restraining order). "Both are 'extraordinary remedies involving the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances.'" *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017) (quoting *MicroStrategy Inc. v. Motorola*, 245 F.3d 335, 339 (4th Cir. 2001)). The court may grant a temporary restraining order or preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). They are "never awarded as of right." *Id.* at 24. To obtain one, the plaintiff must demonstrate (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable

harm without preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Id.* at 20.

### III.     Analysis

Based on the court's review of RMA's amended complaint and its motion for a preliminary injunction, the parties' briefing and supporting documents in support and opposition of the motion, and the witness testimony from various witnesses at the February 23 and March 4 hearings, the court finds that RMA failed to establish a likelihood of success on the merits and will deny RMA's motion for preliminary injunction.[3] To satisfy likelihood of success on the merits, "[a] plaintiff need not establish a certainty of success, but must make a clear showing that [s]he is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (cleaned up). This burden is high, and "merely providing sufficient factual allegations to meet the Fed. R. Civ. P. 12(b)(6) standard of *Twombly* and *Iqbal* does not show a likelihood of success on the merits." *J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33, 60 (D. Md. 2020) (cleaned up). For the following reasons, the court finds that RMA has not made a clear showing that it is likely to succeed on any of its claims.

**A. <u>Tortious Interference with Contract and Business Relations (Counts I & II)</u>**

In Count I, RMA alleges that Signature's ban tortiously interfered with its customer contracts. (Am. Compl. ¶¶ 123–37). Tortious interference with a contract in Virginia requires a showing of: (1) the existence of a valid contractual relationship; (2) the interferer's knowledge of the relationship; (3) intentional interference inducing or causing a breach or termination of

---

[3] Because RMA does not establish a likelihood of success on the merits, the court need not reach the remaining *Winter* factors.

- 5 -

the relationship; and (4) resultant damage to the party whose relationship has been disrupted. *Chipper Pro, LLC v. Bandit Indus., Inc.*, 616 F. Supp. 3d 525, 538 (W.D. Va. 2022). Under Virginia law, tortious interference can only occur when a defendant interferes with a contract that exists between a third party and the plaintiff. *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985).

RMA argues that it has "valid contractual relationships with thousands of customers," that Signature is "well aware" of those contractual relationships and has "intentionally interfered with those contracts by barring RMA from its leaseholds." (Pl.'s Br. at 19–20.) It further argues that the interference is "bound to induce RMA's customers" to "terminate those contracts," and "RMA has suffered and will continue to suffer damage as a result of Signature's intentional interference." (*Id.* at 20.) Signature responds that RMA "does not specify any particular [customer] contract, let alone one that was breached or terminated due to the access restriction." (Def.'s Supp. Br. I at 6.) It also maintains that its conduct was justified by safety concerns and Signature's own financial interest. (*See id.* at 6–7, 10.)

The court finds Signature's argument more persuasive here. Indeed, RMA does not identify any specific contracts that were breached or terminated because of the ban in its amended complaint, nor could any witness identify any during the hearings on this motion. RMA's President, Michael Fogarty, confirmed that no clients have canceled any written contracts with RMA because of the ban. (Feb. 23 Hearing Transcript at 96:1–17 [hereinafter "Tr. I"].) RMA's CEO, Robert Alexander, further explained that RMA does not have written contracts with "[t]he majority" of its clients, and when it does, "they're very much just one-sided contracts that protect [clients] on the rate, but there's no obligations on [the client's] part to use [RMA] whatsoever." (*Id.* at 57:9–23.) Additionally, both Fogarty and Alexander

- 6 -

suggested that since the ban went into effect, RMA has maintained client relationships by hiring third parties to serve RMA customers at Signature leaseholds.  (*See, e.g.*, Tr. I at 91:4–7, 38:23–39:7.)

At *most*, then, RMA has shown contracts that are terminable at will, which demands the same analysis as tortious interference with business relations.  *See Maximus, Inc. v. Lockheed Info. Mgt. Sys. Co., Inc.*, 493 S.E.2d 375, 378 (Va. 1997).  Count I is therefore "identical with a claim for tortious interference with business expectancy," and is "duplicative and unnecessary."  *See Frank Brunckhorst Co. v. Coastal Atlantic*, 542 F. Supp. 2d 452, 463 (E.D. Va. 2008).  The court will therefore analyze Counts I and II together.

In Count II, RMA alleges that Signature's ban tortiously interferes with its customer relationships and future business expectancies.  (Am. Compl. ¶¶ 138–49.)  In Virginia, the required showing for tortious interference with a business expectancy is: (1) the existence of a business relationship or expectancy with a probability of future benefit; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent intentional misconduct, the claimant would have continued the relationship or realized the expectancy; and (4) damage suffered from the interference.  *Comm. Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001).  In addition, the interference must be by "improper means or methods."  *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 688 (Va. 2012).  RMA argues that it expects future business from its existing and new customers, Signature is aware of those relationships, and Signature's "intentional misconduct of barring RMA from Signature's leaseholds" caused and will cause RMA to lose customers, goodwill, and reputational standing in the industry.  (Pl.'s Br. at 21–22; *see* Am. Compl. ¶ 104.)

The analysis for tortious interference with a business expectancy and of a contract terminable at will is identical. *Maximus, Inc.*, 493 S.E.2d at 378. To make out a *prima facie* case, then, RMA must show that Signature employed "improper methods." *Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987). Improper methods include conduct that is "illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules." *Id.* It also may include "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship." *Id.* "Sharp dealing, overreaching, or unfair competition may also constitute improper methods." *Id.* at 837.

RMA argues that Signature's conduct is improper because it "flouted" both the Federal Aviation Administration ("FAA") rules and standards and the minimum standards prescribed by CHO. (Am. Compl. ¶¶ 23–24.) Ultimately, the court is not persuaded by these arguments.

RMA maintains that Signature is subject to (1) FAA "standards, rules, obligations, and assurances," which are imposed on Signature directly, as well as (2) all applicable FAA Rules, as a lessee at CHO, "that flow from [the Charlottesville-Albemarle Airport Authority's] acceptance of Federal Airport Improvement Program ('AIP') funds under 49 U.S.C. § 47107." (*Id.* ¶¶ 21–22.) When considering airport development projects, the Secretary of Transportation reviews certain written assurances from airports when determining whether to approve the grant. *See* 49 U.S.C. § 47107. One of these assurances is that "the airport will be available for public use on reasonable conditions and without unjust discrimination." *Id.* § 47107(a)(1). RMA asserts that Signature is subject to these FAA "mandated economic non-

- 8 -

discrimination and uniform application of standards for admission to Signature's leaseholds." (*See* Am. Compl. ¶ 23.)

RMA does not show that the FAA rules or standards likely prohibit Signature from deciding which ground transportation vendors can access its private leaseholds. RMA argues that the grant assurances "appropriately limit the purported right to discriminate that Signature asks this Court to believe it uniquely possesses." (Pl.'s Supp. Br. I at 11.) But the assurances represent an agreement between the airport sponsor and the United States government via the FAA; the assurances do not apply directly to FBOs like Signature. And even if they did apply to Signature, Grant Assurance 22 (Economic nondiscrimination) applies to "aeronautical activities." (*See, e.g.*, Dkt. 44-2 ¶ 22(a) ("[The sponsor] will make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of *aeronautical activities*" (emphasis added).) RMA contends that it is engaged in "Aeronautical Activities." (Pl.'s Supp. Br. I at 3–4.) The court disagrees.

Both parties point the court to the definition of "aeronautical activities" offered in an FAA Airport Compliance Manual, Order 5190.6B. (*See id.* at 11; Def.'s Br. at 6–7.) The Order defines "aeronautical activity" as: "[a]ny activity that involves, makes possible, or is required for the operation of aircraft or that contributes to or is required for the safety of such operations." (Dkt. 44-5 at App'x 23-126.) The Order also lists examples of aeronautical activities, like "[a]ir taxi and charter operations" and "[a]ircraft storage." (*Id.*)

RMA—a ground transportation company that provides white glove chauffeur services—does not perform aeronautical activities. RMA argues that its ground transportation services "make[] possible" air taxi and charter operations. (Pl.'s Supp. Br. I at 11–12.) But an

activity does not become aeronautical itself just because it "makes possible" another aeronautical activity.  Rather, an aeronautical activity must "make[] possible" or "contribute[] to" the "operation of an aircraft" or "the safety of" that operation.  (Dkt. 44-5 at App'x 23-126.)  To the extent that RMA argues that its assistance with emplaning and deplaning of the passengers "makes possible" or "contributes to" the operation of an aircraft, it is Signature's employees, not RMA's, who typically unload baggage from the aircraft and pull the stairs up to allow passengers to deplane.  (Mar. 4 Hearing Transcript at 37:23–25 [hereinafter "Tr. II"].)  Additionally, RMA's primary purpose is to provide transportation services to those passengers leaving and arriving, which is not required for and does not contribute to the *operation* of an aircraft nor the safety of the operation of an aircraft.[4]  (*See* Am. Compl. ¶¶ 26, 30.)  Under RMA's interpretation of the term "aeronautical activities," almost any vendor activity at an airport could be construed to "make[] possible" or "contribute[] to" the operation of an aircraft or the safety of that operation.  (Dkt. 44-5 at App'x 23-126.)  The court is not inclined to interpret the term so broadly.

Further, the Order states that "[n]onaeronautical uses include . . . ground transportation," and that "[f]ederal law and policy on . . . terms of airport access do not apply to nonaeronautical uses."  (Dkt. 44-5 ¶ 18.4(c).)  RMA's private chauffeur service is therefore a nonaeronautical activity or use,[5] and Signature is not obligated by the FAA to provide leasehold access to *any* vendor providing nonaeronautical services.

---

[4] RMA's CEO admitted that sometimes when the FBO leasehold is "too busy" it "wouldn't have been safe" to allow RMA vehicles to access the secure side of the FBO.  (*See* Tr. I at 44:15–19.)  RMA is not likely to show that ground transportation necessarily increases the safety of even passenger transportation on an FBO, let alone the safety of aircraft operations.
[5] RMA suggests that Section 18.4(a) of the Order cuts in its favor.  (*See* Pl.'s Supp. Br. I at 12.)  Here, the Order defines "aeronautical use" as those "services provided by air carriers related directly and substantially to the movement of

RMA's claim that the CHO minimum standards limit Signature's ability to ban RMA from its leaseholds likewise fails. (*See* Am. Compl. ¶ 24.) RMA points to the "FAA Required Lease Provisions" section of the standards, which requires that FBOs include the following provision in their leases with airports:

> The FBO shall furnish all services authorized or licensed on a fair, equal, and not unjustly discriminatory basis to all users and shall charge fair, reasonable, and not unjustly discriminatory prices for each unit or service, provided that the FBO may make reasonable and nondiscriminatory discounts, rebates, or other similar types of price reductions to volume purchasers, if permitted by law.

(Dkt. 45-4 at 98–99; Am. Compl. ¶ 24.) Signature's lease with the Charlottesville-Albemarle Airport Authority ("CAAA") contains the following corresponding language:

> Lessee shall furnish its services to the public at the Airport on a fair, equal, and not unjustly discriminatory basis to all users thereof, and shall charge fair, reasonable, and not unjustly discriminatory prices for such services. Lessee may make reasonable, non-discriminatory discounts, rebates, or other, similar types of price reductions to volume customers without breaching its obligations under this paragraph.

(Dkt. 48-1 § 2.16). This lease provision mandates that Signature furnish *its services* on a fair, equal, and not unjustly discriminatory basis. Signature is an FBO that provides, among other services, aircraft parking and storage and airfield escort services. (*See* Am. Compl. ¶¶ 17–18.) While the lease provision requires Signature to provide *those services* on a "fair, equal, and not unjustly discriminatory basis," (Dkt. 48-1 § 2.16), it does not require Signature to allow onto its private leasehold any vendor that would like to operate there. RMA has provided little facts to persuade the court that the FAA's grant assurances or regulations or the CHO minimum

---

passengers, baggage, mail and cargo on the airport." (*Id*.; Dkt. 44-5 ¶ 18.4(a).) RMA is not an air carrier, so its activities are not covered under this definition of "aeronautical use."

standards deny Signature—a lessee that is an FBO—the right to control access to restricted areas that it leases.

RMA is unlikely to overcome the crucial fact that it does not appear to have the legal *right*, contractual or otherwise, to access Signature's leaseholds.[6] RMA asks the court to effectively override Signature's right to control restricted aviation areas and compel Signature to allow a particular vendor onto its property. Signature's exercising of that right "cannot itself be an 'improper method' of interference that would make it amenable to suit in tort." *Priority Auto Group, Inc. v. Ford Motor Co.*, 757 F.3d 137, 144 (4th Cir. 2014); *see also Cedar Point Nursery v. Hassid*, 594 U.S. 139, 158 (2021) (finding that the right to exclude is a "fundamental element of the property right" (cleaned up)); *Lewis-Gale Med. Ctr., LLC v. Alldredge*, 710 S.E.2d 716, 722 (Va. 2011) ("Under Virginia law, a threat to perform an act one is legally entitled to perform is not a wrongful act. . . . [T]he law provides a remedy in tort only where the plaintiff can prove that the third party's actions were illegal or fell so far outside the accepted practice of that 'rough-and-tumble world' as to constitute improper methods."). RMA has not clearly shown that Signature's ban runs afoul of any law or regulation or falls "so far outside the accepted practice" of an FBO. *See Alldredge*, 710 S.E.2d at 722. Accordingly, the court finds that RMA is not likely to succeed on its tortious interference with contract or with business relations claims.

---

[6] RMA's CEO appears to agree, stating that he "think[s] [RMA's] ability to access the ramp for a restricted area is up to the people at the FBO to determine if [RMA has] access" and noting that "[t]here are plenty of FBOs where [RMA doesn't] ever get access." (Tr. I at 43:1–4.)

B. **Business Conspiracy (Count III)**

RMA also alleges that Signature Flight Support LLC and Signature Aviation Services Corporation conspired against it in violation of the Virginia business conspiracy statute ("VBCA"). (Am. Compl. ¶¶ 150–158.) RMA claims that the two companies acted in concert to "interfere with RMA's access to all Signature fixed base operations" and to "interfere with RMA's contractual and business relationships." (*Id.* ¶ 151.) Signature counters that the two companies are affiliates of the same parent company, that Signature Aviation Services has zero employees, and that RMA offers no evidence to suggest that anyone at Signature Flight Support conspired with any affiliate in making the decision to ban RMA from its leaseholds. (Def.'s Supp. Br. I at 10, 10 n.3.)

Statutory business conspiracy in Virginia requires "two or more persons [to] combine, associate, agree, mutually undertake or concert together for the purpose of . . . willfully and maliciously injuring another in his reputation, trade, or profession." Va. Code Ann. § 18.2-499. But a corporation "cannot conspire with itself," *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 801 (Va. 1985), and an "agent cannot conspire with its principal," *Michigan Mut. Ins. Co. v. Smoot*, 128 F. Supp. 2d 917, 925 (E.D. Va. 2000). RMA does not provide any evidence to suggest that Signature Flight Support LLC and Signature Aviation Services Corporation are not, as Signature attests, affiliates of the same parent company. And even if they were not, RMA does not allege which acts that each company took independently or what role each played in the conspiracy. *See Dream Kitchen & Bath Shop, LLC v. Kitchen & Bath Shop, LLC*, No. 2:22-cv-184, 2023 WL 6192722, at *7 (E.D. Va. June 21, 2023) (finding that Plaintiff failed to state a claim for conspiracy under § 18.2-499 because it "never describes a single

action [co-defendant] took independently" or "what role it is alleged to have played in the conspiracy").  Further, Signature's in-house counsel, Matthew Klein, represented that "Signature Aviation Services Corporation" is a "dormant company" that "hasn't operated or employed anyone in many years" and is a holdover "from a prior corporate structure." (Tr. II at 43:9–17.)  A corporation with no employees simply cannot be held liable for conspiracy. *See, e.g.*, *Meadows v. Allstate Ins. Co.*, Civ. No. 2:05-0185, 2005 WL 8159310, at *2 (S.D. W. Va. July 13, 2005) (noting that conspiracy "requires at least two parties" and "corporations can act only through their employees or agents").

RMA also fails to plead any facts to suggest that the two Signature affiliates conspired with the purpose of injuring RMA in its trade or business.  *See Glob. Tel*Link Corp. v. JACS Sols. Inc.*, 708 F. Supp. 3d 784, 804 (E.D. Va. 2023) ("[A] VBCA plaintiff must plead that [the purpose of injuring another in his trade or business] was at least *one* of the purposes of the conspiracy." (cleaned up)).  With nothing but conclusory allegations of conspiracy, RMA is unlikely to succeed on Count III.

Even if RMA had alleged conspiracy against the proper parties and alleged the roles of each party, it would still be unlikely to succeed on its business conspiracy claim.  As the court explains above, RMA is not likely to succeed on its tortious interference claims.  Without sufficiently showing an underlying unlawful or bad act, RMA's statutory conspiracy claim cannot survive.  *See Aimbridge Hosp., LLC v. Provident Grp.-Radford Props., LLC*, No. 7:24-cv-00262, 2024 WL 3534150, at *8–9 (W.D. Va. July 24, 2024) ("Because Virginia civil conspiracy claims—business and common law—require a wrongful or unlawful underlying act, a necessary component of pleading a civil conspiracy claim is adequately pleading the underlying

- 14 -

act."); *see also Com. Bus. Sys., Inc. v. Halifax Corp.,* 484 S.E.2d 892, 896 (Va. 1997) ("[W]ithout proof of the underlying tort, there can be no conspiracy to commit the tort."). Since RMA is not likely to succeed on the underlying claims, the court finds that it is unlikely to succeed on its business conspiracy claim.

### C. Breach of Contract (Count IV)

RMA alleges that Signature breached its obligations under the Third Party Vendor Release by banning RMA from its leaseholds. (Am. Compl. ¶¶ 159–64.) RMA claims that the Release was a valid and enforceable agreement that gave RMA a "guaranteed right of access" to Signature's leasehold at CHO. (*Id.* ¶¶ 36, 160.) Signature argues that the Release was not a valid, enforceable contract, and that even if it was, Signature's ban did not constitute a breach because the Release did not grant RMA unconditional access to the CHO leasehold. (Def.'s Supp. Br. II at 3–6.) The court is more persuaded by Signature's argument.

To establish a breach of contract under Virginia law, RMA must show (1) a legally enforceable obligation, (2) Signature's material breach of that obligation, and (3) damage to RMA caused by the breach of that obligation. *Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1076, 1086 (E.D. Va. 2011). To establish a legally enforceable obligation under the Release, RMA must first establish that the Release is a valid, enforceable contract. *See Ellison v. Inova Health Care Servs.*, 692 F. Supp. 3d 548, 562 (E.D. Va. 2023). Under Virginia law, forming a contract requires "three basic ingredients: offer, acceptance, and consideration." *Id.*

The parties disagree on the second element: acceptance. In its amended complaint, RMA alleges that on October 2, 2025, Signature "requested that RMA sign [the Release], before Signature would allow RMA to access its leasehold at CHO, and RMA did so." (Am.

- 15 -

Compl. ¶ 33.) However, as Signature points out, the Release that RMA attaches to its amended complaint is not signed by Signature. (*See* Dkt. 48-2; Def.'s Supp. Br. II at 5.) In the face of this defect, RMA must show that Signature assented to the Release. *S. Elec. Servs., Inc. v. Cornerstone Detention Prods., Inc.*, No. 7:10-cv-00076, 2010 WL 2233664, at *5 (W.D. Va. June 3, 2010) ("Under Virginia law, a written contract signed by only one party may be binding and enforceable even without the other party's signature, if the other party assented to the agreement.").

RMA cannot show as much. The amended complaint is devoid of any facts that suggest Signature ever acknowledged the agreement. (*See* Dkt. 48-2.) Without that, RMA's allegation that it entered Signature's leasehold at CHO after signing the Release, (Am. Compl. ¶ 37), is not enough to show that it entered the leasehold *pursuant* to the Release. As a result, RMA's leasehold access from October 3 to November 20 does not show Signature "perform[ing]" under the Release, "acknowledg[ing] RMA's acceptance of its offer," or "demonstrat[ing] its intent to be bound by [the Release's] terms." (*See* Pl.'s Supp. Br. II at 5.) Signature cannot be said to have "acted consistently with the Release" without any evidence of such. (*Id.* at 6.) "Silence alone, without some other objective manifestation of assent, will not serve as acceptance of a contract." *Odyssey Imaging, LLC v. Cardiology Assocs. of Johnston, LLC*, 752 F. Supp. 2d 721, 724 (W.D. Va. 2010) (citing *Phillips v. Mazyck*, 643 S.E.2d 172, 176 (Va. 2007)). RMA therefore fails to show that the Release is a valid, enforceable contract.

But even if the Release was a valid, enforceable contract, RMA cannot show that the Release created a legally enforceable obligation for Signature to allow RMA unlimited access to its leasehold. The Release authorizes RMA to "enter the FBO premises on a temporary

basis." (Dkt. 48-2.) RMA conveniently omits this language from its amended complaint and its supplemental briefs. The Release does not include any language to define this "temporary basis" or to dispel the notion that Signature, the leasehold owner, may change the terms of RMA's temporary authorization to access the CHO leasehold. Matthew Klein testified that Signature's ability to control access rights is precisely the reason why it includes the "temporary basis" language in its releases. (Tr. II at 56:22–57:2.)

Signature also indicated that it occasionally excludes *all* third-party ground transportation vendors from the secure side of CHO for safety reasons when there is heightened congestion on the ramp.[7] (Tr. II at 37:6–8.) RMA's expansive reading of the Release would render even this occasional safety precaution a breach of the Release. The court does not read the Release to be providing unlimited and permanent access to the CHO leasehold and therefore finds RMA failed to establish a likelihood of success on its breach claim.

Because RMA does not establish a likelihood of success on the merits on all claims in its amended complaint, the court does not reach the remaining *Winter* factors. *See Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023) ("[A] district court is entitled to deny preliminary injunctive relief on the failure of any single *Winter* factor, without fully evaluating the remaining factors.").

### IV.     Conclusion

For the foregoing reasons, the court will **DENY** RMA's motion for a temporary restraining order and preliminary injunction.

---

[7] RMA's CEO confirmed that RMA's vehicles have been subject to this safety measure at FBOs. (Tr. I at 44:15–20.)

An appropriate Order will issue.

**ENTERED** this $\underline{16}$ day of March, 2026.

                                            HON. JASMINE H. YOON
                                            UNITED STATES DISTRICT JUDGE